# EXHIBIT 1

ID#2019-0167771-CV
⊕ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

19108936

S. Lark Ingram - 34
DEC 12, 2019 04:32 PM

Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

## SUPERIOR COURT OF COBB COUNTY
## STATE OF GEORGIA

|  |  |
|---|---|
| GUNUP, INC., | CIVIL ACTION FILE. |
| Plaintiff, | NO. _____ |
| v. | |
| STEVE URVAN, | |
| Defendant. | |

## **COMPLAINT**

COMES NOW, Plaintiff GunUp, Inc., and hereby alleges for its Complaint against Defendant Steve Urvan as follows:

### **THE PARTIES**

1.      Plaintiff GunUp, Inc. ("GunUp") is a Delaware corporation with its principal place of business in Washington State.  GunUp, Inc. owned a subsidiary, GunUp Publishing, LLC ("GP LLC"), a South Dakota limited liability company.  In March 2015, GP LLC was converted to GunUp Publishing, Inc. ("GunUp Publishing"), a Delaware Corporation.  Media Lodge, Inc. ("Media Lodge") then purchased GunUp Publishing pursuant to a merger agreement between Media Lodge, MLA Acquisition Corp. ("MLA"), GunUp Publishing, and GunUp (the "Agreement").  The merger of GunUp Publishing into Media Lodge closed on or about March 31, 2015 (the "Transaction"), as further detailed below.

2.      At all times relevant, Defendant Steve Urvan has been the Chief Executive Officer of IA Tech, LLC, a Delaware limited liability company.  Before the Transaction closed, IA Tech was the sole owner of Media Lodge, LLC ("ML LLC"), a Delaware limited liability company.  Media Lodge's Chief Executive Officer, Jeff Siegel, and Chief Financial Officer, Susan Lokey, have testified at deposition that Mr. Urvan was a member of the board of directors of ML LLC.  In connection with the Transaction, ML LLC was converted to Media

Lodge, ML LLC's successor-in-interest. Since that conversion, IA Tech has been the majority owner of Media Lodge, and Mr. Urvan has been a member of the board of directors of Media Lodge. At all times relevant, Mr. Urvan has directed and been the final decision-maker with respect to all of ML LLC and Media Lodge's day-today business activities. For example, Mr. Urvan has provided direction and made decisions with regard to corporate acquisitions, ML LLC and Media Lodge's DNS servers and technical engineering priorities, who is designated a corporate officer and what position each such person holds, the hiring and firing of ML LLC and Media Lodge employees, whether or not to pursue legal action, the language of ML LLC and Media Lodge's press releases, and ML LLC and Media Lodge's budget and revenue forecasting. In short, as Ms. Lokey has testified, "ultimately, Steve owns Media Lodge." Mr. Urvan directed and was the final decision maker with regard to the Transaction. He was actively involved in Media Lodge's acquisition of GunUp Publishing. His acts were a substantial factor in bringing about the Transaction, which he materially aided in directing, negotiating and consummating.

### JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action.

4.      This Court has personal jurisdiction over Mr. Urvan because, among other reasons, he is a resident of Georgia, regularly transacts business within Georgia, and/or owns, uses or possesses real property in Georgia.

5.      Venue is proper in this Court because, among other reasons, Mr. Urvan regularly transacted business in Cobb County, Georgia at all times relevant to this dispute.

### FACTUAL ALLEGATIONS

### Media Lodge Solicits GunUp

6.      From December 2013 to the present, GunUp's Chief Executive Officer, Daniel Hall, has operated GunUp from his home in King County, Washington.

7.      Through Mr. Siegel (also a member of the board of directors of ML LLC), ML LLC first contacted Mr. Hall in November 2014, inviting him to "connect" on LinkedIn.com.

After Mr. Hall accepted Mr. Siegel's invitation, Mr. Siegel sent Mr. Hall an email through LinkedIn.com asking to discuss a potential purchase of GP LLC.

8.     In December 2014, Mr. Hall flew to New York City and met with Mr. Siegel to further discuss the potential purchase of GP LLC by ML LLC.

9.     On January 23, 2015, GP LLC; GunUp Gun Sales, LLC ("GunUp Sales"), a South Dakota limited liability company; ML LLC; and GunUp entered into a letter of intent (the "LOI") regarding ML LLC's potential acquisition of GP LLC and GunUp Sales.  Mr. Siegel and Kevin O'Connell, another member of the board of directors of ML LLC, personally negotiated the LOI on behalf of ML LLC, and Mr. Siegel signed it.  A true and correct copy of the LOI is attached hereto as **Exhibit A**.  Exhibit A to the LOI set forth a purchase price of "$4,000,000 (Four Million Dollars)," consisting of $1 million in cash and "membership units" in ML LLC equivalent to:

a)     Valuation – Media Lodge Valuation of $38,250,000.

b)     Percentage Ownership in Media Lodge – GunUp Inc. shall receive membership units equal to 7.8% of the valuation of Media Lodge

*calculated as follows:  ($3M divided by $38,250,000 ML valuation = 7.8%)*

### Due Diligence, Execution of the Agreement, and Closing of the Transaction

10.     Over the next several months, the parties systematically and continuously engaged in due diligence and further negotiations.  Mr. Urvan directed the negotiations; Mr. Siegel, Mr. O'Connell and attorney Stanley Moskowitz conducted them; and Ms. Lokey was also involved.

11.     GunUp provided numerous documents and third-party reports to Media Lodge to verify the website traffic on the GunUp blog network, all publisher and advertising revenue agreements, and a detailed accounting of GunUp's books.  The information that GunUp provided to Media Lodge was materially accurate and complete.

12.     By contrast, Media Lodge provided materially inaccurate information to GunUp, and withheld material information from GunUp, as discussed more fully below.

13.     During the course of negotiations, it was determined that the Transaction would be in the form of a "tri-party merger." To accomplish the merger, ML LLC was converted to Media Lodge and GP LLC was converted to GunUp Publishing.

14.     Media Lodge, MLA, GunUp Publishing, and GunUp executed the Agreement on or about March 31, 2015.

15.     At closing, Media Lodge purchased GunUp Publishing with a mixture of Media Lodge stock and $1 million in cash, to be paid out over the next several years. Media Lodge did not purchase GunUp Sales. However, at Media Lodge's insistence GunUp agreed to wind up and liquidate GunUp Sales, as reflected in Section 5.03 of the Agreement. A true and correct copy of the Agreement is attached hereto as **Exhibit B**.

16.     After the Transaction closed, GunUp acted in good faith and fully satisfied its obligations under the Agreement. This included winding up and liquidating GunUp Sales as required by Section 5.03 of the Agreement, which deprived GunUp of a significant ongoing source of revenue. GunUp fully remedied any and all financial liabilities known or unknown to it at the time of closing.

17.     On April 1, 2015, Mr. Hall began working for Media Lodge as its Vice President of Network Development from his home in King County, Washington.

18.     Media Lodge timely made the payments that the Agreement required it to make to GunUp in 2015.

**Media Lodge Refuses To Pay the Remaining Amounts Due Under the Agreement**

19.     On March 28, 2016, after Media Lodge had fired all the former GunUp employees who had joined Media Lodge following the closing of the Transaction (including Mr. Hall on January 31, 2016), Media Lodge sent GunUp a letter (the "Demand Letter") alleging, among other things, that GunUp had breached certain representations and warranties contained in the Agreement, and that Media Lodge and GunUp Publishing had incurred damages "in excess of $1,000,000," supposedly due to the purported breaches.

20.     At no time during Mr. Hall's employment with Media Lodge, when he reported directly to Mr. Siegel, nor at any time prior to Media Lodge's issuance of the Demand Letter, did Mr. Siegel or anyone else at Media Lodge assert that GunUp had in any way misled Media Lodge, misrepresented anything to Media Lodge, or otherwise violated the representations and warranties contained in the Agreement.

21.     On or about April 19, 2016, GunUp responded to the Demand Letter, denying Media Lodge's allegations and requesting that Media Lodge confirm it would make the contractually obligated payment of $250,000 that was due on May 15, 2016.  Media Lodge did not respond to that request or to subsequent requests from GunUp for assurances that it would make the May 15, 2016 payment.

22.     Media Lodge did not make the May 15, 2016 payment or the May 15, 2017 payment provided for in the Agreement.

23.     Media Lodge did not make the September 2016 stock distribution toward the purchase price for GunUp.

### Media Lodge's Material Misrepresentations and Omissions

24.     Prior to execution of the Agreement and closing of the Transaction (including in the LOI), Defendants represented to GunUp that ML LLC was worth more than $38 million and GunUp would receive an interest in ML LLC and/or Media Lodge worth approximately $3 million.  Sections 3.08 and 3.17 of the Agreement confirmed these representations by indicating that Media Lodge had capital and owned properties and assets.

25.     Well after the Transaction closed, however, Media Lodge's attorney advised GunUp that GunUp's shares of stock in Media Lodge were worthless.

26.     GunUp subsequently learned that before the Transaction closed, Media Lodge had provided materially inaccurate information to GunUp and withheld material information from GunUp.  For example:

        a.      Although Mr. Siegel told Mr. Hall that Media Lodge had the exclusive right to represent affiliated entity GunBroker.com "in perpetuity," Media Lodge did not

disclose that it only had an oral agreement with GunBroker that GunBroker could cancel at any time.

b.      Media Lodge did not disclose that all advertising revenue earned by Media Lodge in 2014 had been deposited into GunBroker's bank account, or that before the Transaction closed GunBroker had not transferred any of these payments into Media Lodge's bank account.

c.      Media Lodge did not disclose that except for $25 required to open Media Lodge's only bank account, every deposit into the account prior to closing of the Transaction had been a loan from an affiliated entity to fund operational shortfalls at Media Lodge.

d.      Media Lodge did not disclose that it owed its only member, IA Tech LLC, $770,517.75 as of December 31, 2014, and $1,330,557 as of March 31, 2015, when the Agreement was signed.  Media Lodge did not disclose that it owed this debt pursuant to a March 31, 2015 promissory note (executed by Mr. Urvan on behalf of IA Tech and Mr. Siegel on behalf of ML LLC) that allowed IA Tech to call its loan whenever it wished.

e.      In response to a request by GunUp for "Media Lodge's 2014 financials," Media Lodge passed off as "the Media Lodge 2014 P&L" an incomplete "interim" profit and loss statement that omitted approximately $1 million in costs.

f.      Media Lodge included in the Agreement a provision (Section 3.08) falsely indicating that it had minimal liabilities and infrequent shortfalls in capital.

g.      Media Lodge did not disclose that all of its intellectual property (even its brand name and the medialodge.com domain) was owned by an affiliated entity and was licensed to Media Lodge pursuant to an agreement (executed by Mr. Urvan on behalf of affiliate S&T Tech, LLC and ML LLC) that was cancelable at any time.

27.      Mr. Urvan participated in the foregoing misrepresentations, had knowledge of them, and/or directed that they be made to GunUp by Mr. Siegel and Media Lodge.

***GunUp v. Media Lodge***

28.     On June 23, 2016, GunUp sued Media Lodge in King County, Washington Superior Court (the "Washington Lawsuit").  On October 23, 2017, Media Lodge amended its complaint in the Washington Lawsuit to add claims under the Washington State Securities Act ("WSSA"), RCW ch. 21.20, against Media Lodge and several other defendants, including Mr. Siegel and Mr. Urvan.

29.     Mr. Siegel's attorney accepted service for Mr. Siegel in the Washington Lawsuit.  Mr. Urvan was not served with process and did not appear as a party in the Washington Lawsuit.  However, he was in privity with Media Lodge and Mr. Siegel because he controlled the litigation and because Media Lodge and Mr. Siegel fully and adequately represented his interests.

30.     On October 26, 2018, the King County Superior Court entered an order granting summary judgment in favor of GunUp and against Media Lodge and Mr. Siegel on GunUp's WSSA claims (the "SJ Order").  The SJ Order stated in relevant part:

> As a matter of law, Media Lodge and Mr. Siegel made material misrepresentations to GunUp and failed to disclose material information to GunUp.

> As a matter of law, Media Lodge and Mr. Siegel are liable to GunUp for violating the Washington State Securities Act ("WSSA"), RCW 21.20.010(2), (3) and RCW 21.20.430(1), (3).

31.     After a trial on damages, the King County Superior Court entered a judgment in favor of GunUp and against Media Lodge and Mr. Siegel (the "Judgment") "in the principal amount of $911,000.00 ($1,411,000.00 less $500,000.00 previously paid by Media Lodge to GunUp), plus prejudgment interest (at eight percent per annum) in the amount of $329,852.49 pursuant to RCW 21.20.430(1) and (3), plus reasonable attorneys' fees and costs pursuant to RCW 21.20.430(1) (to be determined upon separate application)."  GunUp's motion for an award of attorneys' fees and costs is presently pending before the King County Superior Court. The Judgment remains unpaid.

## CAUSE OF ACTION

## Violation of the Washington State Securities Act

32.     GunUp re-alleges and incorporates paragraphs 1 through 30 as if fully set forth herein.

33.     RCW 21.20.010 provides:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

> (1)     To employ any device, scheme, or artifice to defraud;
>
> (2)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> (3)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

34.     RCW 21.20.430 provides in relevant part:

(1) Any person, who offers or sells a security in violation of any provisions of RCW 21.20.010 … is liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security.  Damages are the amount that would be recoverable upon a tender less (a) the value of the security when the buyer disposed of it and (b) interest at eight percent per annum from the date of disposition.

* * *

(3) Every person who directly or indirectly controls a seller or buyer liable under subsection (1) … above, every partner, officer, director or person who occupies a similar status or performs a similar function of such seller or buyer, [and] every employee of such a seller or buyer who materially aids in the transaction … is also liable jointly and severally with and to the same extent as the seller or buyer, unless such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of

the existence of the facts by reason of which the liability is alleged to exist.
There is contribution as in cases of contract among the several persons so liable.

35.    Mr. Urvan's actions as set forth herein violated RCW 21.20.010.  Before the Transaction closed, Mr. Urvan participated in the making of material misrepresentations to GunUp regarding ML LLC and Media Lodge, failed to disclose material information to GunUp regarding ML LLC and Media Lodge, and/or directed, was a substantial factor in, or materially aided in the making of material misrepresentations to GunUp and the withholding of material information from GunUp regarding ML LLC and Media Lodge.  Mr. Urvan was a director of ML LLC and Media Lodge at the time of the misrepresentations and omissions, and directly or indirectly controlled ML LLC and Media Lodge.

36.    GunUp relied to its financial detriment on the material misrepresentations and omissions set forth herein.

37.    Mr. Urvan is liable to GunUp under RCW 21.20.430(1) and/or RCW 21.20.430(3).

## **PRAYER FOR RELIEF**

WHEREFORE, GunUp prays for the following relief:

1.    That the Court enter judgment in favor of GunUp and against Mr. Urvan on GunUp's claim for violation of the WSSA.

2.    That the Court award GunUp rescissionary damages pursuant to RCW 21.20.430(1).

3.    That the Court award GunUp prejudgment interest.

4.    That the Court award GunUp its attorneys' fees and costs incurred herein.

5.    That the Court grant GunUp all other relief that the Court deems just and proper.

*(Signature page to follow)*

This 12th day of December, 2019.

MOORE INGRAM JOHNSON
& STEELE, LLP

*/s/ Robert D. Ingram*
Robert D. Ingram
Georgia Bar No.: 383405
David P. Conley
Georgia Bar No.: 141760
326 Roswell Street
Suite 100
Marietta, GA 30060
Telephone: (770) 429-1499
Facsimile: (770) 429-8631
Email: ringram@mijs.com
Email: dpconley@mijs.com

SAVITT BRUCE & WILLEY LLP

*/s/ Duncan E. Manville*
Duncan E. Manville
Washington Bar No.: 30304
1425 Fourth Avenue, Suite 800
Seattle, WA 98101-2272
Telephone: (206) 749-0500
Facsimile: (206) 749-0600
Email: dmanville@sbwllp.com
*To Apply for Admission Pro Hac Vice*

*Attorneys for Plaintiff GunUp, Inc.*

# EXHIBIT A

# MEDIA LODGE

· ENTHUSIAST MEDIA AND MARKETING —

Januar **23, 2015**

Mr. Daniel Hal.
GunUp Publishing, LLC
230 S. Phillips Ave. Ste. 307
Sioux Falls, SD 57104

RE:    Acquisition of GunUp Publishing, LLC and GunUp Gun Sales. LL.

Dear Mr. Hall.

The purpose of this Letter of Intent ("LOI") is to set forth certain proposed understandings and agreements between of GunUp Publishing, LLC ("GP"), a South Dakota Limited Liability Company , GunUp Gun Sales. LLC (GGS), a South Dakota Limited Liability Company, an. Media Lodge, LLC ("ML") and GunUp, Inc. ("Managing Member"), the sole membership holder of GP and GGS, with respect to the potential transactions set forth on Exhibit A attached hereto. on the terms and subject to the conditions set forth thereon and below.

Upon execution of this LOI by the Parties, the paragraphs numbered 1-5 below will constitute a legally binding and enforceable agreement of the Parties in recognition of the significant costs to be borne by the Parties in pursuing the transaction and further in consideration of their mutua. undertakings as to the matters described herein.

The terms in Exhibit A (the "Terms") will not be binding upon the Parties until and unless definitive agreements between Members of GP, GP, GGS, and ML, incorporating the Terms, have been executed and become effective at a closing of definitive agreements. The Terms are not intended to create rights in favor of the Parties with respect to the transaction and are subject to change based upon the results of due diligence. The obligations of the Parties to consummate any transaction will be subject in all respects to the negotiation, execution and delivery of definitive agreements approved by the respective members of GP, GGS, and ML (the "Definitive Agreements").

1.    Due Diligence Investigation and Confidentialir

(a) (i) GP and GGS will afford ML and its agents reasonable opportunity and access during normal business hours to review GP's and GGS's contracts, technology, equipment, operations, and other business factors related to GP and GGS will conduct this inspection, investigation and review in a reasonable manner during regular business hours. GP and GGS will furnish ML with all such information and data (including without limitation copies of business contracts, business licenses, benefit plans and other business books and records) concerning exclusively GP and its related assets and operations as ML reasonably may request

1

...connection with such investigation.

(b) ML agrees to use all information concerning GP and GGS, furnished by or on behalf of GP and GGS hereunder, and ML agrees to use all information furnished by or on behalf of GP and GGS (collectively, the "Confidential Information") solely for the purpose of evaluating the transactions contemplated hereby, in accordance with the Mutual Non-Disclosure Agreements entered into by GP and ML as of December 18, 2014, to which GP, GGS, and ML hereby agree to be bound on the same terms and exceptions as GP and GGS is thereby bound. The Confidential Information will be kept confidential by the Parties and their agents unless required to be disclosed by law, disclosed pursuant written consent or otherwise becomes non-confidential as described in subparagraph 1(c) below. If the transactions are not consummated, the Parties will return or destroy all Confidential Information as may be requested by the party providing the Confidential Information. The provisions of the last three sentences of this paragraph shall survive termination of this LOI. Each of the owners of GP, GGS, and ML understand the serious nature of this provision, and any party may claim substantial damages if this confidentiality is breached.

(c) The term "Confidential Information" shall not be deemed to include information which: (i) is now, or hereafter becomes, through no act or failure to act on the part of the receiving party, generally known or available; (ii) is known by the receiving party at the time of receiving such information as evidenced by the receiving party's records; (iii) is hereafter furnished to the receiving party by a third party, as a matter of right and without restriction on disclosure; or (iv) is the subject of a written permission to disclose provided by the disclosing party.

2.    Disclosure. Before the consummation of the transaction contemplated by this LOI, except as required by law and based on the advice of legal counsel, neither GP, GGS, nor ML shall disclose to any third party, other than agents, lenders, trustees of interested charitable remainder trusts (existing or to be formed), and attorneys and accountants for any of the foregoing, of the Parties on a need-to-know basis who agree to be bound by the terms of this provision, information regarding the matters contemplated by this LOI. The Parties agree to consult with each other and to agree to the language of any press release announcing a transaction or potential transaction between them at a mutually agreed upon time. ML, GGS and GP shall cooperate with each other and proceed, as promptly as is reasonably practicable, to seek to obtain all necessary consents and approvals from governmental agencies, regulatory authorities, lenders, landlords, and other third parties, and to endeavor to comply with all other legal or contractual requirements for or preconditions to the execution and consummation of the Definitive Agreements. The parties will cooperate with each other in reasonable good faith to close the transactions contemplated by this Letter of Intent as soon as is practical and feasible.

.    Exclusive Dealing. None of the Membership Holders nor GP or GGS , shall, directly or indirectly, offer or solicit, initiate or encourage submission of inquiries, proposals or offers relating to the purchase of shares of GP or GGS owned by the Membership Holders nor related assets of GP or GGS or enter into negotiations for the disposition of GP or GGS and related assets or any part thereof with any person other than ML until the earlier of February 1st, 2015 (as may be extended by the Parties by written addendum to this LOI, the "Termination Date.")

2



~embership Holders. GGS. and GP represent that no commitments or arrangements exist with ~rd parties which would prevent Membership Holders. GGS. or GP  from negotiating or ~ntering into an agreement with pursuant to the terms of this LOI.

4.    Costs. ML, GGS, and GP. will each be solely responsible for and bear all of their own respective expenses, including, without limitation, expenses of legal counsel, accountants, finders, brokers or investment bankers and any other advisors, incurred at any time in connection with this LOI and the negotiation and closing of the Definitive Agreements.

5.    Counterparts.  This LOI may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same instrument.

Please sign the enclosed copy of this LOI to confirm the mutual understandings and agreements as set forth in this LOI and return to the undersigned.

Very truly yours,

Media Lodge, LLC

By: _____    _JEFF SIEGEL_
                                CEO

GunUp Publishing, LLC              GunUp Gun Sales, LLC

By: _____       By: _____

Managing Member of GunUp Publishing, LLC and GunUp Gun Sales, LLC

_____
GunUp, Inc. by Daniel M. Hall, CEO

**EXHIBIT A**

**Summary of Terms**

3

The terms in Exhibit A will not be binding upon either party until and if definitive agreements between the parties incorporating these terms have been executed and become effective. The terms contained herein are not intended to create rights in favor of the parties with respect to the transaction and are subject to change based upon the results of due diligence. The obligations of the parties to consummate any transaction will be subject in all respects to the negotiation, execution and delivery of definitive agreements approved by the Membership Holders or the respective Boards of Directors of GP, GGS, and ML and the satisfaction of conditions contained in this Exhibit

A. Pursuant to the terms of a Mutual Non-Disclosure Agreement, ML, GGS and GP have agreed, subject to certain exceptions, to keep the existence and terms of this transaction strictly confidential until public disclosure as provided in the "Announcement of Transaction" section below.

## 1. PURCHASE PRICE, EQUITY, and INSTALLMENT PAYMENT.

a) Guaranteed Payments. At the closing (the "Closing") of the Definitive Agreements, if any, by GP, GGS, and ML will purchase from Membership Holders and Membership Holders will sell, all of the outstanding membership interests of GP and GGS to ML for a total purchase price of $4,000,000 (Four Million Dollars) payable as follows:

(i) $500,000 USD upon closing payable to GunUp, Inc

(ii) $250,000 USD to be paid to GunUp, Inc. on the last day of the 15th months from the closing date as may be agreed to in the fully executed Definitive Agreement.

(iii) $250,000 USD shall be the final cash payment to be made 365 days from the date of the previous payment as specified in (ii) above

(iv) Equity Ownership in Media Lodge, LLC -- ML will issue membership units to GunUp, Inc. equivalent to the following:

a) Valuation -- Media Lodge Valuation of $38,250,000
b) Percentage Ownership in Media Lodge -- GunUp, Inc. shall receive membership units equal to 7.8% of the valuation of Media Lodge

   *calculated as follows: ($3M divided by $38,250,000 ML valuation = 7.8%)*

c) Vesting -- the Membership Units shall vest at 33.33% per annum for three (3) consecutive years

## 2. MISCELLANEOUS

The Membership Purchase Agreement will contain the following principal covenants (in addition to usual and customary terms and conditions):

DMH

ii  Between the date of the LOI and the Closing of the Acquisition, GP and GGS will continue to operate their respective businesses in the ordinary course consistent with past practice and in accordance with its operating plans with the exception of:

(aa)  The existing e-commerce business shall be terminated       (b) Membership Holders of GP and GGS and GP and GGS will use their best efforts to preserve its business organization intact and to preserve the goodwill of its customers and suppliers.

(c)  GP nor GGS will not transfer, sell or encumber any of the Assets between the date of the LOI and the Closing,

(d)  As promptly as practicable, GP and GGS will deliver to ML true and complete copies of such financial statements, reports and analyses relating to GP and GGS as may be prepared or received by Seller

(e)  As promptly as practicable, GP and GGS will deliver copies of all licenses, permits, permit and license applications, and make available for inspection other filings, made by GP and GGS in connection with the operation of GP and GGS with any governmental or regulatory authority.

(f)  ML, GGS, and GP shall cooperate with each other and proceed, as promptly as is reasonably practicable, to seek to obtain all necessary consents and approvals from governmental agencies, regulatory authorities, lenders, landlords, and other third parties, and to endeavor to comply with all other legal or contractual requirements for or preconditions to the execution and consummation of the Stock Purchase Agreement. The parties will cooperate with each other in reasonable good faith to close the transactions contemplated by this LOI as soon as is practical and feasible

## 3. CLOSING

The projected closing of the Stock Purchase Agreement (the "Closing") will occur on or before February 1, 2015, subject to delays resulting solely from governmental filings and approvals, and will be subject to the following principal conditions (in addition to customary conditions), any of which may be waived by the other party in its discretion:

(a)  Each Party shall have complied in all material respects with the covenants set forth in the Definitive Agreement

? Any requisite governmental approvals and clearances shall have been obtained except for any such approvals or clearances the failure of which to obtain would not have a material adverse effect on the continued operation of GP and GGS.

(c)  There shall have occurred no material adverse change in the operations and functionality of GP, nor in the business, condition (financial or otherwise), results of operations, prospects or assets and properties of each party since the date hereof. The representations and warranties of each party contained in the Stock Purchase Agreement shall be true in all material

5

respects as of the Closing date.

(d) At the date of the Closing, there shall be a minimum cash balance of $10,000 in GP and GP 's Balance Sheet shall indicate that GP has a minimum of $10,000 in Working Capital (Working Capital shall be defined as Current Assets, less Cash, less Current Liabilities). There shall be a minimum cash balance of $2,500 in GGS and GGS 's Balance Sheet shall indicate that GGS has a minimum of $2,500 in Working Capital (Working Capital shall be defined as Current Assets, less Cash, less Current Liabilities).

(e) There shall be no pending or threatened litigation or enforcement action against GP nor GGS or regarding the Stock Purchase Agreement or the transactions to be contemplated thereby

(f) Each Party shall have delivered the closing certificates, and other documentation required by the Stock Purchase Agreements.

(g) ML shall have completed all financial, legal, and other due diligence with results being satisfactory to ML in its sole discretion.

.; ML will enter into an 18 month employment contract agreement with Dan Hall at a salary of $140,000 per year that will include an 18 month non-solicitation provision of GP and ML publishers and advertisers.

(i) Absent breach by a Party or earlier termination by mutual agreement, the LOI and this Summary of Terms shall terminate without liability to either party (if the Closing does not occur on or before February 1, 2015, or such extended date as the Parties may agree

m) The Membership Purchase Agreement and any other ancillary agreements related to the transaction, and any other closing documents will be governed by and construed in accordance with California law.

## 4. BOARD and STOCKHOLDER APPROVAL

The obligations of the Parties to consummate any transaction will be subject in all respects to the negotiation, execution and delivery of definitive agreements approved by the Membership Holders of GP and GGS, and by the Management of ML.



# EXHIBIT B

# AGREEMENT OF MERGER AND PLAN OF REORGANIZATION

### by and among

## MEDIA LODGE, INC.

## MLA ACQUISITION CORP.

## GUNUP INC.

### And

## GUNUP PUBLISHING INC.

### Dated as of March <u>31</u> , 2015

THIS AGREEMENT OF MERGER AND PLAN OF REORGANIZATION (this "Agreement") is made and entered into on March __, 2015, by and among Media Lodge, Inc., a Delaware corporation ("Parent"), MLA Acquisition Corp., a Delaware corporation ("Acquisition Corp."), which is a wholly-owned subsidiary of Parent,  GunUp Publishing, Inc., a Delaware corporation (the " Company") and GunUp Inc. a Delaware corporation, the sole stockholder of the Company (the "Stockholder") .

WITNESSETH:

WHEREAS, the respective Board of Directors of each of Acquisition Corp., Parent, Stockholder,  and the Company have each determined that it is fair to and in the best interests of their respective corporations and stockholders for Acquisition Corp. to be merged with and into the Company (the " Merger") upon the terms and subject to the conditions set forth herein; GunUp is the "Company".

WHEREAS, the Board of Directors of each of Parent, Acquisition Corp. and the Company have approved the Merger in accordance with the Delaware General Corporation Law (the "DCL"), and upon the terms and subject to the conditions set forth herein, (the "Plan of Merger");

WHEREAS, the sole stockholder of the Company, GunUp, Inc. a Washington corporation, (the "Stockholder") has approved this Agreement, the Plan of Merger, and the transactions contemplated and described hereby and thereby, including, without limitation, the Merger, and Parent, as the sole stockholder of Acquisition Corp., has approved by written consent pursuant to the DCL, as applicable, this Agreement, the Certificate of Merger and the transactions  contemplated  and  described  hereby and  thereby,  including,  without limitation, the Merger; and

WHEREAS, the parties hereto intend that the Merger contemplated herein shall qualify as a reorganization within the meaning of Section 368(a)(1)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), by reason of Section 368(a)(2)(E) of

the Code.

NOW, THEREFORE, in consideration of the mutual agreements and covenants hereinafter set forth, the parties hereto agree as follows:

## ARTICLE I. THE MERGER

Section 1.01 <u>Merger</u>. Subject to the terms and conditions of this Agreement and the Articles of Merger, Acquisition Corp. shall be merged with and into the Company in accordance with Section 253 of the DCL. At the Closing Date (as defined below), the separate legal existence of Acquisition Corp. shall cease, and the Company shall be the surviving company in the Merger (sometimes hereinafter referred to as the "<u>Surviving Company</u>") and shall continue its corporate existence under the laws of the State of Delaware under the name "GunUp Publishing, Inc.."

Section 1.02 <u>Closing Date</u>. The Merger shall become effective upon the filing of the Certificate of Merger with the Secretary of State of the State in the State of Delaware in accordance with Section 253 of the DCL. The time at which the Merger shall become effective as aforesaid is referred to hereinafter as the "<u>Closing Date</u>."

Section 1.03 <u>Closing</u>. The closing of the Merger (the "<u>Closing</u>") shall occur concurrently with the Closing Date (the "<u>Closing Date</u>"). The Closing shall occur at the offices of The Bingham Law Group, APC referred to in Section 10.01 hereof. At the Closing, all of the documents, certificates, agreements, opinions and instruments referenced in Article VII will be executed and delivered as described therein. At the Closing Date, all actions to be taken at the Closing shall be deemed to be taken simultaneously.

Section 1.04 <u>Certificate of Incorporation, By-Laws, Directors and Officers</u>.

(a) The Certificate of Incorporation of the Company, as in effect immediately prior to the Closing Date, attached as <u>Exhibit A</u> hereto, as amended by the Certificate of Merger, shall be the Certificate of Incorporation of the Surviving Company from and after the Closing Date until amended in accordance with applicable law and such Certificate of Incorporation.

(b) The By-Laws of the Company, as in effect immediately prior to the Closing Date, attached as <u>Exhibit B</u> hereto, shall be the By-Laws of the Surviving Company from and after the Effective Time until amended in accordance with applicable law, the Certificate of Incorporation of the Surviving Company and such By-Laws.

(c) The directors and officers listed in <u>Exhibit C</u> hereto shall be the directors and officers of the Surviving Company and Parent, and each shall hold his or her respective office or offices from and after the Closing Date until his or her successor shall have been elected and shall have qualified in accordance with applicable law, or as otherwise provided in the Certificate of Incorporation or By-Laws of the Surviving Company or the Certificate of Incorporation or By-Laws of Parent, as the case may be.

Section 1.05 <u>Effects of the Merger</u>. At the Closing Date, the Merger shall have the effects set forth in the applicable provisions of the DCL.

Section 1.06 <u>Manner and Basis of Converting Shares, Vesting of Shares and Cash Consideration.</u>

(a) At the Closing Date:

(i) each share of common stock, par value $0.001 per share, of Acquisition Corp. that shall be outstanding immediately prior to the Closing Date shall, by virtue of the Merger and without any action on the part of the holder thereof, be converted into the right to receive one share of common stock, par value $0.001 per share of the Surviving Company, so that at the Closing Date, Parent shall be the holder of all of the issued and outstanding shares of the Surviving Company;

(ii) <u>each share of common stock, par value $0.0001 per share of the Company (the "Company Common Stock") beneficially owned by the Stockholder of the Company shall, by virtue of the Merger and without any action on the part of the holder thereof, be converted into the right to receive a total of 845,986 shares of common stock, par value $0.0001 per share, of Parent (the "Parent Common Stock") as follows:</u>

(A) 281,996 on the Closing Date.

(B) 281,995 on September 15, 2016; and

(C) 281,995 on March 15, 2018.

(D) Notwithstanding the provisions of Sub-Paragraph (ii) of this Section 1.06, issuance of the 845,986 shall accelerate such that effective as of immediately prior to consummation of a Change of Control, as hereafter defined, all unissued Parent Common Stock shall be issued to the Stockholder and all unpaid cash consideration will become due and payable to Stockholder. "Change of Control" means (1) a sale of all or substantially all of the Parent's assets other than to an Excluded Entity (as defined below), (2) a merger, consolidation or other capital reorganization or business combination transaction of the Parent with or into another corporation, limited liability company or other entity other than an Excluded Entity, or (3) the consummation of a transaction, or series of related transactions, in which any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), other than the current shareholders of the Parent, becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of all of the Parent's then outstanding voting securities. Notwithstanding the foregoing, a transaction shall not constitute a Change of Control if its purpose is to (A) change the jurisdiction of the Parent's domicile, (B) create a holding company that will be owned in substantially the same proportions by the persons who hold the Parent's securities immediately before such transaction, or (C) obtain funding for the Parent in a financing that is approved by the Parent's board of directors An "Excluded Entity" means a corporation, limited liability company or other entity of which the holders of shares of the Parent outstanding immediately prior to such transaction are the direct or indirect holders of voting securities representing at least a majority of the votes

3

entitled to be cast by all of such corporation's, limited liability company's or other entity's voting securities outstanding immediately after such transaction.

(iii) As additional consideration to the Stockholder, Parent shall pay a cash consideration of a total of One Million dollars ($1,000,000), to be paid as follows:

(A) At the Closing, Parent shall pay Three Hundred Thousand Dollars ($300,000) (the "Initial Amount") as follows:

*(1)* First, Parent shall pay, on behalf of the Stockholder and the Company, certain of the liabilities of the Stockholder and the Company ("Consolidated Liabilities") from the Initial Amount as listed on Schedule 1.06(a)(iii)(A)*(1)* attached hereto.

*(2)* Upon the payment of the Consolidated Liabilities, the balance of the Initial Amount, if any, shall be paid to the Stockholder.

(B) Two Hundred Thousand ($200,000) on July 1, 2015 (the "2015 Amount");;

(C) Two Hundred and Fifty thousand ($250,000) on May 15, 2016, (the "2016 Amount") subject to Paragraph 7.2(c) below; and

(D) Two Hundred and Fifty thousand ($250,000) on May 15, 2017 the "2017 Amount").

Section 1.07 <u>Surrender and Exchange of Certificates</u>. Promptly after the Closing Date and upon (a) surrender of a certificate or certificates representing Company Common Stock that were outstanding immediately prior to the Closing Date or an affidavit and indemnification in form reasonably acceptable to counsel for Parent stating that Stockholder has lost its certificate or certificates or that such have been destroyed and (b) delivery of a Letter of Transmittal (as described in Article IV hereof), Parent shall issue to each record holder of Company Common Stock surrendering such certificate, certificates or affidavit and Letter of Transmittal, a certificate or certificates registered in the name of such Stockholder representing the number of shares of Parent Common Stock that such Stockholder shall be entitled to receive as set forth in <u>Sections 1.06(a)(ii)</u> hereof. Until the certificate, certificates or affidavit is or are surrendered together with the Letter of Transmittal as contemplated by this Section 1.08 and Article IV hereof, each certificate or affidavit that immediately prior to the Closing Date represented any outstanding Company Common Stock shall be deemed at and after the Closing Date to represent only the right to receive upon surrender as aforesaid the Parent Common Stock specified in <u>Schedule 1.06(a)(ii)</u> for the holder thereof or to perfect any rights of appraisal that such holder may have pursuant to the applicable provisions of the DCL.

Section 1.08 <u>Parent Stock</u>. Parent agrees that it will cause sufficient Parent Common Stock, into which the Company Common Stock or other interests are converted at the Closing Date pursuant to <u>Section 1.06(a)(ii)</u> to be available for such purposes.

Section 1.09 Operation of Surviving Company. The Company acknowledges that upon the effectiveness of the Merger, and the compliance by Parent and Acquisition Corp. with their respective duties and obligations hereunder, Parent shall have the absolute and unqualified right to deal with the assets and business of the Surviving Company as its own property without limitation on the disposition or use of such assets or the conduct of such business.

Section 1.10 Covenants of Stockholder in Connection with Stockholder's Acquisition of Parent Common Stock

(a) Stockholder acknowledges that the shares of Parent Common Stock have not and will not be registered under the Securities Act of 1933 (the "Act) or any applicable blue sky laws in reliance, in part, on the representations and warranties herein.

(b) Stockholder acknowledges that (i) the shares of the Parent Common Stock are "restricted securities" under the Federal Securities laws (e.g., the Act) insofar as the Parent Common Stock will be acquired from the Company in a transaction not involving a public offering, (ii) under such laws and applicable regulations, the shares of the Parent Common Stock may be resold without registration under the Act only in certain limited circumstances and (iii) in the absence of registration under the Act (which is not presently contemplated and with respect to which the Stockholder has no obligation) the shares of the Parent Common Stock must be held indefinitely. Stockholder acknowledges the resale limitations imposed by the Act and is familiar with Rule 144 under the Act, as presently in effect, and the conditions which must be met in order for Rule 144 to be available with respect to the resale of "restricted securities". Stockholder acknowledges that the Stockholder does not presently meet conditions for the availability of Rule 144 under certain circumstances (e.g., the provision of current "public company" information) and that the Parent has no present plans ever to do so.

(c) Stockholder acknowledges that any certificates evidencing the shares of the Parent Common Stock will bear one or all of the following legends:

(i) "THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT."

(ii) "THE OWNERSHIP AND TRANSFERABILITY OF THIS CERTIFICATE AND THE MEMBERSHIP INTERESTS REPRESENTED HEREBY ARE SUBJECT TO THE TERMS AND CONDITIONS (INCLUDING FORFEITURE) OF THE ASSET PURCHASE AGREEMENT BETWEEN MEDIA LODGE, INC. AND GUNUP, INC. COPIES OF SUCH AGREEMENT IS ON FILE IN THE EXECUTIVE OFFICES OF MEDIA LODGE, INC."

(iii)    Any legend required by applicable state securities laws.

5

(d) Without in any way limiting the representations set forth above, Stockholder further agrees not to make any disposition of all or any portion of the shares of the Parent Common Stock until March 15, 2018, or there is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement and any applicable requirements of state securities laws.

(e) In the event of an initial public offering relating to the Parent's securities, Stockholder shall enter into a lock-up agreement upon such terms as shall be requested by the managing underwriter for such offering.

## ARTICLE II.

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND THE STOCKHOLDER

The Company hereby represents and warrants to Parent and Acquisition Corp. as follows.

Section 2.01 Organization, Standing, Subsidiaries, Etc.

(a) The Company is a corporation duly organized and existing in good standing under the laws of the State of Delaware and has all requisite power and authority (corporate and other) to carry on its business, to own or lease its properties and assets, to enter into this Agreement and the Certificate of Merger and to carry out the terms hereof and thereof. Copies of the Certificate of Incorporation and By-Laws of the Company that have been delivered to Parent and Acquisition Corp. prior to the execution of this Agreement are true and complete and have not since been amended or repealed.

(b) The Company has no subsidiaries or direct or indirect interest (by way of stock ownership or otherwise) in any firm, corporation, limited liability company, partnership, association or business, except as set forth on Schedule 2.01 (each, a "Subsidiary"). The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary free and clear of any Liens (as defined below), except as set forth on Schedule 2.01, and all of the issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities. Except where otherwise indicated, the term "Company" shall include the Company and all of its Subsidiaries.

Section 2.02 Qualification. The Company and each Subsidiary is duly qualified to conduct business as a foreign corporation and is in good standing in each jurisdiction wherein the nature of its activities or its properties owned or leased makes such qualification necessary, except where the failure to be so qualified would not have a material adverse effect on the condition (financial or otherwise), properties, assets,

6

liabilities, business operations or results of operations of the Company taken as a whole (the " Condition of the Company").

Section 2.03 Capitalization of the Company. The authorized capital stock of the Company consists of One Hundred Million (100,000,000) shares of Company Common Stock, of which _____ shares are issued and outstanding and Twenty Million (20,000,000) shares of preferred stock, $.0001 par value per share ("Preferred Stock"), of which no shares are issued and outstanding. Such outstanding shares of Company Common Stock are duly authorized, validly issued, fully paid and non-assessable, and none of such shares have been issued in violation of the preemptive rights of any natural person, corporation, business trust, association, limited liability company, partnership, joint venture, other entity, government, agency or political subdivision (each, a "Person"). The offer, issuance and sale of such Company Common Stock was (a) exempt from the registration and prospectus delivery requirements of the Securities Act of 1933, as amended (the "Securities Act"), registered or qualified (or were exempt from registration or qualification) under the registration or qualification requirements of all applicable state securities laws and (c) accomplished in conformity with all other applicable securities laws. None of such outstanding Company Common Stock is subject to a right of withdrawal or a right of rescission under any federal or state securities laws or "Blue Sky" law. Except as otherwise set forth in this Agreement or any Schedule hereto, the Company has no outstanding options, rights or commitments to issue Company Common Stock or other Equity Securities (as defined below) of the Company, and there are no outstanding securities convertible or exercisable into or exchangeable for Company Common Stock or other Equity Securities of the Company. For purposes of this Agreement, "Equity Security" shall mean any stock or similar security of an issuer or any security (whether stock or Indebtedness for Borrowed Money (as defined below)) convertible, with or without consideration, into any stock or other equity security, or any security (whether stock or Indebtedness for Borrowed Money) carrying any warrant or right to subscribe to or purchase any stock or similar security, or any such warrant or right.

Section 2.04 Indebtedness. Except as disclosed on Schedule 2.04, the Company has no Indebtedness for Borrowed Money. For purposes of this Agreement, "Indebtedness for Borrowed Money" shall mean (a) all Indebtedness in respect of money borrowed including, without limitation, Indebtedness that represents the unpaid amount of the purchase price of any property and is incurred in lieu of borrowing money or using available funds to pay such amounts and not constituting an account payable or expense accrual incurred or assumed in the ordinary course of business of the Company, (b) all Indebtedness (as defined below) evidenced by a promissory note, bond or similar written obligation to pay money or (c) all such Indebtedness guaranteed by the Company or for which the Company is otherwise contingently liable. Furthermore, for purposes of this Agreement, "Indebtedness" shall mean any obligation of the Company which, under generally accepted accounting principles in the United Stated ("GAAP"), is required to be shown on the balance sheet of the Company as a liability. Any obligation of the Company secured by a mortgage, pledge, security interest, encumbrance, lien or charge of any kind (a "Lien"), shall be deemed to be Indebtedness.

Section 2.05 Company Stockholders. The Stockholder is the sole stockholder of the

Company. To the knowledge of the Company, there is no voting trust, agreement or arrangement among the Stockholder and any other person or entity affecting the nomination or election of directors or the exercise of the voting rights of the Company Common Stock.

Section 2.06 <u>Corporate Acts and Proceedings</u>. The execution, delivery and performance of this Agreement and the Certificate of Merger (together, the "<u>Merger Documents</u>") have been duly authorized by the Board of Directors of the Company and have been approved by the requisite vote of the shareholders of the Company and the Stockholder, and all of the corporate acts and proceedings required for the due and valid authorization, execution, delivery and performance of the Merger Documents and the consummation of the Merger have been validly and appropriately taken, except for the filings referred to in Section 1.02.

Section 2.07 <u>Governmental Consents</u>. All material consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with any federal or state governmental authority on the part of the Company required in connection with the consummation of the Merger shall have been obtained prior to, and be effective as of, the Closing.

Section 2.08 <u>Compliance with Laws and Instruments</u>. The business, products and operations of the Company have been and are being conducted in compliance in all material respects with all applicable state laws, rules and regulations, except for such violations thereof for which the penalties, in the aggregate, would not have a material adverse effect on the Condition of the Company. The execution, delivery and performance by the Company of the Merger Documents and the consummation by the Company of the transactions contemplated by this Agreement: (a) will not cause the Company to violate or contravene (i) any provision of material law, (ii) any rule or regulation of any agency or government, (iii) any order, judgment or decree of any court, or (iv) any provision of the Articles of Incorporation or By-Laws of the Company, (b) will not violate or be in conflict with, result in a breach of or constitute (with or without notice or lapse of time, or both) a default under, any indenture, loan or credit agreement, deed of trust, mortgage, security agreement or other material contract, agreement or instrument to which the Company is a party or by which the Company or any of its properties is bound or affected, except as would not have a material adverse effect on the Condition of the Company and (c) will not result in the creation or imposition of any Lien upon any property or asset of the Company. The Company is not in violation of, or (with or without notice or lapse of time, or both) in default under, any term or provision of its Certificate of Incorporation or By-Laws or of any indenture, loan or credit agreement, deed of trust, mortgage, security agreement or, except as would not materially and adversely affect the Condition of the Company, any other material agreement or instrument to which the Company is a party or by which the Company or any of its properties is bound or affected.

Section 2.09 <u>Binding Obligations</u>. When executed and delivered, the Merger Documents will constitute the legal, valid and binding obligations of the Company and will be enforceable against the Company in accordance with their respective terms, except as such enforcement is limited by bankruptcy, insolvency and other similar laws affecting the enforcement of creditors' rights generally and by general principles of

equity.

Section 2.10 <u>Broker's and Finder's Fees</u>. Except as disclosed in <u>Schedule 2.10</u>, no Person has, or as a result of the transactions contemplated or described herein will have, any right or valid claim against the Company or, to the knowledge of the Company, any Stockholder for any commission, fee or other compensation as a finder or broker, or in any similar capacity.

Section 2.11 <u>Financial Statements</u>. Parent has been provided with the Company's (i) unaudited balance sheet (the "<u>Balance Sheet</u>") as of December 31, 2014 (the "<u>Company Balance Sheet Date</u>"), and (ii) related income statements. Such financial statements are collectively referred to as the "<u>Financial Statements</u>," copies of which have been attached hereto as <u>Schedule 2.11</u>. The Financial Statements (a) are in accordance with the books and records of the Company, and (b) present fairly in all material respects the financial condition of the Company at the dates therein specified and the results of its operations and changes in financial position for the periods therein specified.

Section 2.12 <u>Absence of Undisclosed Liabilities</u>. Except as disclosed on <u>Schedule 2.12</u>, the Company has no material obligation or liability (whether accrued, absolute, contingent, liquidated or otherwise, whether due or to become due), arising out of any transaction entered into at or prior to the Closing, except (a) as disclosed in the Balance Sheet, (b) to the extent set forth on or reserved against in the Balance Sheet or the notes to the Financial Statements, (c) current liabilities incurred and obligations under agreements entered into in the usual and ordinary course of business since the Company Balance Sheet Date, none of which (individually or in the aggregate) has had or will have a material adverse effect on the Condition of the Company, (d) by the specific terms of any written agreement, document or arrangement identified in this Agreement or the Schedules hereto, and (e) obligations under this Agreement.

Section 2.13 <u>Changes</u>. Except as disclosed on Schedule 2.13, since the Company Balance Sheet Date, the Company has not (a) incurred any debts, obligations or liabilities, absolute, accrued or, to the knowledge of the Company, contingent, whether due or to become due, except for fees, expenses and liabilities incurred in connection with the Merger and related transactions and current liabilities incurred in the usual and ordinary course of business, (b) discharged or satisfied any Liens other than those securing, or paid any obligation or liability other than, current liabilities shown on the Balance Sheet and current liabilities incurred since the Company Balance Sheet Date, except in each case in the usual and ordinary course of business, (c) mortgaged, pledged or subjected to Lien any of its assets, tangible or intangible other than in the usual and ordinary course of business, (d) sold, transferred or leased any of its assets, except in the usual and ordinary course of business, (e) suffered any physical damage, destruction or loss (whether or not covered by insurance) materially and adversely affecting the Condition of the Company, (f) except for the transactions contemplated by this Agreement, entered into any transaction other than in the usual and ordinary course of business, (g) encountered any labor union difficulties, (h) issued or sold any shares of capital stock, bonds, notes, debentures or other securities or granted any options (including employee stock options), warrants or other rights with respect thereto, declared or paid any dividends on or made any other distributions with respect to, or purchased or redeemed, any of its

outstanding capital stock, (j) suffered or experienced any change in, or condition affecting, the Condition of the Company other than changes, events or conditions in the usual and ordinary course of its business, none of which (either by itself or in conjunction with all such other changes, events and conditions) has been materially adverse, (k) suffered any material loss not reflected in the Balance Sheet or its statement of income for the period ended on the Company Balance Sheet Date, made or agreed to make any charitable contributions or incurred any non-business expenses in excess of $10,000 in the aggregate or (m) entered into any agreement, or otherwise obligated itself, to do any of the foregoing.

Section 2.14 Assets and Contracts.

(a)   Schedule 2.14(a) contains a true and complete list of all real property leased by the Company. All the real property listed in Schedule 2.14(a) is leased by the Company under valid leases enforceable in accordance with their terms, and there is not, under any such lease, any existing default or event of default or, to the knowledge of the Company, event which with notice or lapse of time, or both, would constitute a default by the Company and which would have a material adverse effect upon the Company, and the Company has not received any notice or claim of any such default by the Company. The Company does not own any real property.

(b) Except as expressly set forth in this Agreement, the Financial Statements or the notes thereto, or as disclosed in Schedule 2.14(b) hereto, the Company is not a party to any written or oral agreement not made in the ordinary course of business that is material to the Company. Except as disclosed in Schedule 2.14(b) hereto, the Company is not a party to any written or oral (i) agreement for the purchase of fixed assets or for the purchase of materials, supplies or equipment in excess of normal operating requirements, agreement for the employment of any officer, individual employee or other Person on a full-time basis or any agreement with any Person for consulting services, (iii) indenture, loan or credit agreement, note agreement, deed of trust, mortgage, security agreement, promissory note or other agreement or instrument relating to or evidencing Indebtedness for Borrowed Money or subjecting any asset or property of the Company to any Lien or evidencing any Indebtedness, (iv) guaranty of any Indebtedness, (v) lease or agreement under which the Company is lessee of or holds or operates any property, real or personal, owned by any other Person under which payments to such Person exceed $10,000 per year, (vi) agreement granting any preemptive right, right of first refusal or similar right to any Person, (vii) agreement or arrangement with any Affiliate (as defined below) or any "associate" (as such term is defined in Rule 405 under the Securities Act) of the Company or any present or former officer, director or Stockholder of the Company, (viii) agreement obligating the Company to pay any royalty or similar charge for the use or exploitation of any tangible or intangible property, (ix) covenant not to compete or other material restriction on its ability to conduct a business or engage in any other activity, (x) agreement to register securities under the Securities Act or (xi) collective bargaining agreement. Except as disclosed in Schedule 2.14(b), none of the agreements, contracts, leases, instruments or other documents or arrangements listed in Schedules 2.14(a) and 2.14(b) requires the consent of any of the parties thereto other than the Company to permit the contract, agreement, lease, instrument or other document or arrangement to remain effective following consummation of the Merger and the

transactions contemplated hereby. For purposes of this Agreement, an "Affiliate" shall mean any Person that directly or indirectly controls, is controlled by, or is under common control with, the indicated Person.

(c) The Company has made available to Parent and Acquisition Corp. true and complete copies of all agreements and other documents and a description of all applicable oral agreements disclosed or referred to in Schedules 2.14(a) and 2.14(b).

Section 2.15 Personnel. The Company has complied in all material respects with all laws relating to the employment of labor, and the Company has encountered no material labor union difficulties. Other than pursuant to ordinary arrangements of compensation to personnel, the Company is not under any obligation or liability to any officer, director, consultant or staff member of the Company.

Section 2.16 Tax Returns and Audits.

(a) Except as disclosed in Schedule 2.16(a) hereto, all required federal, state and local Tax Returns (as defined below) of the Company have been accurately prepared in all material respects and duly and timely filed, and all federal, state and local Taxes (as defined below) required to be paid with respect to the periods covered by such returns have been paid to the extent that the same have become due, except where the failure so to file would not reasonably be expected to have a material adverse effect on the Condition of the Company. The Company has not had a Tax deficiency proposed or assessed against it and has not executed a waiver of any statute of limitations on the assessment or collection of any Tax. None of the Company's federal income Tax Returns has been audited by any governmental authority; and none of the Company's state or local income or franchise Tax Returns has been audited by any governmental authority. The reserves for Taxes reflected on the Balance Sheet, if any, are and will be sufficient for the payment of all unpaid Taxes payable by the Company as of the Company Balance Sheet Date. Since the Company Balance Sheet Date, the Company has made adequate provisions on its books of account for all Taxes with respect to its business, properties and operations for such period. Except as disclosed in Schedule 2.16(a) hereto, the Company has withheld or collected from each payment made to each of its employees the amount of all Taxes (including, but not limited to, federal, state and local income Taxes, Federal Insurance Contribution Act Taxes and Federal Unemployment Tax Act Taxes) required to be withheld or collected therefrom, and has paid the same to the proper Tax receiving officers or authorized depositaries. There are no federal, state, local or foreign audits, actions, suits, proceedings, investigations, claims or administrative proceedings relating to Taxes or any Tax Returns of the Company now pending, and the Company has not received any notice of any proposed audits, investigations, claims or administrative proceedings relating to Taxes or any Tax Returns. The Company is not obligated to make a payment, nor is it a party to any agreement that under certain circumstances could obligate it to make a payment that would not be deductible under Section 280G of the Code. The Company has not agreed, nor is it required, to make any adjustments under Section 481(a) of the Code (or any similar provision of state, local and foreign law), whether by reason of a change in accounting method or otherwise, for any Tax period for which the applicable statute of limitations has not yet expired. The Company (i) is not a party to, nor is it bound by or obligated under, any Tax sharing agreement, Tax

11

indemnification agreement or similar contract or arrangement, whether written or unwritten (collectively, "Tax Sharing Agreements"), and (ii) does not have any potential liability or obligation to any Person as a result of, or pursuant to, any such Tax Sharing Agreements.

(b) For purposes of this Agreement, the following terms shall have the meanings provided below:

(i) "Tax" or "Taxes" shall mean (A) any and all taxes, assessments, customs, duties, levies, fees, tariffs, imposts, deficiencies and other governmental charges of any kind whatsoever (including, but not limited to, taxes on or with respect to net or gross income, franchise, profits, gross receipts, capital, sales, use, ad valorem, value added, transfer, real property transfer, transfer gains, transfer taxes, inventory, capital stock, license, payroll, employment, social security, unemployment, severance, occupation, real or personal property, estimated taxes, rent, excise, occupancy, recordation, bulk transfer, intangibles, alternative minimum, doing business, withholding and stamp), together with any interest thereon, penalties, fines, damages costs, fees, additions to tax or additional amounts with respect thereto, imposed by the United States (federal, state or local) or other applicable jurisdiction; (B) any liability for the payment of any amounts described in clause (A) as a result of being a member of an affiliated, consolidated, combined, unitary or similar group or as a result of transferor or successor liability, including, without limitation, by reason of Code section 1.1502-6; and (C) any liability for the payments of any amounts as a result of being a party to any Tax Sharing Agreement or as a result of any express or implied obligation to indemnify any other Person with respect to the payment of any amounts of the type described in clause (A) or (B).

(ii) "Tax Return" shall include all returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns (including partnership returns filed on Form 1065) required to be supplied to a Tax authority relating to Taxes.

Section 2.17 Patents and Other Intangible Assets.

(a) To the knowledge of the Stockholder and the Company, the Company (i) owns or has the right to use, free and clear of all Liens, claims and restrictions, all patents, trademarks, service marks, trade names, copyrights, licenses and rights with respect to the foregoing (collectively, "Intellectual Property") used in or necessary for the conduct of its business as now conducted without infringing upon or otherwise acting adversely to the right or claimed right of any Person under or with respect to any of the foregoing and (ii) is not obligated or under any liability to make any payments by way of royalties, fees or otherwise to any owner or licensor of, or other claimant to, any patent, trademark, service mark, trade name, copyright or other intangible asset, with respect to the use thereof or in connection with the conduct of its business or otherwise.

(b) To the knowledge of the Company and the Stockholder, the Company owns and has the unrestricted right to use all trade secrets, if any, including know-how, negative know- how, formulas, patterns, programs, devices, methods, techniques,

inventions, designs, processes, computer programs and technical data and all information that derives independent economic value, actual or potential, from not being generally known or known by competitors (collectively, "Trade Secrets") required for or incident to the development, operation and sale of all products and services sold by the Company, free and clear of any right, Lien or claim of others; provided, however, that the possibility exists that other Persons, completely independently of the Company or its employees or agents, could have developed Intellectual Property or Trade Secrets similar or identical to that of the Company. The Company is not aware of any such development of substantially identical trade secrets or technical information by others. All Intellectual Property and Trade Secrets can and will be transferred by the Company to the Surviving Company as a result of the Merger and without the consent of any Person other than the Company.

Section 2.18 Employee Benefit Plans; ERISA.

(a) Except as disclosed on Schedule 2.18 hereto, there are no "employee benefit plans" (within the meaning of Section 3(3) of ERISA) nor any other employee benefit or fringe benefit arrangements, practices, contracts, policies or programs of every type other than programs merely involving the regular payment of wages, commissions, or bonuses established, maintained or contributed to by the Company, whether written or unwritten and whether or not funded. The plans listed on Schedule 2.18 hereto are hereinafter referred to as the "Employee Benefit Plans."

(b) All current and prior material documents, including all amendments thereto, with respect to each Employee Benefit Plan have been made available to Parent and Acquisition Corp. or their advisors.

(c) To the knowledge of the Company, all Employee Benefit Plans are in material compliance with the applicable requirements of ERISA, the Code and any other applicable state, federal or foreign law.

(d) There are no pending claims or lawsuits that have been asserted or instituted against any Employee Benefit Plan, the assets of any of the trusts or funds under the Employee Benefit Plans, the plan sponsor or the plan administrator of any of the Employee Benefit Plans or against any fiduciary of an Employee Benefit Plan with respect to the operation of such plan, nor does the Company have any knowledge of any incident, transaction, occurrence or circumstance that might reasonably be expected to form the basis of any such claim or lawsuit.

(e) There is no pending or, to the knowledge of the Company, threatened investigation, or pending or, to the knowledge of the Company, possible enforcement action by the Pension Benefit Guaranty Corporation, the Department of Labor, the Internal Revenue Service or any other government agency with respect to any Employee Benefit Plan and the Company has no knowledge of any incident, transaction, occurrence or circumstance which might reasonably be expected to trigger such an investigation or enforcement action.

(f) No actual or, to the knowledge of the Company, contingent liability exists with

respect to the funding of any Employee Benefit Plan or for any other expense or obligation of any Employee Benefit Plan, except as disclosed on the financial statements of the Company, and no contingent liability exists under ERISA with respect to any "multi-employer plan," as defined in Section 3(37) or Section 4001(a)(3) of ERISA.

(g) Except for the transactions contemplated by this Agreement, no events have occurred or are expected to occur with respect to any Employee Benefit Plan that would cause a material change in the costs of providing benefits under such Employee Benefit Plan or would cause a material change in the cost of providing for other liabilities of such Employee Benefit Plan.

Section 2.19 <u>Title to Property and Encumbrances</u>. The Company has good, valid and indefeasible title to all properties and assets used in the conduct of its business (except for property held under valid and subsisting leases that are in full force and effect and which are not in default) free of all Liens and other encumbrances, except Permitted Liens (as defined below) and such ordinary and customary imperfections of title, restrictions and encumbrances as do not, individually or in the aggregate, materially detract from the value of the property or assets or materially impair the use made thereof by the Company in its business. Without limiting the generality of the foregoing, the Company has good and indefeasible title to all of its properties and assets reflected in the Balance Sheet, except for property disposed of in the usual and ordinary course of business since the Company Balance Sheet Date and for property held under valid and subsisting leases that are in full force and effect and that are not in default. For purposes of this Agreement, "<u>Permitted Liens</u>" shall mean (a) Liens for taxes and assessments or governmental charges or levies not at the time due or in respect of which the validity thereof shall currently be contested in good faith by appropriate proceedings; (b) Liens in respect of pledges or deposits under workmen's compensation laws or similar legislation, carriers', warehousemen's, mechanics', laborers' and materialmens' and similar Liens, if the obligations secured by such Liens are not then delinquent or are being contested in good faith by appropriate proceedings, (c) Liens incidental to the conduct of the business of the Company that were not incurred in connection with the borrowing of money or the obtaining of advances or credits and that do not in the aggregate materially detract from the value of its property or materially impair the use made thereof by the Company in its business, and (d) Liens set forth on <u>Schedule 2.14(b)</u> hereto.

Section 2.20 <u>Condition</u> of Properties. All facilities, machinery, equipment, fixtures and other properties owned, leased or used by the Company are in reasonably good operating condition and repair, subject to ordinary wear and tear, and are adequate and sufficient for the Company's business.

Section 2.21 <u>Insurance Coverage</u>. There is in full force and effect one or more policies of insurance, insuring the Company and its properties, products and business against such losses and risks, and in such amounts, as are customary for corporations engaged in the same or similar business and similarly situated. The Company has not been refused any insurance coverage sought or applied for, and the Company has no reason to believe that it will be unable to renew its existing insurance coverage as and when the same shall expire upon terms at least as favorable to those currently in effect, other than possible increases in premiums that do not result from any act or omission of

the Company. No suit, proceeding or action or, to the knowledge of the Company, threat of suit, proceeding or action has been asserted or made against the Company within the last five years due to alleged bodily injury, disease, medical condition, death or property damage arising out of the function or malfunction of a product, procedure or service designed, manufactured, sold or distributed by the Company.

Section 2.22 <u>Litigation</u>. Except as disclosed in <u>Schedule 2.22</u> hereto, there is no legal action, suit, arbitration or other legal, administrative or other governmental proceeding pending or, to the knowledge of the Company, threatened against or affecting the Company or its properties, assets or business, and, to the knowledge of the Company, there is no incident, transaction, occurrence or circumstance that might reasonably be expected to result in or form the basis for any such action, suit, arbitration or other proceeding. The Company is not in default with respect to any order, writ, judgment, injunction, decree, determination or award of any court or any governmental agency or instrumentality or arbitration authority.

Section 2.23 <u>Licenses.</u> The Company possesses from all appropriate governmental authorities all licenses, permits, authorizations, approvals, franchises and rights necessary for the Company to engage in the business currently conducted by it, all of which are in full force and effect, except where the failure to obtain such license has not had and would not reasonably excepted to have a material adverse effect on the Condition of the Company.

Section 2.24 <u>Interested Party Transactions</u>. Except as described on Schedule 2.24 hereto, no officer, director or, to the knowledge of the Company, Stockholder of the Company or any Affiliate or "associate" (as such term is defined in Rule 405 under the Securities Act) of any such Person or the Company has or has had, either directly or indirectly, (a) an interest in any Person that (i) furnishes or sells services or products that are furnished or sold or are proposed to be furnished or sold by the Company or purchases from or sells or furnishes to the Company any goods or services, or (b) a beneficial interest in any contract or agreement to which the Company is a party or by which it may be bound or affected.

Section 2.25 <u>Environmental Matters</u>.

(a) To the knowledge of the Company, the Company has never generated, used, handled, treated, released, stored or disposed of any Hazardous Materials (as defined below) on any real property on which it now has or previously had any leasehold or ownership interest, except in compliance with all applicable Environmental Laws (as defined below).

(b) To the knowledge of the Company, the historical and present operations of the business of the Company are in compliance with all applicable Environmental Laws, except where any non-compliance has not had and would not reasonably be expected to have a material adverse effect on the Condition of the Company.

Section 2.26 <u>Questionable Payments</u>. Neither the Company nor any director,

15

officer or, to the knowledge of the Company, any agent, employee or other Person associated with or acting on behalf of the Company, has used any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payments to government officials or employees from corporate funds; established or maintained any unlawful or unrecorded fund of corporate monies or other assets; made any false or fictitious entries on the books of record of any such corporations; or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

Section 2.27 <u>Obligations to or by Stockholder</u>. Except as set forth in <u>Schedule 2.27</u> hereto and except in connection with the transactions contemplated by this Agreement, the Company has no liability or obligation or commitment to t h e Stockholder or any Affiliate or "associate" (as such term is defined in Rule 405 under the Securities Act) of any Stockholder, nor does any Stockholder or any such Affiliate or associate have any liability, obligation or commitment to the Company.

Section 2.28 <u>Duty to Make Inquiry</u>. To the extent that any of the representations or warranties in this Article II are qualified by "knowledge" or "belief," the Company represents and warrants that it has made due and reasonable inquiry and investigation concerning the matters to which such representations and warranties relate, including, but not limited to, diligent inquiry of its directors and executive officers.

# ARTICLE III.

## REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION CORP.

Parent and Acquisition Corp. represent and warrant to the Company as follows:

Section 3.01 <u>Organization and Standing</u>. Parent is a corporation duly organized and existing in good standing under the laws of the State of Delaware. Acquisition Corp. is a corporation duly organized and existing in good standing under the laws of the State of Delaware. Parent and Acquisition Corp. have heretofore delivered to the Company complete and correct copies of their respective Certificate of Incorporation and By-Laws as now in effect. Parent and Acquisition Corp. have full corporate power and authority to carry on their respective businesses as they are now being conducted and as now proposed to be conducted and to own or lease their respective properties and assets. Neither Parent nor Acquisition Corp. has any subsidiaries in any firm, corporation, limited liability company, partnership, association or business. Parent owns all of the issued and outstanding capital stock of Acquisition Corp. free and clear of all Liens, and Acquisition Corp. has no outstanding options, warrants or rights to purchase capital stock or other securities of Acquisition Corp., other than the capital stock owned by Parent. Unless the context otherwise requires, all references in this Article III to "Parent" shall be treated as being a reference to Parent and Acquisition Corp. taken together as one enterprise.

16

Section 3.02 <u>Qualification</u>. Parent is duly qualified to conduct business as a foreign corporation and is in good standing in each jurisdiction wherein the nature of its activities or its properties owned or leased makes such qualification necessary, except where the failure to be so qualified would not have a material adverse effect on the condition, properties, assets, liabilities, business operations or results of operations of Parent (the "<u>Condition of the Parent</u>").

Section 3.03 <u>Corporate Authority</u>. Each of Parent and/or Acquisition Corp. (as the case may be) has full corporate power and authority to enter into the Merger Documents and the other agreements to be made pursuant to the Merger Documents, and to carry out the transactions contemplated hereby and thereby. All corporate acts and proceedings required for the authorization, execution, delivery and performance of the Merger Documents and such other agreements and documents by Parent and/or Acquisition Corp. (as the case may be) have been duly and validly taken or will have been so taken prior to the Closing. Each of the Merger Documents constitutes a legal, valid and binding obligation of Parent and/or Acquisition Corp. (as the case may be), each is enforceable against it and/or them in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general principles of equity.

Section 3.04 <u>Broker's and Finder's Fees</u>. No Person is entitled by reason of any act or omission of Parent or Acquisition Corp. to any broker's or finder's fees, commission or other similar compensation with respect to the execution and delivery of the Merger Documents, or with respect to the consummation of the transactions contemplated thereby, except as set forth in the Disclosures.

Section 3.05 <u>Capitalization</u>.

(a) The authorized capital stock of Parent consists of (i) One Hundred Million (100,000,000) shares of Parent Common Stock, of which 10,000,000 shares are issued and outstanding and (ii) Twenty Million (20,000,000) shares of preferred stock, par value $0.0001 per share (the "<u>Parent Preferred Stock</u>") of which no shares are issued and outstanding. Parent has no outstanding options, rights or commitments to issue shares of Parent Stock or any other Equity Security of Parent or Acquisition Corp., and there are no outstanding securities convertible or exercisable into or exchangeable for shares of Parent Stock or any other Equity Security of Parent or Acquisition Corp. There is no voting trust, agreement or arrangement among any of the beneficial holders of Parent Common Stock affecting the nomination or election of directors or the exercise of the voting rights of Parent Common Stock. Each share of Parent Common Stock was duly authorized, validly issued, fully paid and non-assessable, and none of such shares have been issued in violation of the preemptive rights of any Person. The offer, issuance and sale of such shares of Parent Common Stock were (x) exempt from the registration and prospectus delivery requirements of the Securities Act, (y) registered or qualified (or were exempt from registration or qualification) under the registration or qualification requirements of all applicable state securities laws and (z) accomplished in conformity with all other applicable securities laws. None of such shares of Parent Common Stock are subject to a right of withdrawal or a right of rescission under any

federal or state securities or "Blue Sky" law. Except as otherwise set forth in this Agreement or any Schedule hereto, the Parent has no outstanding options, rights or commitments to issue Parent Common Stock or other Equity Securities of the Parent, and there are no outstanding securities convertible or exercisable into or exchangeable for Parent Common Stock or other Equity Securities of the Parent.

(b) The authorized capital stock of Acquisition Corp. consists of Ten Thousand (10) shares of common stock, par value $0.0001 per share (the "Acquisition Corp. Common Stock"), of which 1 share is issued and outstanding. All of the outstanding Acquisition Corp. Common Stock is owned by Parent. All outstanding shares of the capital stock of Acquisition Corp. are duly authorized, validly issued and outstanding, fully paid and non- assessable, and none of such shares have been issued in violation of the preemptive rights of any Person. Acquisition Corp. has no outstanding options, rights or commitments to issue shares of Acquisition Corp. Common Stock or any other Equity Security of Acquisition Corp., and there are no outstanding securities convertible or exercisable into or exchangeable for shares of Acquisition Corp. Common Stock or any other Equity Security of Acquisition Corp.

Section 3.06 Acquisition Corp. Acquisition Corp. is a wholly-owned Delaware subsidiary of Parent that was formed specifically for the purpose of the Merger and that has not conducted any business or acquired any property, and will not conduct any business or acquire any property prior to the Closing Date, except in preparation for and otherwise in connection with the transactions contemplated by the Merger Documents and the other agreements to be made pursuant to or in connection with the Merger Documents.

Section 3.07 Validity of Shares. The shares of Parent Common Stock to be issued pursuant to Section 1.06(a)(ii) hereof, when issued and delivered in accordance with the terms of the Merger Documents, shall be duly and validly issued, fully paid and non-assessable. Based in part on the representations and warranties of the Stockholders as contemplated by Article IV hereof and assuming the accuracy thereof, the issuance of the Parent Common Stock upon consummation of the Merger pursuant to Sections 1.06(a)(ii) will be exempt from the registration and prospectus delivery requirements of the Securities Act and from the qualification or registration requirements of any applicable state "Blue Sky" or securities laws.

Section 3.08 Parent Financial Representation. Except to the extent that an intercompany "Due to IA Tech LLC" exists on the Parent's books and records, to fund operations in the event of a shortfall in capital at the Parent, Parent has only minimal liabilities in the form of accounts payables. Parent has borrowed from IA Tech, LLC, the $300,000 in cash consideration to be paid pursuant to Section 106(iii)(A) above.

Section 3.09 Governmental Consents. All material consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with any federal or state governmental authority on the part of Parent or Acquisition Corp. required in connection with the consummation of the Merger shall have been obtained prior to, and be effective as of, the Closing.

Section 3.10 <u>Compliance with Laws and Other Instruments</u>. The execution, delivery and performance by Parent and/or Acquisition Corp. of the Merger Documents and the other agreements to be made by Parent or Acquisition Corp. pursuant to or in connection with the Merger Documents and the consummation by Parent and/or Acquisition Corp. of the transactions contemplated by the Merger Documents will not cause Parent and/or Acquisition Corp. to violate or contravene (a) any provision of law, (b) any rule or regulation of any agency or government, (c) any order, judgment or decree of any court, (d) any provision of their respective charters or By-laws as amended and in effect on and as of the Closing Date and (e) will not violate or be in conflict with, result in a breach of or constitute (with or without notice or lapse of time, or both) a default under, any indenture, loan or credit agreement, deed of trust, mortgage, security agreement or other material contract, agreement or instrument to which Parent or Acquisition Corp. is a party or by which Parent or Acquisition Corp. or any of their respective properties is bound or affected, except as would not have a material adverse effect on the Condition of Parent or Acquisition Corp. Neither Parent nor Acquisition Corp. is in violation of, or (with or without notice or lapse of time, or both) in default under, any term or provision of its Certificate of Incorporation or By-Laws or of any indenture, loan or credit agreement, deed of trust, mortgage, security agreement or, except as would not materially and adversely affect the Condition of Parent or Acquisition Corp., any other material agreement or instrument to which the Company is a party or by which the Company or any of its properties is bound or affected.

Section 3.11 <u>No General Solicitation</u>. In issuing the Parent Common Stock in the Merger hereunder, neither Parent nor anyone acting on its behalf has offered to sell the Parent Common Stock by any form of general solicitation or advertising.

Section 3.12 <u>Binding Obligations</u>. The Merger Documents constitute the legal, valid and binding obligations of Parent and Acquisition Corp., and are enforceable against Parent and Acquisition Corp., in accordance with their respective terms, except as such enforcement is limited by bankruptcy, insolvency and other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

Section 3.13 <u>Employee Benefit Plans; ERISA</u>.

(a)  There are no "employee benefit plans" (within the meaning of Section 3(3) of ERISA) nor any other employee benefit or fringe benefit arrangements, practices, contracts, policies or programs other than programs merely involving the regular payment of wages, commissions, or bonuses established, maintained or contributed to by Parent, whether written or unwritten and whether or not funded. Any plans listed in the Parent SEC Documents are hereinafter referred to as the "<u>Parent Employee Benefit Plans</u>."

(b)  Any current and prior material documents, including all amendments thereto, with respect to each Parent Employee Benefit Plan have been given to the Company or its advisors.

(c)  All Parent Employee Benefit Plans are in material compliance with the applicable requirements of ERISA, the Code and any other applicable state, federal or

foreign law.

(d) There are no pending, or to the knowledge of Parent, threatened, claims or lawsuits which have been asserted or instituted against any Parent Employee Benefit Plan, the assets of any of the trusts or funds under the Parent Employee Benefit Plans, the plan sponsor or the plan administrator of any of the Parent Employee Benefit Plans or against any fiduciary of a Parent Employee Benefit Plan with respect to the operation of such plan, nor does Parent have any knowledge of any incident, transaction, occurrence or circumstance that might reasonably be expected to form the basis for any such claim or lawsuit.

(e) There is no pending, or to the knowledge of Parent, threatened, investigation or pending or possible enforcement action by the Pension Benefit Guaranty Corporation, the Department of Labor, the Internal Revenue Service or any other government agency with respect to any Parent Employee Benefit Plan and Parent has no knowledge of any incident, transaction, occurrence circumstance which might reasonably be expected to trigger such an investigation or enforcement action.

(f) No actual or, to the knowledge of Parent, contingent liability exists with respect to the funding of any Parent Employee Benefit Plan or for any other expense or obligation of any Parent Employee Benefit Plan, except as disclosed on the financial statements of Parent or the Parent SEC Documents, and to the knowledge of Parent, no contingent liability exists under ERISA with respect to any "multi-employer plan," as defined in Section 3(37) or Section 4001(a)(3) of ERISA.

Section 3.14 Litigation. There is no legal action, suit, arbitration or other legal, administrative or other governmental proceeding pending or, to the knowledge of Parent, threatened against or affecting Parent or Acquisition Corp. or any of their respective properties, assets or businesses and, to the knowledge of Parent, there is no incident, transaction, occurrence or circumstance that might reasonably be expected to result in or form the basis for any such action, suit, arbitration or other proceeding. Neither Parent nor Acquisition Corp. is in default with respect to any order, writ, judgment, injunction, decree, determination or award of any court or any governmental agency or instrumentality or arbitration authority.

Section 3.15 Licenses. Parent possesses from all appropriate governmental authorities all licenses, permits, authorizations, approvals, franchises and rights necessary for Parent to engage in the business currently conducted by it, all of which are in full force and effect.

Section 3.16 Questionable Payments. Neither Parent, Acquisition Corp. nor, to the knowledge of Parent, any director, officer, agent, employee or other Person associated with or acting on behalf of Parent or Acquisition Corp. has used any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payments to government officials or employees from corporate funds; established or maintained any unlawful or unrecorded fund of corporate monies or other assets; made any false or fictitious entries on the books of record of any such corporations; or made any

bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

Section 3.17 Assets and Contracts.

(a) Parent has good title to, or valid leasehold interests in, all of its properties and assets used in the conduct of its business. All such assets and properties, other than assets and properties in which the Parent has leasehold interests, are free and clear of all Liens. Parent has complied in all material respects with the terms of all leases to which it is a party and under which it is in occupancy, and all such leases are in full force and effect. Parent enjoys peaceful and undisturbed possession under all such leases.

# ARTICLE IV.

## CONDUCT OF BUSINESSES PENDING THE MERGER.

Section 4.01 Conduct of Business by the Company Pending the Merger. Prior to the Closing Date, unless Parent shall otherwise agree in writing or as otherwise contemplated by this Agreement:

(a) the business of the Company shall be conducted only in the ordinary course;

(b) the Company shall not (i) directly or indirectly redeem, purchase or otherwise acquire or agree to redeem, purchase or otherwise acquire any shares of its capital stock; (ii) amend its Certificate of Incorporation or By-Laws except to effectuate the transactions contemplated by this Agreement or (iii) split, combine or reclassify the outstanding Company Common Stock or declare, set aside or pay any dividend payable in cash, stock or property or make any distribution with respect to any such stock;

(c) the Company shall not (i) issue or agree to issue any additional Company Common Stock, or options, warrants or rights of any kind to acquire any Company Common Stock, except to issue Company Common Stock in connection with any matter contemplated by this Agreement; (ii) acquire or dispose of any fixed assets or acquire or dispose of any other substantial assets other than in the ordinary course of business; (iii) enter into any contract, agreement, commitment or arrangement with respect to any of the foregoing or (iv) except as contemplated by this Agreement, enter into any contract, agreement, commitment or arrangement to dissolve, merge, consolidate or enter into any other material business combination;

(d) the Company shall use its commercially reasonable efforts to preserve intact the business organization of the Company, to keep available the service of its present officers and key employees, and to preserve the good will of those having business relationships with it; and

(e) the Company will not, nor will it authorize any director or authorize or permit any officer or employee or any attorney, accountant or other representative retained by it to make, solicit, encourage any inquiries with respect to, or engage in any negotiations concerning, any Acquisition Proposal (as defined below for purposes of this paragraph). The Company will promptly advise Parent orally and in writing of any such inquiries or

proposals (or requests for information) and the substance thereof. As used in this paragraph, "Acquisition Proposal" shall mean any proposal for a merger or other business combination involving the Company or for the acquisition of a substantial equity interest in it or any material assets of it other than as contemplated by this Agreement. The Company will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any Person conducted heretofore with respect to any of the foregoing.

Section 4.02 Conduct of Business by Parent and Acquisition Corp. Pending the Merger. Prior to the Closing Date, unless the Company shall otherwise agree in writing or as otherwise contemplated by this Agreement the business of Parent and Acquisition Corp. shall be conducted only in the ordinary course;

(a) neither Parent nor Acquisition Corp. shall (i) directly or indirectly redeem, purchase or otherwise acquire or agree to redeem, purchase or otherwise acquire any shares of its capital stock; (ii) amend its charter or by-laws other than to effectuate the transactions contemplated hereby; or (iii) split, combine or reclassify its capital stock or declare, set aside or pay any dividend payable in cash, stock or property or make any distribution with respect to such stock;

(b) neither Parent nor Acquisition Corp. shall (i) issue or agree to issue any additional shares of, or options, warrants or rights of any kind to acquire shares of, its capital stock; (ii) acquire or dispose of any assets other than in the ordinary course of business (except for dispositions in connection with Section 5.02(a) hereof); (iii) incur additional Indebtedness or any other liabilities or enter into any other transaction except in the ordinary course of business; (iv) enter into any contract, agreement, commitment or arrangement with respect to any of the foregoing or (v) except as contemplated by this Agreement, enter into any contract, agreement, commitment or arrangement to dissolve, merge, consolidate or enter into any other material business contract or enter into any negotiations in connection therewith; NO

(c) neither Parent nor Acquisition Corp. will enter into any new employment agreements with any of their officers or employees or grant any increases in the compensation or benefits of their officers and employees.

## ARTICLE V.
## ADDITIONAL AGREEMENTS

Section 6.01 Access and Information. The Company, on the one hand, and Parent and Acquisition Corp., on the other hand, shall each afford to the other and to the other's accountants, counsel and other representatives full access during normal business hours throughout the period prior to the Closing Date to all of its properties, books, contracts, commitments and records (including but not limited to Tax Returns) and during such period, each shall furnish promptly to the other all information concerning its business, properties and personnel as such other party may reasonably request, provided that no investigation pursuant to this Section 6.01 shall affect any representations or warranties

made herein. Each party shall hold, and shall cause its employees and agents to hold, in confidence all such information other than such information that (a) is already in such party's possession or (b) becomes generally available to the public other than as a result of a disclosure by such party or its directors, officers, managers, employees, agents or advisors or (c) becomes available to such party on a non-confidential basis from a source other than a party hereto or its advisors, provided that such source is not known by such party to be bound by a confidentiality agreement with or other obligation of secrecy to a party hereto or another party until such time as such information is otherwise publicly available; provided, however, that (i) any such information may be disclosed to such party's directors, officers, employees and representatives of such party's advisors who need to know such information for the purpose of evaluating the transactions contemplated hereby (it being understood that such directors, officers, employees and representatives shall be informed by such party of the confidential nature of such information), (ii) any disclosure of such information may be made as to which the party hereto furnishing such information has consented in writing and (iii) any such information may be disclosed pursuant to a judicial, administrative or governmental order or request; provided, further, that the requested party will promptly so notify the other party so that the other party may seek a protective order or appropriate remedy and/or waive compliance with this Agreement and if such protective order or other remedy is not obtained or the other party waives compliance with this provision, the requested party will furnish only that portion of such information that is legally required and will exercise its best efforts to obtain a protective order or other reliable assurance that confidential treatment will be accorded the information furnished. If this Agreement is terminated, each party will deliver to the other all documents and other materials (including copies) obtained by such party or on its behalf from the other party as a result of this Agreement or in connection herewith, whether so obtained before or after the execution hereof.

Section 5.02 <u>Additional Agreements</u>. Subject to the terms and conditions herein provided, each of the parties hereto agrees to use its commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including using its commercially reasonable efforts to satisfy the conditions precedent to the obligations of such party, to obtain all necessary waivers, and to lift any injunction or other legal bar to the Merger (and, in such case, to proceed with the Merger as expeditiously as possible). In order to obtain any necessary governmental or regulatory action or non-action, waiver, consent, extension or approval, each of Parent, Acquisition Corp. and the Company agrees to take all reasonable actions and to enter into all reasonable agreements as may be necessary to obtain timely governmental or regulatory approvals and to take such further action in connection therewith as may be necessary. In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, the proper officers and/or directors of Parent, Acquisition Corp. and the Company shall take all such necessary action.

Section 5.03 <u>Liquidation of GunUp Gun Sales, LLC.</u> Stockholder, as the sole Member of GunUp Gun Sales, LLC a South Dakota limited liability company ("GGSA") has agreed that it will wind down and cause the liquidation of GGSA within 30 days of the Closing. "Liquidation" shall mean the winding up of the business and affairs of GGSA so

that there is no successor in interest to the business of GGSA. Stockholder agrees that the liquidation of GGSA is part of the consideration that is being given to Parent for the Parent to complete this Transaction, and that the failure to liquidate GGSA as set forth in this Paragraph will be a breach of this Agreement and Parent shall have the right to seek specific performance of the terms of this Paragraph.  If Stockholder does not liquidate GGSLLC as set forth in this Section 5.03, that Parent would be entitled to liquidated damages as follows:

(i) Stockholder will forfeit its right to receive the  cash payments in Section 1.06 (iii) (B and (C); and

(ii) The Parent Common Stock set forth in Section 1.06(a)(ii) will not be issued unless and until GGSA is liquidated.

Section 5.04 <u>Publicity</u>. No party shall issue any press release or public announcement pertaining to the Merger that has not been agreed upon in advance by Parent and the Company, except as Parent reasonably determines to be necessary in order to comply with the rules of the Commission or of the principal trading exchange or market for the Parent Common Stock, provided, that in such case Parent will use its best efforts to allow the Company to review and reasonably approve any such press release or public announcement prior to its release.

## ARTICLE VI.

## CONDITIONS TO PARTIES' OBLIGATIONS

Section 6.01 <u>Conditions to Parent and Acquisition Corp. Obligations</u>. The obligations of Parent and Acquisition Corp. under the Merger Documents are subject to the fulfillment, at or prior to the Closing, of the following conditions, any of which may be waived in whole or in part by Parent:

(a) The representations and warranties of the Company under this Agreement (when read without regard to any qualification as to materiality or material adverse effect) shall be deemed to have been made again on the Closing Date and shall then be true and correct in all material respects.

(b) The Company shall have performed and complied in all material respects with all agreements and conditions required by this Agreement to be performed or complied with by it on or before the Closing Date.

(c) There shall have been no material adverse change in the Condition of the Company.

(d) No action or proceeding before any court, governmental body or agency shall have been threatened, asserted or instituted to restrain or prohibit, or to obtain damages in respect of, the Merger Documents or the carrying out of the transactions contemplated by the Merger Documents.

(e) Parent and Acquisition Corp. shall have received the following:

(i) copies of resolutions of the Board of Directors and the Stockholder, certified by the Secretary of the Company, authorizing and approving the execution, delivery and performance of the Merger Documents and all other documents and instruments to be delivered pursuant thereto;

(ii) a certificate of incumbency executed by the Secretary of the Company certifying the names, titles and signatures of the officers authorized to execute any documents referred to in this Agreement and further certifying that the Certificate of Incorporation and By-Laws of the Company delivered to Parent and Acquisition Corp. at the time of the execution of this Agreement have been validly adopted and have not been amended or modified;

(iii) evidence as of a recent date of the good standing and corporate existence of the Company issued by the Secretary of State of the State of Delaware and evidence that the Company is qualified to transact business as a foreign corporation and is in good standing in each state of the United States and in each other jurisdiction where the character of the property owned or leased by it or the nature of its activities makes such qualification necessary;

(iv) a certificate, dated the Closing Date, executed by the Chief Executive Officer or other acceptable officer of the Company certifying that he has no knowledge of any plan to issue any securities of the Company, and the Company has not entered into any agreement, written or oral, to issue any securities of the Company except as described in the Disclosures or this Agreement; and

(v) such additional supporting documentation and other information with respect to the transactions contemplated hereby as Parent and Acquisition Corp. may reasonably request.

(f) All corporate and other proceedings and actions taken in connection with the transactions contemplated hereby and all certificates, opinions, agreements, instruments and documents mentioned herein or incident to any such transactions shall be reasonably satisfactory in form and substance to Parent and Acquisition Corp. The Company shall furnish to Parent and Acquisition Corp. such supporting documentation and evidence of the satisfaction of any or all of the conditions precedent specified in this Section 6.01 as Parent or its counsel may reasonably request.

(g) The delivery to Parent of the Financial Statements.

Section 6.02 <u>Conditions to the Company's Obligations</u>. The obligations of the Company under the Merger Documents are subject to the fulfillment, at or prior to the Closing, of the following conditions, any of which may be waived in whole or in part by the Company:

(a) The representations and warranties of Parent and Acquisition Corp. under this Agreement (when read without regard to any qualification as to materiality or material

adverse effect) shall be deemed to have been made again on the Closing Date and shall then be true and correct in all material respects.

(b) Parent and Acquisition Corp. shall have performed and complied in all material respects with all agreements and conditions required by the Merger Documents to be performed or complied with by them on or before the Closing Date.

(c) There shall have been no material adverse change in the Condition of the Parent.

(d) Stockholder shall have received the following:

(i) Copies of resolutions of Parent's and Acquisition Corp.'s respective boards of directors and the sole stockholder of Acquisition Corp., certified by their respective Secretaries, authorizing and approving, to the extent applicable, the execution, delivery and performance of the Merger Documents and all other documents and instruments to be  delivered by them pursuant thereto;

(ii) A certificate of incumbency executed by the respective Secretaries of Parent and Acquisition Corp. certifying the names, titles and signatures of the officers authorized to execute the documents referred to in this Agreement and further certifying that the Certificates of Incorporation and By-Laws of Parent and Acquisition Corp. appended thereto have not been amended or modified.

(iii) A certificate, dated the Closing Date, executed by the President or Chief Executive Officer of each of the Parent and Acquisition Corp., certifying that (A) except  for the filing of the Certificate of Merger, all consents, authorizations, orders and approvals of, and filings and registrations with, any court, governmental body or instrumentality that are required for the execution and delivery of the Merger Documents and the consummation of the Merger shall have been duly made or obtained, and all material consents by third parties required for the Merger have been obtained and (B) no action or proceeding before any court, governmental body or agency has been threatened, asserted or instituted to restrain or prohibit, or to obtain substantial damages in respect of, the Merger Documents or the carrying out of the transactions contemplated by any of the Merger Documents;

(iv) Evidence as of a recent date and within five (5) days of the Closing Date of the good standing and corporate existence of each of Parent and Acquisition Corp. issued  by the Secretary of State of the State of Delaware, and evidence that Parent and Acquisition Corp. are qualified to transact business as foreign corporations and are in good standing  in each state of the United States and in each other jurisdiction where the character of the  property owned or leased by them or the nature of their activities makes such  qualification necessary; and

(v) Such additional supporting documentation and other information with respect  to the transactions contemplated hereby as the Company may reasonably request.

(f) All corporate and other proceedings and actions taken in connection with the transactions contemplated hereby and all certificates, opinions, agreements, instruments

and documents mentioned herein or incident to any such transactions shall be satisfactory in form and substance to the Company. Parent and Acquisition Corp. shall furnish to the Company such supporting documentation and evidence of satisfaction of any or all of the conditions specified in this Section 6.02 as the Company may reasonably request.

(g) No action or proceeding before any court, governmental body or agency shall have been threatened, asserted or instituted to restrain or prohibit, or to obtain substantial damages in respect of, the Merger Documents or the carrying out of the transactions contemplated by the Merger Documents.

## ARTICLE VII.

## INDEMNIFICATION
## AND RELATED MATTERS

Section 7.1. Parent's Indemnification. Subject to the limitations set forth in this Article 7, Parent shall indemnify and hold harmless, Stockholder, and its shareholders, officers, directors, employees, agents and Affiliates (collectively, the "Stockholder Indemnitees") from, against and in respect of losses, claims, actions, damages, liabilities, obligations, fines, proceedings, deficiencies, and out-of-pocket costs and expenses, including reasonable attorneys' fees and disbursements (collectively, "Losses") arising from or related to any of the following:

(a) any breach or default in performance by Parent of any covenant or agreement of Parent contained in this Agreement or any Transaction Document; and

(b) any breach of, or inaccuracy in, any representation or warranty made by Parent in this Agreement or any Transaction Document.

Section 7.2. Stockholder's Indemnification. (a) Upon closing of the transactions contemplated herein, Stockholder hereby agrees to indemnify and hold Parent, its Affiliates, successors and assigns and their respective representatives ("Parent's Indemnitees") harmless from and against, and agrees to defend promptly Parent's Indemnitees from and reimburse Parent's Indemnitees for, any and all losses, damages, costs, expenses, liabilities, obligations and claims of any kind, including, without limitation, reasonable attorneys' fees and other legal costs and expenses, (collectively, the "Losses"), that Parent's Indemnitees may at any time suffer or incur, or become subject to, as a result of or in connection with: (i) any breach or inaccuracy of any of the representations and warranties made by Stockholder in or pursuant to this Agreement or any instrument or document executed by Stockholder in connection with or as a result of this Agreement; (ii) the non-fulfillment of any covenant, undertaking, agreement or other obligation of Stockholder under this Agreement; or (iii) any noncompliance by Stockholder with bulk sales laws or similar laws which may be applicable to the sale or transfer of the Acquired Assets (hereinafter referred to collectively as "Claims"); provided, however, that Parent's Indemnitees shall have the right to be indemnified, held harmless from, defended or reimbursed under this § 6.2(a) hereof only if such Claims have actually been asserted on or before one year after the Closing Date.

(b) In the event a claim against Parent's Indemnitees arises that is covered by

27

the indemnity provisions of § 7.2(a) hereof, notice shall be given promptly by Parent to Stockholder. Stockholder shall have the right to contest and defend by all appropriate legal proceedings any third-party claim and to control all settlements (unless Parent agrees to assume the cost of settlement and to forgo such indemnity) and to select lead counsel to defend any and all third-party claims at the sole cost and expense of Stockholder, as the case may be; provided, however, that Stockholder may not effect any settlement that could result in any cost, expense or liability to Parent's Indemnitees unless Parent consents in writing to such settlement, which consent shall not be unreasonably withheld. Any of Parent's Indemnitees may select and engage counsel to participate in any defense, in which event such counsel shall be at the sole cost and expense of the party selecting and engaging such counsel. In connection with any such claim, action or proceeding, the parties shall cooperate with each other and provide each other with access to relevant Books and Records in their possession.

(c) In addition to the provisions of §7.2(a) and to provide for the payment of any undisclosed liability of the Stockholder or the Company, the Parent may deduct up to $75,000 of the $250,000 payment that is due on May 15, 2016 pursuant to Section 1.06(iii)(C), to pay Parent Indemnitee the amount of any Damage for which Parent Indemnitee is entitled to indemnification pursuant to §7.2(a). Parent shall pay any undisclosed liability up to $75,000. The period during which claims for indemnification from the $75,000 referred to above may be initiated, shall commence on the Closing Date and terminate at 5:00 p.m., Pacific Time, on May 15, 2016.

Section 7.3. Third Party Claims. Promptly after the receipt by any Person entitled to indemnification pursuant to this Article 7 (the "Indemnified Party") of notice of the assertion of a claim or the commencement of any Action against such Indemnified Party by a third party (a "Third Party Claim"), such Indemnified Party shall, if a claim with respect thereto is to be made against any party obligated to provide indemnification pursuant to this Article 7 (the "Indemnifying Party"), give such Indemnifying Party written notice thereof in reasonable detail in light of the circumstances then known to such Indemnified Party. The failure to give such notice shall not relieve any Indemnifying Party from any obligation hereunder except where, and then solely to the extent that, such failure actually and materially prejudices the rights of such Indemnifying Party. Such Indemnifying Party shall have the right, at its option, to defend such claim, at such Indemnifying Party's expense and with counsel of its choice reasonably satisfactory to the Indemnified Party, provided that the Indemnifying Party conducts the defense of such claim actively and diligently. If the Indemnifying Party assumes the defense of such claim, the Indemnified Party agrees to reasonably cooperate in such defense so long as the Indemnified Party is not materially prejudiced thereby and the Indemnifying Party (a) irrevocably acknowledges in writing full responsibility for and agrees to fully indemnify the Indemnified Party, and (b) furnishes satisfactory evidence of the financial ability to indemnify the Indemnified Party. The Indemnified Party may retain separate co-counsel at its sole cost and expense and may participate in the defense of such claim. No Indemnifying Party will consent to the entry of any judgment or enter into any settlement with respect to a Third Party Claim without the prior written consent of the Indemnified Party, which consent will not be unreasonably withheld, provided that such consent shall be granted in connection with any settlement (i) containing a full release of the Indemnified Party and (ii) in the case of a consent from an Indemnified Party, involves only monetary damages. In the event the Indemnifying Party

does not defend or ceases to conduct the defense of such Third Party Claim, (x) the Indemnified Party may defend against, and, consent to the entry of any judgment or enter into any settlement with respect to, such Third Party Claim, (y) the Indemnifying Party will reimburse the Indemnified Party promptly and periodically for the costs of defending against such Third Party Claim, including reasonable attorneys' fees and expenses and (z) the Indemnifying Party will remain responsible for any Losses the Indemnified Party may suffer as a result of such Third Party Claim to the full extent provided in this Article 6.

Section 7.4. <u>Information</u>. Each Party hereby agrees to provide to the other Party on request all information and documentation in its possession or control that is not protected by attorney-client privilege, attorney work-product or otherwise protected and that is reasonably necessary to support and verify any Losses which give rise to a claim for indemnification pursuant to this Article 6 and to provide reasonable access to all books, records and personnel in their possession or under their control which would have a bearing on such claim.

## ARTICLE XIII
## TERMINATION PRIOR TO CLOSING

Section 8.01 <u>Termination of Agreement</u>. This Agreement may be terminated at any time prior to the Closing:

(a) by the mutual written consent of the Company, Acquisition Corp. and Parent;

(b) by the Company, if Parent or Acquisition Corp. (i) fails to perform in any material respect any of its agreements contained herein required to be performed by it on or prior to the Closing Date, or (ii) materially breaches any of their representations, warranties or covenants contained herein, which failure or breach is not cured by the date the Company has satisfied all of its conditions to Closing, or if the Company is unable to obtain the written consent of the Required Majority of the Senior Notes, after using it commercially reasonable efforts to obtain such consent;

(c) by Parent and Acquisition Corp. if the Company (i) fails to perform in any material respect any of its agreements contained herein required to be performed by it on or prior to the Closing Date or (ii) materially breaches any of its representations, warranties or covenants contained herein, which failure or breach is not cured by the date Parent and Acquisition Corp. have satisfied all of its conditions to Closing;

(d) by either the Company, on the one hand, or Parent and Acquisition Corp., on the other hand, if there shall be any order, writ, injunction or decree of any governmental or regulatory agency binding on Parent, Acquisition Corp. or the Company that prohibits or restrains any of them from consummating the transactions contemplated hereby, provided that the parties hereto shall have used their best efforts to have any such order, writ, injunction or decree lifted and the same shall not have been lifted within ninety (90) days after entry by any such court or governmental or regulatory agency; or

(e) by either the Company, on the one hand, or Parent and Acquisition Corp., on the other hand, if the Closing has not occurred on or prior to December 31, 2014, for any reason other than delay or nonperformance of the party seeking such termination.

Section 8.02 Termination of Obligations. Termination of this Agreement pursuant to this Article VIII shall terminate all obligations of the parties hereunder, except for the obligations under Article VII.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1. <u>Press Releases and Public Announcements</u>. Subject to this Section 8.1, no press release, publicity or other form of public written disclosure related to this Agreement shall be permitted by either party to be published or otherwise disclosed unless the other party has indicated its consent to the form of release in writing.

Section 9.2. <u>Entire Agreement</u>. This Agreement, including the Schedules and the other Transaction Documents, constitutes the entire agreement among the Parties hereto with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto. In the event of any conflict between the terms of this Agreement and any agreement or document entered into or delivered in accordance herewith, including any purchase order, terms and conditions of supply or any other document delivered in accordance herewith, the terms of this Agreement shall prevail.

Section 9.3. <u>Succession and Assignment; No Third-Party Beneficiary</u>. This Agreement and the rights of the Parties hereunder may not be assigned by operation of law or otherwise. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and the successors and permitted assigns thereof. This Agreement is for the sole benefit of the Parties and their successors and permitted assignees and nothing herein expressed or implied will give or be construed to give any Person, other than the Parties and such successors and permitted assignees, any legal or equitable rights hereunder (other than the provision of Article 6 relating to indemnified parties).

Section 9.4. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, (including by facsimile transmission or by electronic mail with scan or attachment signature) each of which will be deemed an original, but all of which together will constitute but one and the same instrument.

Section 9.5. <u>Headings</u>. The headings contained in this Agreement are for convenience purposes only and will not in any way affect the meaning or interpretation hereof.

Section 9.6. <u>Notices</u>. Any and all notices required hereunder shall be in writing and shall be (a) sent by certified, first-class mail, postage prepaid, (b) sent by national overnight

courier or (c) delivered by facsimile (with the original promptly sent by any of the foregoing manners), to the addresses or facsimile numbers of the other Party as set forth below. The effective date of any notice hereunder shall be the date of receipt by the receiving Party:

If to Parent:  Media Lodge,Inc
1690 Roberts Blvd., Suite 108
Kennesaw, GA  30144
Attention: Jeff Siegel, CEO

Telephone: 860-912-9966

Copy to:  The Bingham Law Group, APC
2173 Salk Avenue, Suite 250
Carlsbad, CA 92008
Attention: Stanley Moskowitz, Esq.

Telephone: 858-523-0100
Facsimile:  858-523-0444

If to Stockholder:  GunUp, Inc.
9732 45th Avenue N.E.
Seattle, Washington 98115
Attention: Dan Hall, CEO

Telephone:
Facsimile:

-22-

Copy to:  Ashbaugh Beal
4400 Columbia Center
701 Fifth Avenue
Seattle, WA 98104
Attention: Matt Runkel, Esq.

Telephone: 206-386-5900
Facsimile:

Section 9.7. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware.

Section 9.8. <u>Amendments and Waivers</u>. No alternation, waiver, cancellation, or any other change or modification in any term or condition of this Agreement, or any agreement contemplated to be negotiated or reached pursuant to the terms of this Agreement, shall be valid or binding on either party unless made in writing and signed by duly authorized representatives of both Parties. Any waiver of breach or default pursuant to this Agreement shall not be a waiver of any other subsequent default. Failure or delay by either party to enforce any term or condition of this Agreement shall not constitute a waiver of such term or condition.

Section 9.9. <u>Severability</u>. To the extent any provision of this Agreement is found by a court of competent jurisdiction to be invalid or unenforceable, that provision notwithstanding, the remaining provisions of this Agreement shall remain in full force and effect and such invalid or unenforceable provision shall be deleted.

Section 9.10. <u>Expenses</u>. Each of Parent and Stockholder will bear its own costs and expenses (including legal and accounting fees and expenses) incurred in connection with this Agreement, the Transaction Documents and the transactions contemplated hereby. All of Company's costs and legal expenses up to and including the Closing Date shall be the sole expense of the Stockholder.

Section 9.11. <u>Construction</u>. This Agreement is the result of negotiation between the Parties and their respective counsel. This Agreement will be interpreted fairly in accordance with its terms and conditions and without any strict construction in favor of either Party. Any ambiguity shall not be interpreted against the drafting Party.

Section 9.12. <u>Incorporation of Schedules</u>. The Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

Section 9.13. <u>Waiver of Jury Trial</u>. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE ITS RIGHT TO TRIAL BY JURY IN ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY..

Section 9.13 <u>Section Headings and Gender</u>. The Section headings used herein are inserted for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement. All personal pronouns used in this Agreement

shall include the other genders, whether used in the masculine, feminine or neuter gender, and the singular shall include the plural, and vice versa, whenever and as often as may be appropriate.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be binding and effective as of the day and year first above written.

**MEDIA LODGE, INC.**

By: _____
Name: Jeff Siegel
Title: CEO

**MLA ACQUISITION CORP.**

By: _____
Name: Susan Lokey
Title: CEO

**GUNUP INC. (STOCKHOLDER)**

By: s/ _____
Name:
Title: CEO

**GUNUP PUBLISHING, INC.**

By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be binding and effective as of the day and year first above written.

**MEDIA LODGE, INC.**

By:_
Name: Susan Lokey
Title: CEO

**MLA ACQUISITION CORP.**

By:_
Name: Susan Lokey
Title: CEO

**GUNUP INC. (STOCKHOLDER)**

By; s/
Name:
Title: CEO

**GUNUP PUBLISHING, INC.**

By:
Name: Daniel M Hall
Title: President

34

19-1-0167772-CV
⚖ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
**19108936**
S. Lark Ingram - 34
DEC 12, 2019 04:32 PM

*Rebecca Keaton*
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

# SUPERIOR COURT OF COBB COUNTY
# STATE OF GEORGIA

CIVIL ACTION NUMBER  <u>19108936</u>

$216.00 COST PAID

GunUp, Inc.

_____
**PLAINTIFF**

**VS.**

Urvan, Steve

_____
**DEFENDANT**

**SUMMONS**

TO: URVAN, STEVE

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

> **David P Conley**
> **Moore, Ingrm Johnson & Steele**
> **Emerson Overlook**
> **326 Roswell Street**
> **Marietta, Georgia 30060**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 12th day of December, 2019.**

Clerk of Superior Court

*Rebecca Keaton*

Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

Page 1 of 1

ID# 2019-0167773-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

19108936

S. Lark Ingram - 34
DEC 12, 2019 04:32 PM

Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

## General Civil and Domestic Relations Case Filing Information Form

☑ **Superior or** ☐ **State Court of** ___Cobb___ **County**

**For Clerk Use Only**

**Date Filed** ___12-12-2019___        **Case Number** ___19108936___
**MM-DD-YYYY**

| **Plaintiff(s)** | | | | | | **Defendant(s)** | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| GunUp, Inc. | | | | | | Urvan, Steve | | | | |
| Last | First | Middle I. | Suffix | Prefix | | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | | Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** ___Conley, Mr. David P___        **Bar Number** ___141760___   **Self-Represented** ☐

### Check One Case Type in One Box

**General Civil Cases**

- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Automobile Tort
- ☑ General Tort
- ☐ Contract
- ☐ Real Property
- ☐ Civil Appeal
- ☐ Habeas Corpus
- ☐ Restraining Petition
- ☐ Injunction/Mandamus/Other Writ
- ☐ Garnishment
- ☐ Landlord/Tenant
- ☐ Other General Civil

**Domestic Relations Cases**

- ☐ Dissolution/Divorce/Separate Maintenance
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Adoption
- ☐ Family Violence Petition
- ☐ Other Domestic Relations

**Post-Judgement – Check One Case Type**

- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony.
- ☐ Modification
- ☐ Administrative/Other

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all the same parties, subject matter, or factual issues. If so, provide a case number for each.

___16-1-03815___              _____
**Case Number**                    **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. §9-11-7.1.

☐ Is interpreter needed in this case? If so, provide the language(s) required. _____
                                                          **Language(s) Needed**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

ID# 2019-0167774-CV
⚡ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**19108936**

S. Lark Ingram - 34
DEC 12, 2019 04:32 PM

*Rebecca Keaton*
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

DISCLOSURE STATEMENT
CLERK OF SUPERIOR COURT

CASE NUMBER    **19108936**

**GunUp, Inc.**
                        Plaintiff

                        Vs.

**Urvan, Steve**
                        Defendant

## TYPE OF ACTION

- ○ Divorce without Agreement Attached
- ○ Divorce with Agreement Attached
- ○ Domestic Relations
- ○ Damages Arising out of Contract
- ✔ Damages Arising out of Tort
- ○ Condemnation
- ○ Equity
- ○ Zoning – County Ordinance Violations (i.e., Injunctive Relief-Zoning)
- ○ Zoning Appeals (denovo)
- ○ Appeal, Including denovo appeal – excluding Zoning

- ○ URESA
- ○ Name Change
- ○ Other
- ○ Recusal
- ○ Adoption

## PREVIOUS RELATED CASES

Does this case involve substantially the same parties, or substantially the same subject matter, or substantially the same factual issues, as any other case filed in this court (Whether pending simultaneously or not)?

- ○    NO
- ✔ YES – If yes, please fill out the following:
  1. Case # **16-1-03815**

  2. Parties **Media Lodge  v GunUp, Inc**

  3. Assigned Judge **Ingram**

  4. Is this case still pending?    ○    Yes    ✔    No

  5. Brief description of similarities:
     **similar parties / transaction**

/S/    **Conley, Mr. David P**

                                Attorney or Party Filing Suit

ID# 2019-0172285-CV
⊕ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**19108936**

DEC 20, 2019 03:06 PM

*Rebecca Keaton*
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

## SUPERIOR COURT OF COBB COUNTY
## STATE OF GEORGIA

GUNUP, INC.,

　　　　Plaintiff,

v.

STEVE URVAN,

　　　　Defendant.

CIVIL ACTION FILE.

NO. __19-1-08936_____

## VERIFIED APPLICATION OF DUNCAN E. MANVILLE TO APPEAR AS COUNSEL *PRO HAC VICE* FOR PLAINTIFF

COMES NOW, Plaintiff GunUp, Inc. ("Plaintiff"), pursuant to State Court Rule 4.4, and moves this Court to allow Duncan E. Manville to appear in this case as counsel *pro hac vice* for Plaintiff. Plaintiff respectfully shows unto the Court as follows:

1. Duncan E. Manville is a lawyer with the firm of Savitt Bruce & Willey LLP, whose address is 1425 Fourth Avenue, Suite 800, Seattle, WA 98101, telephone number 206-749-0500. His residence is 1629 Second Avenue West, Seattle, WA 98119.

2. Duncan E. Manville will be representing the Plaintiff, GunUp, Inc., whose address is 43126 SE 175th Lane, North Bend, WA 98045.

3. Duncan E. Manville is currently admitted to practice as an attorney in the following courts:

| Jurisdiction | Admission Date |
|---|---|
| Illinois State Court (Inactive) | 11/4/1999 |
| Washington State Court | 10/23/2000 |

1

| Jurisdiction | Admission Date |
|---|---|
| U.S. District Court, Western District of Washington | 1/26/2001 |
| U.S. Court of Appeals, Ninth Circuit | 11/06/2003 |
| U.S. District Court, Eastern District of Washington | 12/12/2006 |

4. Duncan E. Manville has not been denied admission *pro hac vice*, has not had his admission revoked, and has not otherwise been formally disciplined or sanctioned in the State of Georgia.

5. There have not been any formal, written disciplinary proceedings brought against Duncan E. Manville by a disciplinary authority or any other jurisdiction.

6. Duncan E. Manville has not been held formally in contempt or otherwise sanctioned in any court in a written order for disobedience to its rules or orders.

7. Duncan E. Manville was admitted *pro hac vice* in the Superior Court of Cobb County, located at 70 Haynes St, Marietta, GA 30090, in the matter GunUp v. Media Lodge, Inc., CAFN 18-1-523. Applicant has filed no other application to appear *pro hac vice* within the past two years in the State of Georgia.

8. Duncan E. Manville is familiar with the Georgia Rules of Professional Conduct, local rules, and court procedures of the State Court of Georgia.

9. Duncan E. Manville has been engaged to serve as counsel for Plaintiff GunUp, Inc., and Duncan E. Manville is being sponsored by Robert D. Ingram. Mr. Ingram is regularly admitted to practice in the State Courts of Georgia.

**WHEREFORE,** Plaintiff moves for the admission of Duncan E. Manville *pro hac vice* as counsel for Plaintiff in this case and requests that the Court enter Plaintiff's proposed order.

**[signatures on next page]**

2

Respectfully submitted this 9th day of December, 2019.

**SAVITT BRUCE & WILLEY LLP**



Duncan E. Manville
Wa. Bar No. 30304
1425 Fourth Avenue, Suite 800
Seattle, WA 98101
Telephone: 206-749-0500
Facsimile: 206-749-0600
E-mail: dmanville@sbwllp.com

Signed and sworn to before me on

this 19 day of December, 2019.

NOTARY PUBLIC
My Commission Expires: 4|29|2023

**MOORE INGRAM JOHNSON & STEELE, LLP**

Robert D. Ingram
Ga. Bar No. 383405
David P. Conley
Ga. Bar No. 141760
326 Roswell Street
Marietta, GA 30060
Telephone: 770-429-1499
Facsimile: 770-429-8631
E-mail: dpconley@mijs.com

3

# State Bar of Georgia

Office of the General Counsel

ID# 2020-0016782-CV
⚖ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

19108936

FEB 05, 2020 01:07 PM

PAULA J. FREDERICK
General Counsel

Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

January 28, 2020

LEIGH BURGESS
WILLIAM V. HEARNBURG, JR.
JAMES S. LEWIS
JENNY K. MITTELMAN
ANDREEA N. MORRISON
ADRIENNE D. NASH
WILLIAM D. NESMITH, III
WOLANDA R. SHELTON
JOHN J. SHIPTENKO

The Honorable S. Lark Ingram
Superior Court of Cobb County
30 Waddell Street
Marietta, GA 30090

Re: Application for Admission *Pro Hac Vice* of Mr. Duncan E. Manville, Gunup, Inc. v. Steve Urvan Superior Court of Cobb County, Civil Action File No. 19-1-08936

Dear Judge Ingram:

Mr. Duncan E. Manville filed an application for admission *pro hac vice* with the Superior Court of Cobb County in the above-referenced case. Pursuant to Rule 4.4 of the Uniform Superior Court Rules, Mr. Manville served the Office of the General Counsel of the State Bar of Georgia with the required fees and a copy of the application. Based upon my review, Mr. Manville has paid the required fees and it appears as though the application complies with Appendix A of Rule 4.4.

By copy of this letter, I request that Mr. Manville and/or Mr. Ingram, sponsor, serve a copy of this letter on all parties, as this case is e-filed and my office is not a party to the case. If Mr. Manville is admitted *pro hac vice*, we ask that Mr. Manville notify this office once this case is closed.

Yours truly,

John J. Shiptenko
Senior Assistant General Counsel

JJS/ksj
c:
Duncan Manville
Robert D. Ingram

State Bar of Georgia

January 28, 2020

The Honorable S. Lark Ingram

ID# 2020-0022447-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**19108936**

FEB 17, 2020 02:59 PM

Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

| | |
|---|---|
| GUNUP, INC., | CIVIL ACTION FILE. |
| Plaintiff, | NO. 19-1-08936 |
| v. | |
| STEVE URVAN, | |
| Defendant. | |

## **ORDER**

THIS MATTER came before me upon application by Duncan Manville, an attorney duly licensed to practice law in the State of Washington, for Admission Pro Hac Vice in the above-captioned case, filed with this Court on December 20, 2019. Upon review of the Application, it is hereby:

ORDERED that Duncan E. Manville's Application for Pro Hac Vice Admission in this court for the above-captioned case is GRANTED.

_____  2-17-2020
The Honorable S. Lark Ingram
Cobb County Superior Court

# State Bar
# of Georgia

Office of the General Counsel

**PAULA J. FREDERICK**
*General Counsel*

January 28, 2020

**LEIGH BURGESS**
**WILLIAM V. HEARNBURG, JR.**
**JAMES S. LEWIS**
**JENNY K. MITTELMAN**
**ANDREEA N. MORRISON**
**ADRIENNE D. NASH**
**WILLIAM D. NESMITH, III**
**WOLANDA R. SHELTON**
**JOHN J. SHIPTENKO**

The Honorable S. Lark Ingram
Superior Court of Cobb County
30 Waddell Street
Marietta, GA 30090

Re: Application for Admission *Pro Hac Vice* of Mr. Duncan E. Manville, <u>Gunup, Inc. v.</u>
<u>Steve Urvan</u> Superior Court of Cobb County, Civil Action File No. 19-1-08936

Dear Judge Ingram:

Mr. Duncan E. Manville filed an application for admission *pro hac vice* with the Superior
Court of Cobb County in the above-referenced case. Pursuant to Rule 4.4 of the Uniform
Superior Court Rules, Mr. Manville served the Office of the General Counsel of the State Bar of
Georgia with the required fees and a copy of the application. Based upon my review, Mr.
Manville has paid the required fees and it appears as though the application complies with
Appendix A of Rule 4.4.

By copy of this letter, I request that Mr. Manville and/or Mr. Ingram, sponsor, serve a
copy of this letter on all parties, as this case is e-filed and my office is not a party to the case. If
Mr. Manville is admitted *pro hac vice*, we ask that Mr. Manville notify this office once this case
is closed.

Yours truly,

John J. Shiptenko
Senior Assistant General Counsel

JJS/ksj
c:
Duncan Manville
Robert D. Ingram

ID# 2020-0053317-CV
**EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**19108936**

S. Lark Ingram - 34
MAY 22, 2020 02:41 PM

*Rebecca Keaton*

Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

| | |
|---|---|
| GUNUP, INC., | CIVIL ACTION FILE. |
| Plaintiff, | NO.   19108936 |
| v. | **NOTICE OF FILING PROOF OF SERVICE OF SUMMONS AND COMPLAINT** |
| STEVE URVAN, | |
| Defendant. | |

Plaintiff GunUp, Inc. hereby gives notice of filing proof of service in this matter.  The following information and attached documents support this Notice:

1.        Attached hereto as **Exhibit A** is a true and correct copy of the Declaration of Duncan E. Manville in Support of Notice of Filing of Proof of Service of Summons and Complaint (the "Manville Declaration").

2.        Attached hereto as **Exhibit B** is a true and correct copy of a Verified Return of Service executed on May 4, 2020 by process server Ray Wilson of Choice Process Serving. This return of service and the Manville Declaration establish that on May 1, 2020, Mr. Wilson delivered the following documents to Luca Handsman at Defendant Steve Urvan's primary residence, 961 Fern Drive, Delray Beach, Florida 33483: Summons; Complaint; [Proposed] Order Granting Application of Duncan E. Manville to Appear as Counsel Pro Hac Vice for Plaintiff; Case Filing Information Form; Disclosure Statement; Verified Application of Duncan

NOTICE OF FILING PROOF OF SERVICE OF
SUMMONS AND COMPLAINT - 1

E. Manville to Appear as Counsel Pro Hac Vice for Plaintiff. Pursuant to Georgia Code §§ 9-10-94 and 9-11-4(e)(7), Mr. Wilson effected service of the Summons and Complaint in this matter on Mr. Urvan by "leaving copies thereof at the defendant's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein."

3.      Attached hereto as **Exhibit C** is a true and correct copy of an Affidavit of Investigative Efforts to Complete Service of Process, executed on May 13, 2020 by private investigator Ronald A. Mann of Derecho Investigations & Security Consultants ("Derecho Investigations") (the "Mann Affidavit").

4.      Attached hereto as **Exhibit D** is a true and correct copy of an Affidavit of Investigative Efforts to Complete Service of Process, executed on May 13, 2020 by private investigator James A. Mayberry of Derecho Investigations (the "Mayberry Affidavit").

5.      The Manville Declaration, Mann Affidavit and Mayberry Affidavit establish that on May 8, 2020, Mr. Mayberry delivered the following documents to Mr. Urvan and to Selena Price at 18210 Town Harbour Road, Cornelius, North Carolina 28031: Summons; Complaint; [Proposed] Order Granting Application of Duncan E. Manville to Appear as Counsel Pro Hac Vice for Plaintiff; Case Filing Information Form; Disclosure Statement; Verified Application of Duncan E. Manville to Appear as Counsel Pro Hac Vice for Plaintiff. Pursuant to Georgia Code §§ 9-10-94 and 9-11-4(e)(7), Mr. Mayberry effected service of the Summons and Complaint in this matter on Mr. Urvan by delivering them "to the defendant personally," and/or by "leaving copies thereof at the defendant's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein."

NOTICE OF FILING PROOF OF SERVICE OF
SUMMONS AND COMPLAINT - 2

DATED: May 22, 2020.

**MOORE INGRAM JOHNSON & STEELE, LLP**

By:    /s/ Robert D. Ingram
     Robert D. Ingram, Georgia Bar No.: 383405
     David P. Conley, Georgia Bar No.: 141760
     326 Roswell Street, Suite 100
     Marietta, GA 30060
     Telephone: (770) 429-1499
     Facsimile: (770)429-8631
     Email: ringram@mijs.com
     Email: dpconley@mijs.com

**SAVITT BRUCE & WILLEY LLP**

By:    /s/ Duncan E. Manville
     Duncan E. Manville, WSBA #30304
     1425 Fourth Avenue, Suite 800
     Seattle, WA 98101-2272
     Telephone: (206) 749-0500
     Facsimile: (206) 749-0600
     Email: dmanville@sbwllp.com
     *Admitted pro hac vice*

*Attorneys for Plaintiff GunUp, Inc.*

NOTICE OF FILING PROOF OF SERVICE OF
SUMMONS AND COMPLAINT - 3

# EXHIBIT A

1
2
3
4
5
6
7

SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

8
9

GUNUP, INC.,

CIVIL ACTION FILE.

10

         Plaintiff,

NO.   19108936

11

    v.

12

**DECLARATION OF DUNCAN E. MANVILLE IN SUPPORT OF NOTICE OF FILING PROOF OF SERVICE OF SUMMONS AND COMPLAINT**

STEVE URVAN,

13

        Defendant.

14
15
16

I, Duncan E. Manville, state as follows:

17

    1.    I am over 18 years of age and am competent to testify to the matters stated

18

herein.  I make this declaration based on personal knowledge and based on my knowledge of

19

the pertinent files and records.

20

    2.    I am a partner with the firm of Savitt Bruce & Willey LLP ("SBW").  I am the

21

primary attorney of record representing Plaintiff GunUp, Inc. in this matter.

22

    3.    Steve Urvan was a member of the board of directors of Media Lodge, Inc. at all

23

times relevant to this litigation.  On April 30, 2020, Media Lodge's counsel, S. Wade Malone,

24

informed me that Mr. Urvan's principal residence address is 961 Fern Drive, Delray Beach,

25

Florida 33483 (the "Delray Beach House").

26
27

DECLARATION OF DUNCAN E. MANVILLE IN
SUPPORT OF NOTICE OF FILING PROOF OF
SERVICE OF SUMMONS AND COMPLAINT - 1

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

4. After I received this information from Mr. Malone, my office directed process server Ray Wilson of Choice Process Serving to serve the Summons and Complaint in this matter on Mr. Urvan at the Delray Beach House. Based on Mr. Wilson's Verified Return of Service, a true and correct copy of which is attached as Exhibit B to GunUp's Notice of Filing Proof of Service of Summons and Complaint, Mr. Wilson served the Summons and Complaint on Mr. Urvan on May 1, 2020.

5. Also on April 30, 2020, Mr. Malone informed me that on May 8, 2020, Mr. Urvan would be present in Mecklenburg County, North Carolina for a remote video deposition in another matter. I had previously been advised that Mr. Urvan had a residence at 18210 Town Harbour Road, Cornelius, North Carolina 28031 (the "Cornelius House"). Cornelius is in Mecklenburg County.

6. On May 5, 2020, my office engaged private investigator Ronald A. Mann and his associate, private investigator James A. Mayberry, both of Derecho Investigations & Security Consultants ("Derecho Investigations"), to serve the Summons and Complaint in this matter on Mr. Urvan at the Cornelius House, either before or during the May 8 deposition.

7. As set forth in Mr. Mann's May 13, 2020 Affidavit of Investigative Efforts to Complete Service of Process (the "Mann Affidavit") and Mr. Mayberry's May 13, 2020 Affidavit of Investigative Efforts to Complete Service of Process (the "Mayberry Affidavit"), on May 8, 2020, Mr. Mann and Mr. Mayberry arrived early in the morning at the Cornelius House, observed a Lexus 450 registered to Mr. Urvan in the driveway, and staked out the residence.

8. At 10:30 AM EDT (7:30 AM PDT in Seattle, where I was located), I began taking Mr. Urvan's deposition by video link, using the Zoom platform. Mr. Malone and a North Carolina court reporter also participated in the Zoom meeting, each from a remote location. In addition, I was connected to our legal assistant, Nathan T. Garberich, via Zoom and text message on other devices. Mr. Garberich could hear me and, to some extent, the other

DECLARATION OF DUNCAN E. MANVILLE IN SUPPORT OF NOTICE OF FILING PROOF OF SERVICE OF SUMMONS AND COMPLAINT - 2

participants in the deposition.  Mr. Urvan was seated in front of a grey curtain or drape that prevented me from observing the room in which he was located.

9.      Shortly before 11:00 AM EDT, Mr. Garberich advised me that Mr. Mann was knocking on the front door of the Cornelius House.  I could not hear the knocking over Mr. Urvan's video feed, and I so informed Mr. Garberich.  Mr. Garberich told me that he had directed Mr. Mann and Mr. Mayberry to go around to the side of the house and try again. Several minutes later, at 11:01 AM EDT, I heard loud pounding over Mr. Urvan's video feed.

10.     I informed Mr. Urvan that the person knocking on his door was a process server who wished to serve a summons, complaint, and case cover sheet in *GunUp, Inc. v. Urvan*, Superior Court of Cobb County, Georgia Case No. 19108936.  I said that if Mr. Urvan wished, the process server would put the legal papers on his doorstep, and would step back so Mr. Urvan could collect them while maintaining at least a six-foot distance (due to the COVID-19 pandemic).  I asked Mr. Urvan if he would open his door and accept service of the legal papers.

11.     Mr. Urvan did not respond verbally.  Instead, he hung his head, looked down, and sat immobile.  Mr. Malone objected, and stated that he and Mr. Urvan would be taking a break.  Mr. Urvan cut his video feed and Mr. Malone left the room in which he had been sitting, and the deposition was paused.

12.     During the break in the deposition, Mr. Garberich forwarded me a photograph that Mr. Mann had taken through the back door of the Cornelius House.  This photograph showed, hanging inside an interior glass-paneled door, a curtain or drape resembling the curtain or drape that I had observed behind Mr. Urvan.  Mr. Garberich also advised me that Mr. Mayberry had left on the front doorstep of the Cornelius House an envelope containing the legal papers he and Mr. Mann were attempting to serve, and that he had subsequently observed Selena Price (whom I understood to be Mr. Urvan's girlfriend) open the front door and collect the envelope.

DECLARATION OF DUNCAN E. MANVILLE IN
SUPPORT OF NOTICE OF FILING PROOF OF
SERVICE OF SUMMONS AND COMPLAINT - 3

13.    Mr. Malone did not return to the Zoom meeting until after 1:30 PM EDT, and Mr. Urvan did not return until ten or fifteen minutes later.  Their break thus lasted for approximately two hours and forty-five minutes.

14.    When the deposition resumed, I again asked Mr. Urvan if he would open his door and accept service of the legal papers that our process server was attempting to serve.  Mr. Malone objected to my question (and other related questions that I asked), but did not instruct Mr. Urvan not to answer.  Nevertheless, Mr. Urvan would not answer the question, instead remaining mute.  I said I was aware that during the break in the deposition, Ms. Price had collected the legal papers from the front doorstep of Mr. Urvan's house.  I advised Mr. Urvan that our process server had a second envelope containing the same legal documents, and that if Mr. Urvan would not open his door and accept delivery of the second envelope, our process server would leave the documents at his doorstep so he could collect them later.  Mr. Urvan said nothing in response to my statements and questions regarding service of process in this matter.

15.    Based on this declaration, the Mann Affidavit and the Mayberry Affidavit, true and correct copies of which are attached as Exhibits A, C and D to GunUp's Notice of Filing Proof of Service of Summons and Complaint, Mr. Mayberry served the Summons and Complaint on Mr. Urvan on May 8, 2020.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 22nd day of May, 2020 at Seattle, Washington.


    _____/s/ Duncan E. Manville_____
    Duncan E. Manville

DECLARATION OF DUNCAN E. MANVILLE IN
SUPPORT OF NOTICE OF FILING PROOF OF
SERVICE OF SUMMONS AND COMPLAINT - 4

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

## **CERTIFICATE OF SERVICE**

I hereby declare under penalty of perjury under the laws of the State of Washington that on this date, I caused a true and correct copy of the foregoing document to be served on the following in the manner(s) indicated:

Mr. Steve Urvan
961 Fern Dr.
Delray Beach, FL 33483

*Defendant*

☐ Via E-Filing
☐ Via Legal Messenger
☐ Via Email
☒ Via U.S. Mail
☐ Via Fax

DATED this 22nd day of May, 2020 at Seattle, Washington.

_____
Nate Garberich

CERTIFICATE OF SERVICE

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

# EXHIBIT B

# VERIFIED RETURN OF SERVICE

**State of Georgia**                    **County of Cobb**                    **Superior Court**

Case Number: 19108936



Plaintiff:
**GunUp, Inc**

CHC2020003084

vs.

Defendant:
**Urvan Steve**

For:
Savitt Bruce & Willey LLP
1425 Fourth Ave
Suite 800
Seattle, WA 98101

Received by CHOICE PROCESS SERVING on the 1st day of May, 2020 at 9:19 pm to be served on **Steve Urvan, 961 Fern Dr, Delray Beach, FL 33483**.

I, Ray Wilson, being duly sworn, depose and say that on the **2nd day of May, 2020 at 9:12 pm, I:**

**SUBSTITUTE** served by delivering a true copy of the **Summons to Steve Urvan; Complaint with exhibits; [Proposed] Order Granting Application of Duncan E. Manville to Appear as Counsel Pro Hac Vice for Plaintiff; Case Filing Information Form; Disclosure Statement; Verified Application of Duncan E. Manville to Appear as Counsel Pro Hac Vice for Plaintiff** with the date and hour of service endorsed thereon by me, to: **Luca Handsman** as Co-Resident at the address of: **961 Fern Dr, Delray Beach, FL 33483**, the within named person's usual place of **Abode**, who resides therein, who is fifteen (15) years of age or older and informed said person of the contents therein, in compliance with state statutes.

**Additional Information pertaining to this Service:**
5/2/2020 9:25 am Staked out property for several hours. White BMW (FL tag NMB-M28) and Black Jeep (FL tag CXM M14) in driveway. White male on property fitting the description of Luca Handsman (brother of Selena Price) at home and people coming and going as appeared to be doing some sort of fitness group at home. I was given photographs of Selena Price and Steve Urvan by my client. I was able to view the Instagram page of Selena to see Luca Handsman. During the stake out I asked the neighbor at 966 Fern Dr if he recognized the people in the pictures. He confirmed that Selena Price and Luca Handsman do reside at 961 Fern Dr but he was not sure about defendant.
5/2/2020 7:30 pm Staked out property once again. There were several cars in the driveway: White BMW (FL tag AYD G)#), Black Jeep (FL tag CXM M14), White Jeep (FL tag DFA 063) Grey Mercedes Benz (FL tag IA4 BLM). At 9:12 PM i rang the door bell and the same white male I saw in the morning stakeout answered the door. I asked him if he was Luca he said "yes I am but I don't want you, go away" and slammed the door. I shouted to him through the door the content of the paper and notified him that I was going to leave the papers by the door for him to retrieve later and give to the defendant Steve Urvan.

**Description** of Person Served: Age: 30+, Sex: M, Race/Skin Color: White, Height: 6'2", Weight: 190, Hair: Brown, Glasses: N

## VERIFIED RETURN OF SERVICE For 19108936

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. Under penalty of perjury, Pursuant to Florida Statute 92.525, I declare that I have read the foregoing document, and that the facts stated in it are true.

Subscribed and Sworn to before me on the 4th day of May, 2020 by the affiant who is personally known to me.

_____
NOTARY PUBLIC

RICKY D. GORDON
Commission # GG 146998
Expires November 18, 2021
Bonded Thru Troy Fain Insurance 800-385-7019

Ray Wilson
1281

**CHOICE PROCESS SERVING**
**5489 Wiles Rd**
**#302**
**Coconut Creek, FL 33073**
**(954) 905-6535**

Our Job Serial Number: CHC-2020003084

Copyright © 1992-2020 Database Services, Inc. - Process Server's Toolbox V8.1c

# EXHIBIT C

**Derecho Investigations & Security Consultants**

P.O. Box 480680
Charlotte, NC
28269

AFFIDAVIT OF INVESTIGATIVE EFFORTS TO COMPLETE SERVICE OF PROCESS
IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

Civil Action No: **19-1-08936**

Service for:   Steve F. Urvan, 18210 Town Harbour Rd., Cornelius NC 28031

On Tuesday, May 5th, 2020, Nathan Garberich from Savitt Bruce & Willey, LLP requested the assistance of Derecho Investigations, Inc. in Service of Process to Mr. Steve F. Urvan.

On Friday, May 8th, 2020, I, Ron Mann, arrived at the wooded area immediately to the north of the address above at 5:30 AM and verified with Mr. Jim Mayberry, employee of Derecho Investigations, that a Lexus 450 (NC plate: BLN-3911) registered to Mr. Urvan was present in the driveway of the above home. I then gave Mr. Mayberry a copy of the following documents to serve on Mr. Urvan: Summons, Complaint, General Civil and Domestic Relations Case Filing Information Form, Disclosure Statement, Verified Application of Duncan E. Manville to Appear as Counsel *Pro Hac Vice* for Plaintiff, and [Proposed] Order Granting Application of Duncan E. Manville to Appear as Counsel *Pro Hac Vice* for Plaintiff.

I updated Mr. Mayberry on the service plan and made sure Mr. Mayberry would monitor anyone arriving or leaving the home. I then departed the location.

I returned to the wooded area location on May 8th at 10:00 AM. I confirmed with Mr. Mayberry that Mr. Urvan's vehicle had not departed. Mr. Mayberry stated that it had not, but that a yard maintenance man wearing a GunBroker.com sweatshirt had arrived and could be heard mowing the grounds of the address above. I then contacted Mr. Garberich and confirmed the delivery plan. Mr. Mayberry and I waited until 10:58 AM.

At 10:50 AM, the yard man said, "If you have paperwork to give my boss, I can take it." I said we needed to give the paperwork to the man's boss.

At 10:58 AM, Mr. Mayberry and I departed the wooded area location in my truck and drove to the above address. In addition to Mr. Urvan's Lexus, there was a white Ford Super Duty truck in the driveway. The truck's NC plate number was DX 6565. It is registered to "GB Racing." Upon arrival at the driveway closest to the front door we stopped and exited our vehicle and approached the front of the above home. Each of us carried an envelope containing the legal documents to be served on Mr. Urvan. Mr. Mayberry started videoing the approach with his video camera. I was on the phone with Mr. Garberich.

P.O. Box 480680
Charlotte, NC
28269

# Derecho Investigations & Security Consultants

At 11:00 AM, I began loudly pounding on the front door. After no one answered the door, I started walking around to the back of the home with Mr. Mayberry videoing the walk. After a few moments, I borrowed Mr. Mayberry's phone and continued to video while he went out to the street to close the door of our truck. At the back of the house, I found a patio, at 11:01 AM, I began to loudly knock on the door opening onto the patio.

I understood that Mr. Urvan was being deposed by live video feed at that time. After I started knocking on the back door, Mr. Garberich stated that the banging could be heard on the video feed for the deposition. Mr. Mayberry rejoined me, took his phone back, and continued to video. I continued to loudly bang on the back door until 11:05 AM. No one answered the door.

I could see into a large room through the glass door that I was knocking on. The room had a fireplace to the left, GunBroker.com themed racing helmets and other mementos on a series of shelves, a GunBroker.com US Flag, and other GunBroker.com mementos. On the far wall, to the right of a staircase going upstairs, were two interior French doors leading to a separate room that appeared to be an office. These interior glass-paneled doors had white see-through draperies on them, and we could see a dark grey or black covering hanging inside the left door. Mr. Mayberry videoed this part of the back of the house.

I then went to the front of the home where Mr. Mayberry had gone to observe if anyone departed the home. As it started to rain, Mr. Mayberry placed his packet of the service documents on the front patio, just outside the front door, to keep it dry.

While I was speaking with Mr. Mayberry, a young woman opened the front door, picked up the packet, and went back into the home. I recognized her as Ms. Selena Price, whom I had seen in photographs provided by Mr. Garberich, and who I understand is in a relationship with Mr. Urvan.

At 1:42 PM, I was standing at the back patio when the man who had been mowing the lawn (a white male with a dark beard and mustache, wearing a black Gunbroker.com sweatshirt and a hat) exited the office through the white draped doors and came to the back door. When he opened the back door, he asked if I would leave. I stated to him that if the owner would come out and accept the service documents then I could depart. I asked him if he would go back to the office and ask Mr. Urvan to come out. The man stated that he could not do that. He stated there was a baby in the house. Mr. Mayberry said about Mr. Urvan: "Tell him to make it easy on us. He'll eventually have it anyways, so why don't he just come get it now?" The yard man responded: "I can't control what he does man, ya know." He closed and locked the door and went back in through the office door and closed it.

## Derecho Investigations & Security Consultants

P.O. Box 480680
Charlotte, NC
28269

At 2:17 PM, the woman I recognized as Ms. Price came out on the back porch and asked me to leave. I asked her if she would accept the service documents and asked what her name was. She refused to identify herself, and refused to accept the service documents (the same documents she had previously collected from the front patio). She again asked me to leave, and I stated that the homeowner could ask me to depart. She returned inside the back-porch door and then went in through the door with the white drapes and closed it.

At 3:04 PM, the lawn man approached me and asked me to speak with a woman on the phone. He put his phone in speaker mode. A woman named Susan Lokey, who identified herself as the "manager" of the company that owned the home, asked me to depart. I asked her to identify the company that owned the home and she refused. I then stated that we had to wait to serve Mr. Urvan, and I ended the conversation.

At 3:45 PM, a UPS delivery man placed a package on the front patio of the home that was addressed to "Selena Price" at 18210 Town Harbour Rd., Cornelius, NC 28031.

At 3:46 PM, I gave instructions to Mr. Mayberry to place our other copy of the service documents on top of the UPS package still sitting on the front patio. We then backed off of the patio, videoing the placement of the service documents on the front doorstep on top of the package. We departed the property and parked a short distance away. I told Mr. Mayberry to remain there and note the time, and video the removal of the service documents from the front patio. Mr. Mayberry remained there in full view of the front of the house and the side where Mr. Urvan's Lexus 450 was parked.

At 8:37 PM, Mr. Mayberry contacted me and told me that it was getting too dark to see the package of service documents and video it, but that the package was still there. I told him to take a final shot and then depart the scene.

I affirm that the above and foregoing statements are true and correct to the best of my information, knowledge, and belief.

_____
Ronald K. Mann, NC PPS license #4885

State of North Carolina, County of Mecklenburg
Sworn and subscribed to before me this _13_ Day of _Nov_, 20 _20_.

Notary Public: _____
My commission expires _January 21, 2022_

# EXHIBIT D

**Derecho Investigations & Security Consultants**

P.O. Box 480680
Charlotte, NC
28269

## AFFIDAVIT OF INVESTIGATIVE EFFORTS TO COMPLETE SERVICE OF PROCESS
### IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

Civil Action No:  **19-1-08936**

Service for:   Steve F. Urvan, 18210 Town Harbour Rd., Cornelius NC 28031

On Friday, May 8th, 2020, I, James Mayberry, arrived at the wooded area immediately to the north of the address above at 4:56 AM and verified that a Lexus 450 (NC plate: BLN-3911) registered to Mr. Urvan was present in the driveway of the above home.

At 5:30 AM, my boss, Ron Mann, arrived and gave me a copy of the following documents to serve on Mr. Urvan in case Mr. Urvan departed the home while Mr. Mann was gone: Summons, Complaint, General Civil and Domestic Relations Case Filing Information Form, Disclosure Statement, Verified Application of Duncan E. Manville to Appear as Counsel *Pro Hac Vice* for Plaintiff, and [Proposed] Order Granting Application of Duncan E. Manville to Appear as Counsel *Pro Hac Vice* for Plaintiff.

I remained at that location, and verified that no one departed from the home.

At 10:00 AM, Mr. Mann returned to the wooded area location.  I confirmed with Mr. Mann that Mr. Urvan's vehicle had not departed, but that a yard maintenance man wearing a GunBroker.com sweatshirt had arrived and could be heard mowing the grounds of the address above.

At 10:50 AM, the yard man said, "If you have paperwork to give my boss, I can take it."  Mr. Mann said we needed to give the paperwork to the man's boss.

At 10:58 AM, Mr. Mann and I departed the wooded area location in my truck and drove to the above address.  In addition to Mr. Urvan's Lexus, there was a white Ford Super Duty truck in the driveway.  The truck's NC plate number was DX 6565.  It is registered to "GB Racing." Upon arrival at the driveway closest to the front door, Mr. Mann and I exited our vehicle and approached the front of the above home.  Each of us carried an envelope containing the legal documents to be served on Mr. Urvan.  I started videoing the approach with my Apple 10 iPhone video camera.

At 11:00 AM, Mr. Mann began loudly pounding on the front door.  After no one answered the door, we started walking to the rear of the home while I continuously videoed the walk.  After

# Derecho Investigations & Security Consultants

a few moments, Mr. Mann borrowed my phone and continued to video while I went out to the street to close the door of our truck.

When I rejoined Mr. Mann, he was at the back of the house loudly knocking on a rear door. I took my phone back, and Mr. Mann continued to loudly bang on the back door until 11:05 AM. No one answered the door. I could see into a basement room through the glass door that Mr. Mann was knocking on. The room had a fireplace to the left, GunBroker.com themed racing helmets and other mementos on a series of shelves, a GunBroker.com US Flag, and other GunBroker.com mementos. On the far wall, to the right of the stairwell going upstairs, were two interior French doors leading to a separate room that appeared to be an office. These interior glass-paneled doors had white see-through draperies on them, and we could see a dark grey or black covering hanging inside the left door. I took video of this room.

In the backyard, I observed a hot tub, and a boat dock with white and blue speed boat named "No Big Deal, Cornelius, NC 44" tied to it.

I then went to the front of the home. I remained at the front of the home in case anyone came out. At one point it started to rain and I placed my copy of Mr. Urvan's service documents on the front patio out of the rain. Mr. Mann and I had stepped away from the patio and were near his vehicle when a young woman I recognized from photographs as Ms. Selena Price stepped out of the home through the front doorway, picked up the packet of service documents and went back inside the home.

At 1:42 PM, I was standing at the back porch with Mr. Mann when the man who had been mowing the lawn (a white male with a dark beard and mustache, wearing a black Gunbroker.com sweatshirt and a hat) exited the office through the white draped office door and came to the back door. When he opened the back door, he asked if we would leave. Mr. Mann told him that if the owner would come out and accept the service documents then we would depart. Mr. Mann asked the lawn man if he would go back to the office and ask Mr. Urvan to come out. The man stated that he could not do that. He stated there was a baby in the house. I said about Mr. Urvan: "Tell him to make it easy on us. He'll eventually have it anyways, so why don't he just come get it now?" The yard man responded: "I can't control what he does man, ya know." He closed and locked the door and went back in through the office door and closed it.

At 3:04 PM, the lawn man approached Mr. Mann and asked him to speak with a woman on the phone. He put his phone in speaker mode. A woman named Susan Lokey, who identified herself as the "manager" of the company that owned the home, asked us to depart. Mr. Mann asked her to identify the company that owned the home and she refused. Mr. Mann stated that we had to wait to serve Mr. Urvan, and ended the conversation.

**Derecho Investigations & Security Consultants**

P.O. Box 480680
Charlotte, NC
28269

At 3:45 PM a UPS delivery man placed a package on the front patio of the home that was addressed to "Selena Price" at 18210 Town Harbour Rd., Cornelius, NC 28031. I took video of the package on the patio.

At 3:46 PM, Mr. Mann instructed me to place our other copy of the service documents on top of the UPS package still sitting on the front patio. We then backed off the patio, videoing the placement of the service documents on the front doorstep on top of the package. We departed the property and parked a short distance away. Mr. Mann instructed me to remain there and note the time, and video any removal of the service documents from the front patio. I moved my truck to where I could see the rear end of Mr. Urvan's Lexus 450 and the front door of the house.

At 8:37 PM, I called Mr. Mann and told him that it was getting too dark to see the package of service documents and video it, but that the package was still there. He told me to take a final shot and then depart the scene, which I did. I departed at 8:37 PM.

I affirm that the above and foregoing statements are true and correct to the best of my information, knowledge, and belief.

_James A Mayl_____
James A. Mayberry, NC PPS license #4670

State of North Carolina, County of Mecklenburg
Sworn and subscribed to before me this _13_ Day of _May_____, 20_20_____.

Notary Public: _Ashley Young_____
My commission expires _November 20, 2023_

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby declare under penalty of perjury under the laws of the State of Washington that

3

on this date, I caused a true and correct copy of the foregoing document to be served on the

4

following in the manner(s) indicated:

5

Mr. Steve Urvan                          ☐ Via E-Filing

6

961 Fern Dr.                             ☐ Via Legal Messenger
Delray Beach, FL 33483                   ☐ Via Email

7

*Defendant*                              ☐ Via Fax

☒ Via U.S. Mail

8

9

DATED this 22nd day of May, 2020 at Seattle, Washington.

10

11

_____
Nate Garberich

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CERTIFICATE OF SERVICE

ID# 2020-0053413-CV
⚖ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**19108936**

S. Lark Ingram - 34
MAY 22, 2020 05:58 PM

*Rebecca Keaton*
Rebecca Keaton, Clerk of Superior Court
Cobb County, Georgia

SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

GUNUP, INC.,

           Plaintiff,

    v.

STEVE URVAN,

           Defendant.

CIVIL ACTION FILE.

NO.    19108936

***AMENDED* NOTICE OF FILING PROOF OF SERVICE OF SUMMONS AND COMPLAINT**

Plaintiff GunUp, Inc. hereby gives notice of filing proof of service in this matter.  The following information and attached documents support this Notice:

1.      Attached hereto as **Exhibit A** is a true and correct copy of the Amended Declaration of Duncan E. Manville in Support of Notice of Filing of Proof of Service of Summons and Complaint (the "Manville Declaration").

2.      Attached hereto as **Exhibit B** is a true and correct copy of a Verified Return of Service executed on May 4, 2020 by process server Ray Wilson of Choice Process Serving. This return of service and the Manville Declaration establish that on May 2, 2020, Mr. Wilson delivered the following documents to Luca Handsman at Defendant Steve Urvan's primary residence, 961 Fern Drive, Delray Beach, Florida 33483: Summons; Complaint; [Proposed] Order Granting Application of Duncan E. Manville to Appear as Counsel Pro Hac Vice for Plaintiff; Case Filing Information Form; Disclosure Statement; Verified Application of Duncan

AMENDED NOTICE OF FILING PROOF OF
SERVICE OF SUMMONS AND COMPLAINT - 1

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

E. Manville to Appear as Counsel Pro Hac Vice for Plaintiff. Pursuant to Georgia Code §§ 9-10-94 and 9-11-4(e)(7), Mr. Wilson effected service of the Summons and Complaint in this matter on Mr. Urvan by "leaving copies thereof at the defendant's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein."

3.     Attached hereto as **Exhibit C** is a true and correct copy of an Affidavit of Investigative Efforts to Complete Service of Process, executed on May 13, 2020 by private investigator Ronald A. Mann of Derecho Investigations & Security Consultants ("Derecho Investigations") (the "Mann Affidavit").

4.     Attached hereto as **Exhibit D** is a true and correct copy of an Affidavit of Investigative Efforts to Complete Service of Process, executed on May 13, 2020 by private investigator James A. Mayberry of Derecho Investigations (the "Mayberry Affidavit").

5.     The Manville Declaration, Mann Affidavit and Mayberry Affidavit establish that on May 8, 2020, Mr. Mayberry delivered the following documents to Mr. Urvan and to Selena Price at 18210 Town Harbour Road, Cornelius, North Carolina 28031: Summons; Complaint; [Proposed] Order Granting Application of Duncan E. Manville to Appear as Counsel Pro Hac Vice for Plaintiff; Case Filing Information Form; Disclosure Statement; Verified Application of Duncan E. Manville to Appear as Counsel Pro Hac Vice for Plaintiff. Pursuant to Georgia Code §§ 9-10-94 and 9-11-4(e)(7), Mr. Mayberry effected service of the Summons and Complaint in this matter on Mr. Urvan by delivering them "to the defendant personally," and/or by "leaving copies thereof at the defendant's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein."

AMENDED NOTICE OF FILING PROOF OF
SERVICE OF SUMMONS AND COMPLAINT - 2

1

DATED:  May 22, 2020.

2

MOORE INGRAM JOHNSON & STEELE, LLP

3

4

By:  ___/s/ Robert D. Ingram_____

Robert D. Ingram, Georgia Bar No.: 383405

David P. Conley, Georgia Bar No.: 141760

5

326 Roswell Street, Suite 100

Marietta, GA 30060

6

Telephone: (770) 429-1499

7

Facsimile:  (770)429-8631

Email: ringram@mijs.com

8

Email: dpconley@mijs.com

9

10

SAVITT BRUCE & WILLEY LLP

11

By:  ___/s/ Duncan E. Manville_____

12

Duncan E. Manville, WSBA #30304

1425 Fourth Avenue, Suite 800

13

Seattle, WA 98101-2272

14

Telephone: (206) 749-0500

Facsimile: (206) 749-0600

Email: dmanville@sbwllp.com

15

*Admitted pro hac vice*

16

*Attorneys for Plaintiff GunUp, Inc.*

17

18

19

20

21

22

23

24

25

26

27

AMENDED NOTICE OF FILING PROOF OF
SERVICE OF SUMMONS AND COMPLAINT - 3

# EXHIBIT A

1
2
3
4
5
6
7
8

SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

9
10
11
12
13
14
15

GUNUP, INC.,

        Plaintiff,

   v.

STEVE URVAN,

        Defendant.

CIVIL ACTION FILE.

NO.   19108936

***AMENDED* DECLARATION OF DUNCAN E. MANVILLE IN SUPPORT OF NOTICE OF FILING PROOF OF SERVICE OF SUMMONS AND COMPLAINT**

16
17
18
19

    I, Duncan E. Manville, state as follows:

    1.    I am over 18 years of age and am competent to testify to the matters stated herein.  I make this declaration based on personal knowledge and based on my knowledge of the pertinent files and records.

20
21

    2.    I am a partner with the firm of Savitt Bruce & Willey LLP ("SBW").  I am the primary attorney of record representing Plaintiff GunUp, Inc. in this matter.

22
23
24
25
26

    3.    Steve Urvan was a member of the board of directors of Media Lodge, Inc. at all times relevant to this litigation.  On April 30, 2020, Media Lodge's counsel, S. Wade Malone, informed me that Mr. Urvan's principal residence address is 961 Fern Drive, Delray Beach, Florida 33483 (the "Delray Beach House").

27

AMENDED DECLARATION OF DUNCAN E.
MANVILLE IN SUPPORT OF NOTICE OF FILING
PROOF OF SERVICE OF SUMMONS AND
COMPLAINT - 1

4.      After I received this information from Mr. Malone, my office directed process server Ray Wilson of Choice Process Serving to serve the Summons and Complaint in this matter on Mr. Urvan at the Delray Beach House.  Based on Mr. Wilson's Verified Return of Service, a true and correct copy of which is attached as Exhibit B to GunUp's Notice of Filing Proof of Service of Summons and Complaint, Mr. Wilson served the Summons and Complaint on Mr. Urvan on May 2, 2020.

5.      Also on April 30, 2020, Mr. Malone informed me that on May 8, 2020, Mr. Urvan would be present in Mecklenburg County, North Carolina for a remote video deposition in another matter.  I had previously been advised that Mr. Urvan had a residence at 18210 Town Harbour Road, Cornelius, North Carolina 28031 (the "Cornelius House").  Cornelius is in Mecklenburg County.

6.      On May 5, 2020, my office engaged private investigator Ronald A. Mann and his associate, private investigator James A. Mayberry, both of Derecho Investigations & Security Consultants ("Derecho Investigations"), to serve the Summons and Complaint in this matter on Mr. Urvan at the Cornelius House, either before or during the May 8 deposition.

7.      As set forth in Mr. Mann's May 13, 2020 Affidavit of Investigative Efforts to Complete Service of Process (the "Mann Affidavit") and Mr. Mayberry's May 13, 2020 Affidavit of Investigative Efforts to Complete Service of Process (the "Mayberry Affidavit"), on May 8, 2020, Mr. Mann and Mr. Mayberry arrived early in the morning at the Cornelius House, observed a Lexus 450 registered to Mr. Urvan in the driveway, and staked out the residence.

8.      At 10:30 AM EDT (7:30 AM PDT in Seattle, where I was located), I began taking Mr. Urvan's deposition by video link, using the Zoom platform.  Mr. Malone and a North Carolina court reporter also participated in the Zoom meeting, each from a remote location.  In addition, I was connected to our legal assistant, Nathan T. Garberich, via Zoom and text message on other devices.  Mr. Garberich could hear me and, to some extent, the other

AMENDED DECLARATION OF DUNCAN E. MANVILLE IN SUPPORT OF NOTICE OF FILING PROOF OF SERVICE OF SUMMONS AND COMPLAINT - 2

1  participants in the deposition.  Mr. Urvan was seated in front of a grey curtain or drape that

2  prevented me from observing the room in which he was located.

3          9.       Shortly before 11:00 AM EDT, Mr. Garberich advised me that Mr. Mann was

4  knocking on the front door of the Cornelius House.  I could not hear the knocking over Mr.

5  Urvan's video feed, and I so informed Mr. Garberich.  Mr. Garberich told me that he had

6  directed Mr. Mann and Mr. Mayberry to go around to the side of the house and try again.

7  Several minutes later, at 11:01 AM EDT, I heard loud pounding over Mr. Urvan's video feed.

8          10.      I informed Mr. Urvan that the person knocking on his door was a process server

9  who wished to serve a summons, complaint, and case cover sheet in *GunUp, Inc. v. Urvan*,

10  Superior Court of Cobb County, Georgia Case No. 19108936.  I said that if Mr. Urvan wished,

11  the process server would put the legal papers on his doorstep, and would step back so Mr.

12  Urvan could collect them while maintaining at least a six-foot distance (due to the COVID-19

13  pandemic).  I asked Mr. Urvan if he would open his door and accept service of the legal papers.

14          11.      Mr. Urvan did not respond verbally.  Instead, he hung his head, looked down,

15  and sat immobile.  Mr. Malone objected, and stated that he and Mr. Urvan would be taking a

16  break.  Mr. Urvan cut his video feed and Mr. Malone left the room in which he had been

17  sitting, and the deposition was paused.

18          12.      During the break in the deposition, Mr. Garberich forwarded me a photograph

19  that Mr. Mann had taken through the back door of the Cornelius House.  This photograph

20  showed, hanging inside an interior glass-paneled door, a curtain or drape resembling the curtain

21  or drape that I had observed behind Mr. Urvan.  Mr. Garberich also advised me that Mr.

22  Mayberry had left on the front doorstep of the Cornelius House an envelope containing the

23  legal papers he and Mr. Mann were attempting to serve, and that he had subsequently observed

24  Selena Price (whom I understood to be Mr. Urvan's girlfriend) open the front door and collect

25  the envelope.

26

27

AMENDED DECLARATION OF DUNCAN E.
MANVILLE IN SUPPORT OF NOTICE OF FILING
PROOF OF SERVICE OF SUMMONS AND
COMPLAINT - 3

13.     Mr. Malone did not return to the Zoom meeting until after 1:30 PM EDT, and Mr. Urvan did not return until ten or fifteen minutes later.  Their break thus lasted for approximately two hours and forty-five minutes.

14.     When the deposition resumed, I again asked Mr. Urvan if he would open his door and accept service of the legal papers that our process server was attempting to serve.  Mr. Malone objected to my question (and other related questions that I asked), but did not instruct Mr. Urvan not to answer.  Nevertheless, Mr. Urvan would not answer the question, instead remaining mute.  I said I was aware that during the break in the deposition, Ms. Price had collected the legal papers from the front doorstep of Mr. Urvan's house.  I advised Mr. Urvan that our process server had a second envelope containing the same legal documents, and that if Mr. Urvan would not open his door and accept delivery of the second envelope, our process server would leave the documents at his doorstep so he could collect them later.  Mr. Urvan said nothing in response to my statements and questions regarding service of process in this matter.

15.     Based on this declaration, the Mann Affidavit and the Mayberry Affidavit, true and correct copies of which are attached as Exhibits A, C and D to GunUp's Notice of Filing Proof of Service of Summons and Complaint, Mr. Mayberry served the Summons and Complaint on Mr. Urvan on May 8, 2020.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 22nd day of May, 2020 at Seattle, Washington.


_____/s/ Duncan E. Manville_____
Duncan E. Manville

AMENDED DECLARATION OF DUNCAN E.
MANVILLE IN SUPPORT OF NOTICE OF FILING
PROOF OF SERVICE OF SUMMONS AND
COMPLAINT - 4

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

## CERTIFICATE OF SERVICE

I hereby declare under penalty of perjury under the laws of the State of Washington that on this date, I caused a true and correct copy of the foregoing document to be served on the following in the manner(s) indicated:

Mr. Steve Urvan
961 Fern Dr.
Delray Beach, FL 33483

*Defendant*

☐ Via E-Filing
☐ Via Legal Messenger
☐ Via Email
☒ Via U.S. Mail
☐ Via Fax

DATED this 22nd day of May, 2020 at Seattle, Washington.

_____
Nate Garberich

CERTIFICATE OF SERVICE

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

# EXHIBIT B

## VERIFIED RETURN OF SERVICE

| State of Georgia | County of Cobb | Superior Court |
|---|---|---|

Case Number: 19108936



CHC2020003084

Plaintiff:
**GunUp, Inc**

vs.

Defendant:
**Urvan Steve**

For:
Savitt Bruce & Willey LLP
1425 Fourth Ave
Suite 800
Seattle, WA 98101

Received by CHOICE PROCESS SERVING on the 1st day of May, 2020 at 9:19 pm to be served on **Steve Urvan, 961 Fern Dr, Delray Beach, FL 33483**.

I, Ray Wilson, being duly sworn, depose and say that on the **2nd day of May, 2020 at 9:12 pm, I:**

**SUBSTITUTE** served by delivering a true copy of the **Summons to Steve Urvan; Complaint with exhibits; [Proposed] Order Granting Application of Duncan E. Manville to Appear as Counsel Pro Hac Vice for Plaintiff; Case Filing Information Form; Disclosure Statement; Verified Application of Duncan E. Manville to Appear as Counsel Pro Hac Vice for Plaintiff** with the date and hour of service endorsed thereon by me, to: **Luca Handsman** as Co-Resident at the address of: **961 Fern Dr, Delray Beach, FL 33483**, the within named person's usual place of **Abode**, who resides therein, who is fifteen (15) years of age or older and informed said person of the contents therein, in compliance with state statutes.

**Additional Information pertaining to this Service:**
5/2/2020 9:25 am Staked out property for several hours. White BMW (FL tag NMB-M28) and Black Jeep (FL tag CXM M14) in driveway. White male on property fitting the description of Luca Handsman (brother of Selena Price) at home and people coming and going as appeared to be doing some sort of fitness group at home. I was given photographs of Selena Price and Steve Urvan by my client. I was able to view the Instagram page of Selena to see Luca Handsman. During the stake out I asked the neighbor at 966 Fern Dr if he recognized the people in the pictures. He confirmed that Selena Price and Luca Handsman do reside at 961 Fern Dr but he was not sure about defendant.
5/2/2020 7:30 pm Staked out property once again. There were several cars in the driveway: White BMW (FL tag AYD G)#), Black Jeep (FL tag CXM M14), White Jeep (FL tag DFA 063) Grey Mercedes Benz (FL tag IA4 BLM). At 9:12 PM i rang the door bell and the same white male I saw in the morning stakeout answered the door. I asked him if he was Luca he said "yes I am but I don't want you, go away" and slammed the door. I shouted to him through the door the content of the paper and notified him that I was going to leave the papers by the door for him to retrieve later and give to the defendant Steve Urvan.

**Description** of Person Served: Age: 30+, Sex: M, Race/Skin Color: White, Height: 6'2", Weight: 190, Hair: Brown, Glasses: N

## VERIFIED RETURN OF SERVICE For 19108936

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. Under penalty of perjury, Pursuant to Florida Statute 92.525, I declare that I have read the foregoing document, and that the facts stated in it are true.

Subscribed and Sworn to before me on the 4th day of May, 2020 by the affiant who is personally known to me.

_____
NOTARY PUBLIC

RICKY D. GORDON
Commission # GG 146998
Expires November 18, 2021
Bonded Thru Troy Fain Insurance 800-385-7019

Ray Wilson
1281

**CHOICE PROCESS SERVING**
**5489 Wiles Rd**
**#302**
**Coconut Creek, FL 33073**
**(954) 905-6535**

Our Job Serial Number: CHC-2020003084

Copyright © 1992-2020 Database Services, Inc. - Process Server's Toolbox V8.1c

# EXHIBIT C

**Derecho Investigations & Security Consultants**

P.O. Box 480680
Charlotte, NC
28269

AFFIDAVIT OF INVESTIGATIVE EFFORTS TO COMPLETE SERVICE OF PROCESS
IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

Civil Action No:  **19-1-08936**

Service for:   Steve F. Urvan, 18210 Town Harbour Rd., Cornelius NC 28031

On Tuesday, May 5th, 2020, Nathan Garberich from Savitt Bruce & Willey, LLP requested
the assistance of Derecho Investigations, Inc. in Service of Process to Mr. Steve F. Urvan.

On Friday, May 8th, 2020, I, Ron Mann, arrived at the wooded area immediately to the north
of the address above at 5:30 AM and verified with Mr. Jim Mayberry, employee of Derecho
Investigations, that a Lexus 450 (NC plate: BLN-3911) registered to Mr. Urvan was present in
the driveway of the above home.  I then gave Mr. Mayberry a copy of the following
documents to serve on Mr. Urvan: Summons, Complaint, General Civil and Domestic
Relations Case Filing Information Form, Disclosure Statement, Verified Application of
Duncan E. Manville to Appear as Counsel *Pro Hac Vice* for Plaintiff, and [Proposed] Order
Granting Application of Duncan E. Manville to Appear as Counsel *Pro Hac Vice* for Plaintiff.

I updated Mr. Mayberry on the service plan and made sure Mr. Mayberry would monitor
anyone arriving or leaving the home.  I then departed the location.

I returned to the wooded area location on May 8th at 10:00 AM.  I confirmed with Mr.
Mayberry that Mr. Urvan's vehicle had not departed.  Mr. Mayberry stated that it had not, but
that a yard maintenance man wearing a GunBroker.com sweatshirt had arrived and could be
heard mowing the grounds of the address above.  I then contacted Mr. Garberich and
confirmed the delivery plan.  Mr. Mayberry and I waited until 10:58 AM.

At 10:50 AM, the yard man said, "If you have paperwork to give my boss, I can take it."  I said
we needed to give the paperwork to the man's boss.

At 10:58 AM, Mr. Mayberry and I departed the wooded area location in my truck and drove to
the above address.  In addition to Mr. Urvan's Lexus, there was a white Ford Super Duty
truck in the driveway.  The truck's NC plate number was DX 6565.  It is registered to "GB
Racing."  Upon arrival at the driveway closest to the front door we stopped and exited our
vehicle and approached the front of the above home.  Each of us carried an envelope
containing the legal documents to be served on Mr. Urvan.  Mr. Mayberry started videoing
the approach with his video camera.  I was on the phone with Mr. Garberich.

## Derecho Investigations & Security Consultants

P.O. Box 480680
Charlotte, NC
28269

At 11:00 AM, I began loudly pounding on the front door. After no one answered the door, I started walking around to the back of the home with Mr. Mayberry videoing the walk. After a few moments, I borrowed Mr. Mayberry's phone and continued to video while he went out to the street to close the door of our truck. At the back of the house, I found a patio, at 11:01 AM, I began to loudly knock on the door opening onto the patio.

I understood that Mr. Urvan was being deposed by live video feed at that time. After I started knocking on the back door, Mr. Garberich stated that the banging could be heard on the video feed for the deposition. Mr. Mayberry rejoined me, took his phone back, and continued to video. I continued to loudly bang on the back door until 11:05 AM. No one answered the door.

I could see into a large room through the glass door that I was knocking on. The room had a fireplace to the left, GunBroker.com themed racing helmets and other mementos on a series of shelves, a GunBroker.com US Flag, and other GunBroker.com mementos. On the far wall, to the right of a staircase going upstairs, were two interior French doors leading to a separate room that appeared to be an office. These interior glass-paneled doors had white see-through draperies on them, and we could see a dark grey or black covering hanging inside the left door. Mr. Mayberry videoed this part of the back of the house.

I then went to the front of the home where Mr. Mayberry had gone to observe if anyone departed the home. As it started to rain, Mr. Mayberry placed his packet of the service documents on the front patio, just outside the front door, to keep it dry.

While I was speaking with Mr. Mayberry, a young woman opened the front door, picked up the packet, and went back into the home. I recognized her as Ms. Selena Price, whom I had seen in photographs provided by Mr. Garberich, and who I understand is in a relationship with Mr. Urvan.

At 1:42 PM, I was standing at the back patio when the man who had been mowing the lawn (a white male with a dark beard and mustache, wearing a black Gunbroker.com sweatshirt and a hat) exited the office through the white draped doors and came to the back door. When he opened the back door, he asked if I would leave. I stated to him that if the owner would come out and accept the service documents then I could depart. I asked him if he would go back to the office and ask Mr. Urvan to come out. The man stated that he could not do that. He stated there was a baby in the house. Mr. Mayberry said about Mr. Urvan: "Tell him to make it easy on us. He'll eventually have it anyways, so why don't he just come get it now?" The yard man responded: "I can't control what he does man, ya know." He closed and locked the door and went back in through the office door and closed it.

Derecho Investigations & Security Consultants

P.O. Box 480680
Charlotte, NC
28269

At 2:17 PM, the woman I recognized as Ms. Price came out on the back porch and asked me to leave. I asked her if she would accept the service documents and asked what her name was. She refused to identify herself, and refused to accept the service documents (the same documents she had previously collected from the front patio). She again asked me to leave, and I stated that the homeowner could ask me to depart. She returned inside the back-porch door and then went in through the door with the white drapes and closed it.

At 3:04 PM, the lawn man approached me and asked me to speak with a woman on the phone. He put his phone in speaker mode. A woman named Susan Lokey, who identified herself as the "manager" of the company that owned the home, asked me to depart. I asked her to identify the company that owned the home and she refused. I then stated that we had to wait to serve Mr. Urvan, and I ended the conversation.

At 3:45 PM, a UPS delivery man placed a package on the front patio of the home that was addressed to "Selena Price" at 18210 Town Harbour Rd., Cornelius, NC 28031.

At 3:46 PM, I gave instructions to Mr. Mayberry to place our other copy of the service documents on top of the UPS package still sitting on the front patio. We then backed off of the patio, videoing the placement of the service documents on the front doorstep on top of the package. We departed the property and parked a short distance away. I told Mr. Mayberry to remain there and note the time, and video the removal of the service documents from the front patio. Mr. Mayberry remained there in full view of the front of the house and the side where Mr. Urvan's Lexus 450 was parked.

At 8:37 PM, Mr. Mayberry contacted me and told me that it was getting too dark to see the package of service documents and video it, but that the package was still there. I told him to take a final shot and then depart the scene.

I affirm that the above and foregoing statements are true and correct to the best of my information, knowledge, and belief.

_____
Ronald K. Mann, NC PPS license #4885

State of North Carolina, County of Mecklenburg
Sworn and subscribed to before me this _13_ Day of _May_ 20 _20_.

Notary Public: _Tonya B Hamer_
My commission expires _January 21, 2022_

# EXHIBIT D

**Derecho Investigations & Security Consultants**

P.O. Box 480680
Charlotte, NC
28269

## AFFIDAVIT OF INVESTIGATIVE EFFORTS TO COMPLETE SERVICE OF PROCESS
### IN THE SUPERIOR COURT OF COBB COUNTY
#### STATE OF GEORGIA

Civil Action No:  **19-1-08936**

Service for:   Steve F. Urvan, 18210 Town Harbour Rd., Cornelius NC 28031

On Friday, May 8th, 2020, I, James Mayberry, arrived at the wooded area immediately to the north of the address above at 4:56 AM and verified that a Lexus 450 (NC plate: BLN-3911) registered to Mr. Urvan was present in the driveway of the above home.

At 5:30 AM, my boss, Ron Mann, arrived and gave me a copy of the following documents to serve on Mr. Urvan in case Mr. Urvan departed the home while Mr. Mann was gone: Summons, Complaint, General Civil and Domestic Relations Case Filing Information Form, Disclosure Statement, Verified Application of Duncan E. Manville to Appear as Counsel *Pro Hac Vice* for Plaintiff, and [Proposed] Order Granting Application of Duncan E. Manville to Appear as Counsel *Pro Hac Vice* for Plaintiff.

I remained at that location, and verified that no one departed from the home.

At 10:00 AM, Mr. Mann returned to the wooded area location.  I confirmed with Mr. Mann that Mr. Urvan's vehicle had not departed, but that a yard maintenance man wearing a GunBroker.com sweatshirt had arrived and could be heard mowing the grounds of the address above.

At 10:50 AM, the yard man said, "If you have paperwork to give my boss, I can take it."  Mr. Mann said we needed to give the paperwork to the man's boss.

At 10:58 AM, Mr. Mann and I departed the wooded area location in my truck and drove to the above address.  In addition to Mr. Urvan's Lexus, there was a white Ford Super Duty truck in the driveway.  The truck's NC plate number was DX 6565.  It is registered to "GB Racing." Upon arrival at the driveway closest to the front door, Mr. Mann and I exited our vehicle and approached the front of the above home.  Each of us carried an envelope containing the legal documents to be served on Mr. Urvan.  I started videoing the approach with my Apple 10 iPhone video camera.

At 11:00 AM, Mr. Mann began loudly pounding on the front door.  After no one answered the door, we started walking to the rear of the home while I continuously videoed the walk.  After

P.O. Box 480680
Charlotte, NC
28269

# Derecho Investigations & Security Consultants

a few moments, Mr. Mann borrowed my phone and continued to video while I went out to the street to close the door of our truck.

When I rejoined Mr. Mann, he was at the back of the house loudly knocking on a rear door. I took my phone back, and Mr. Mann continued to loudly bang on the back door until 11:05 AM. No one answered the door. I could see into a basement room through the glass door that Mr. Mann was knocking on. The room had a fireplace to the left, GunBroker.com themed racing helmets and other mementos on a series of shelves, a GunBroker.com US Flag, and other GunBroker.com mementos. On the far wall, to the right of the stairwell going upstairs, were two interior French doors leading to a separate room that appeared to be an office. These interior glass-paneled doors had white see-through draperies on them, and we could see a dark grey or black covering hanging inside the left door. I took video of this room.

In the backyard, I observed a hot tub, and a boat dock with white and blue speed boat named "No Big Deal, Cornelius, NC 44" tied to it.

I then went to the front of the home. I remained at the front of the home in case anyone came out. At one point it started to rain and I placed my copy of Mr. Urvan's service documents on the front patio out of the rain. Mr. Mann and I had stepped away from the patio and were near his vehicle when a young woman I recognized from photographs as Ms. Selena Price stepped out of the home through the front doorway, picked up the packet of service documents and went back inside the home.

At 1:42 PM, I was standing at the back porch with Mr. Mann when the man who had been mowing the lawn (a white male with a dark beard and mustache, wearing a black GunBroker.com sweatshirt and a hat) exited the office through the white draped office door and came to the back door. When he opened the back door, he asked if we would leave. Mr. Mann told him that if the owner would come out and accept the service documents then we would depart. Mr. Mann asked the lawn man if he would go back to the office and ask Mr. Urvan to come out. The man stated that he could not do that. He stated there was a baby in the house. I said about Mr. Urvan: "Tell him to make it easy on us. He'll eventually have it anyways, so why don't he just come get it now?" The yard man responded: "I can't control what he does man, ya know." He closed and locked the door and went back in through the office door and closed it.

At 3:04 PM, the lawn man approached Mr. Mann and asked him to speak with a woman on the phone. He put his phone in speaker mode. A woman named Susan Lokey, who identified herself as the "manager" of the company that owned the home, asked us to depart. Mr. Mann asked her to identify the company that owned the home and she refused. Mr. Mann stated that we had to wait to serve Mr. Urvan, and ended the conversation.

**Derecho Investigations & Security Consultants**

P.O. Box 480680
Charlotte, NC
28269

At 3:45 PM a UPS delivery man placed a package on the front patio of the home that was addressed to "Selena Price" at 18210 Town Harbour Rd., Cornelius, NC 28031. I took video of the package on the patio.

At 3:46 PM, Mr. Mann instructed me to place our other copy of the service documents on top of the UPS package still sitting on the front patio. We then backed off the patio, videoing the placement of the service documents on the front doorstep on top of the package. We departed the property and parked a short distance away. Mr. Mann instructed me to remain there and note the time, and video any removal of the service documents from the front patio. I moved my truck to where I could see the rear end of Mr. Urvan's Lexus 450 and the front door of the house.

At 8:37 PM, I called Mr. Mann and told him that it was getting too dark to see the package of service documents and video it, but that the package was still there. He told me to take a final shot and then depart the scene, which I did. I departed at 8:37 PM.

I affirm that the above and foregoing statements are true and correct to the best of my information, knowledge, and belief.

James A Mayl
James A. Mayberry, NC PPS license #4670

State of North Carolina, County of Mecklenburg
Sworn and subscribed to before me this _13_ Day of _May_____ , 20_20_____ .

Notary Public: _Ashley Young_____
My commission expires _November 20, 2023_

*(Notary seal: ASHLEY YOUNG, NOTARY PUBLIC, CATAWBA COUNTY, NC, My Commission Expires November 20, 2023)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby declare under penalty of perjury under the laws of the State of Washington that on this date, I caused a true and correct copy of the foregoing document to be served on the following in the manner(s) indicated:

Mr. Steve Urvan
961 Fern Dr.
Delray Beach, FL 33483

*Defendant*

☐ Via E-Filing
☐ Via Legal Messenger
☐ Via Email
☒ Via U.S. Mail
☐ Via Fax

DATED this 22nd day of May, 2020 at Seattle, Washington.

_____
Nate Garberich

CERTIFICATE OF SERVICE

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500