IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GUNUP, INC.,                          :
                                      :
                                      :
        Plaintiff,                    :
                                      :
v.                                    :        CIVIL ACTION NO.
                                      :        1:20-CV-02340-LMM
                                      :
STEVE URVAN,                          :
                                      :
                                      :
        Defendant.                    :


## ORDER

This case comes before the Court on Defendant Steve Urvan's Motion to

Dismiss First Amended Complaint [16]. After due consideration, the Court enters

the following Order.

## I.    BACKGROUND

This case involves allegations of fraud stemming from a March 31, 2015

transaction ("the March 2015 Transaction") involving Plaintiff GunUp, Inc.

("GunUp") and Media Lodge, Inc. ("Media Lodge"), as well as other related

entities. See generally Dkt. No. [5]. Plaintiff alleges that Defendant Steve Urvan is

a member of the board of directors of Media Lodge and exercises considerable

control over its business activities. See id. ¶ 2. Of relevance to this suit, Plaintiff

alleges that Defendant "directed and was the final decision maker with regard to

the Transaction" and that "[h]is acts were a substantial factor in bringing about the Transaction, which he materially aided in directing, negotiating and consummating." Id.

The current suit is not the first that Plaintiff has filed regarding the March 2015 Transaction. On June 23, 2016, GunUp sued Media Lodge in the Superior Court of King County, Washington ("the Washington suit"), and, on October 23, 2017, filed its first amended complaint in that case. Id. ¶ 28. Among the causes of action listed in the Washington suit's first amended complaint, GunUp asserted a violation of the Washington State Securities Act ("WSSA") against Media Lodge and various other defendants, including Steve Urvan, all related to the March 2015 Transaction. See id.; see also Dkt. No. [16-2][1] at 2, 12. Urvan was never served in the Washington suit and did not make an appearance in that matter. Dkt. No. [5] ¶ 31. On October 26, 2018, the King County Superior Court granted summary judgment in favor of GunUp against Media Lodge and Jeff Siegel, Media Lodge's CEO, stating, *inter alia*, that Media Lodge and Siegel "made material misrepresentations . . . and failed to disclose material information to

---

[1] The Court may take judicial notice of the first amended complaint in the Washington suit without converting the motion to dismiss into a motion for summary judgment. See Horne v. Potter, 392 F. App'x 800, 802 (11th Cir. 2010) ("The district court properly took judicial notice of the documents in Horne's first case, which were public records that were not subject to reasonable dispute because they were capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned." (quotation marks and citations omitted)).

GunUp" and were "liable to GunUp for violating the Washington State Securities Act ("WSSA"), RCW 21.20.010(2), (3), and RCW 21.20.430(1), (3)." Id. ¶ 32. Following a trial on damages, judgment was entered in favor of GunUp against Media Lodge and Siegel, but that judgment "remains unpaid." Id. ¶ 33.

On December 12, 2019, Plaintiff filed suit against Defendant Urvan in the Superior Court of Cobb County, Georgia ("the Georgia suit"), again alleging liability under the WSSA for his role in the March 2015 Transaction. Dkt. No. [1-1] at 2. The initial complaint in the Georgia suit contained only one cause of action for Defendant's alleged violation of the WSSA. Id. at 9–10. On June 1, 2020, Defendant removed the case to this Court and, on June 8, 2020, moved to dismiss Plaintiff's initial complaint. Dkt. Nos. [1, 4]. Plaintiff did not respond to Defendant's first motion to dismiss and instead filed its First Amended Complaint on June 22, 2020. Dkt. No. [5]. Defendant's first motion to dismiss was therefore mooted. Dkt. No. [9].

Plaintiff's First Amended Complaint still alleges a violation of the WSSA, but it also now contains a claim for common law fraud. See Dkt. No. [5] ¶¶ 34–47. Defendant has moved to dismiss Plaintiff's First Amended Complaint pursuant to Rules 12(b)(5) and 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. [16].

## II. Rule 12(b)(5) and Insufficient Service of Process

Under Rule 12(b)(5), a defendant may move to dismiss due to insufficient service of process. Fed. R. Civ. P. 12(b)(5). Proper service of process is a jurisdictional requirement. Pardazi v. Cullman Med. Ctr., 896 F.2d 1313, 1317

(11th Cir. 1990). Accordingly, "the Court applies the standards for proof governing motions to dismiss for lack of personal jurisdiction." <u>Lowdon PTY Ltd. v. Westminster Ceramics, LLC</u>, 534 F. Supp. 2d 1354, 1360 (N.D. Ga. Jan. 25, 2008).

The defendant bears the initial burden of describing how service was defective. <u>See</u> <u>T-12 Entm't, LLC v. Young Kings Enter., Inc.</u>, 36 F. Supp. 3d 1380, 1391–92 (N.D. Ga. 2014). Once the defendant describes a defect in service, the plaintiff must make a prima facie showing of proper service by presenting "enough evidence to survive a motion for judgment as a matter of law." <u>Id.</u> (citing <u>Lowdon</u>, 534 F. Supp. 2d at 1360); <u>see also</u> <u>Meier v. Sun Int'l Hotels, Ltd.</u>, 288 F.3d 1264, 1269 (11th Cir. 2002) ("Where, as here, the defendant submits affidavits [contradicting Plaintiff's claim of proper service], the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction . . . ."). "If the plaintiff establishes a *prima facie* case, then the defendant, as the moving party, bears the burden of producing affidavits that, in a non-conclusory fashion, demonstrate the absence of service." <u>Lakeview Loan Servicing, LLC v. Mobley</u>, No. 1:16-CV-4572-MHC, 2017 WL 11358740, at *2 (N.D. Ga. Oct. 2, 2017).

"Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." <u>Meier</u>, 288 F.3d at 1269 (citing <u>Madara v. Hall</u>, 916 F.2d 1510, 1514 (11th Cir. 1990)); <u>see also</u> <u>Lakeview Loan Servicing</u>, 2017 WL 11358740, at

4

*2 ("[G]iven that the Court construes all reasonable inferences in favor of the plaintiff, the plaintiff's presentation of sufficient evidence to defeat a motion for directed verdict ends the inquiry favorably to the plaintiff."). "In resolving a motion for insufficiency of service of process, a court may make factual findings necessary to resolve the motion to dismiss." Mitchell v. Wash. Mut., No. 1:10-cv-3196-TCB-JFK, 2011 WL 13319193, at *2 (N.D. Ga. Mar. 9, 2011) (citing Bryant v. Rich, 530 F.3d 1368, 1376 (11th Cir. 2008)). "The Court may look to affidavits, depositions, and oral testimony to resolve disputed questions of fact." Hollander v. Wolf, 2009 WL 3336012, at *3 (S.D. Fla. Oct. 14, 2009).

Here, Defendant has challenged the sufficiency of service prior to removal.[2] Accordingly, the Court must look to Georgia law to determine whether service was sufficient. Rentz v. Swift Transp. Co., Inc., 185 F.R.D. 693, 696 (M.D. Ga. 1998) ("In actions removed from state court, the sufficiency of service of process prior to removal is determined by the law of the state from which the action was removed."); see also Ritts v. Dealers All. Credit Corp., 989 F. Supp. 1475, 1477 (N.D. Ga. 1997) ("Although this action is now in federal court, in analyzing Defendant's motion to dismiss for insufficiency of service of process, the court must examine whether Plaintiff complied with Georgia law governing process."

---

[2] Defendant argues that Plaintiff's attempted service on May 2, 2020, and May 8, 2020, were both insufficient. Dkt. No. [16-1] at 21. Defendant removed the case to federal court on June 1, 2020. Dkt. No. [1].

(citing <u>Usatorres v. Marina Mercante Nicaraguenses, S.A.</u>, 768 F.2d 1285, 1286 n.1 (11th Cir. 1985))).

Defendant maintains that Plaintiff failed to perfect service of process under O.C.G.A. § 9-11-4(e)(7) when attempting to serve Defendant on May 2, 2020, and May 8, 2020. Dkt. No. [16-1] at 21. O.C.G.A. § 9-11-4(e)(7) provides that service may be accomplished by delivering a copy of the summons and complaint "to the defendant personally, or by leaving copies thereof at the defendant's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein . . . ."

Defendant argues that service under O.C.G.A. § 9-11-4(e)(7) "requires directly communicating with the recipient about service." Dkt. No. [16-1] at 20–21. Defendant contends that service was insufficient in this case because "the process servers attempting to serve [Defendant] on May 2, 2020 and May 8, 2020 neither left papers with a resident nor communicated sufficiently with the person receiving the papers." <u>Id.</u> at 21. Defendant has not produced affidavits or other evidence supporting his contentions.

Beginning with the disputed service on May 2, 2020, Plaintiff argues that Defendant was properly served on this date via substitute service at his primary residence in Delray Beach, Florida. Dkt. No. [17] at 21–23. In support of this argument, Plaintiff cites a sworn declaration from its attorney, Duncan Manville, as well as a return of service that was executed by Plaintiff's process server. <u>See</u>

Dkt. Nos. [18, 18-9].[3] In the declaration, Manville asserts that Plaintiff learned on April 30, 2020, that Defendant was claiming his Delray Beach, Florida residence as his primary residence. See Dkt. No. [18] ¶¶ 60–61. The return of service states the following: (1) the process server effected substitute service on an individual named Luca Handsman, who is alleged to be residing at the Delray Beach residence; (2) the process server confirmed with a neighbor beforehand that Handsman resided at this location; (3) the process server communicated directly with Handsman after Handsman answered the door and identified himself; (4) Handsman closed the door after identifying himself, and the process server shouted through the door regarding the contents of the documents and that he was leaving them by the doorway for retrieval and delivery to Urvan. Dkt. No. [18-9] at 2. Based on the facts asserted in Manville's declaration and the return of service, Plaintiff argues that its "substitute service on Mr. Urvan via Mr. Handsman was proper." Dkt. No. [17] at 23.

The Court finds that Plaintiff has established a prima facie showing that service was sufficient on May 2, 2020. For one, Plaintiff's return of service is itself "*prima facie* evidence of proper service." Hollander, 2009 WL 3336012, at *3 (citing O'Brien v. R.J. O'Brien & Assocs., Inc., 998 F.2d 1394, at 1398 (7th Cir. 1993)). Georgia courts have also found that substitute service was proper under the circumstances described in the return of service filed by Plaintiff. See, e.g.,

---

[3] The return of service was filed in the original action in state court. See Dkt. No. [1-1] at 96–97.

Jacobson v. Garland, 487 S.E.2d 640, 643 (Ga. Ct. App. 1997) (explaining that substitute service was proper despite recipient closing the door and refusing to physically accept documents). Moreover, Defendant has not produced any evidence rebutting Plaintiff's evidence and factual assertions, nor does Defendant raise rebuttal arguments in his Reply. Accordingly, the Court finds that Plaintiff has established a prima facie showing of proper service of process and that Defendant's unsupported assertion of improper service "does not provide an adequate basis for dismissal of the [First] Amended Complaint."[4] Lakeview Loan Servicing, 2017 WL 11358740, at *3; see also Ullico Cas. Co. v. Scott & Sons Holdings, LLC, No. 1:11-cv-2261-WSD, 2013 WL 12233911, at *7–8 & n.10 (N.D. Ga. Jan. 17, 2013).

### III. Failure to State a Claim Under 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While this pleading standard does not require "detailed factual allegations," the Supreme Court has held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

---

[4] Because the Court finds that service of process was sufficient on May 2, 2020, it need not consider the sufficiency of service on May 8, 2020.

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id. (citing Twombly, 550 U.S. at 556).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1296 (11th Cir. 2011) (quoting Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006)). However, this principle does not apply to legal conclusions set forth in the complaint. Iqbal, 556 U.S. at 678.

Defendant argues that dismissal is warranted because GunUp lacks capacity to sue and that its various claims are time-barred and lack pleading specificity.

### A. GunUp's Capacity to Sue

Defendant argues that Plaintiff's First Amended Complaint should be dismissed under Rule 17 of the Federal Rules of Civil Procedure because Plaintiff lacks capacity to sue. Dkt. No. [16-1] at 10–13. Defendant cites GunUp's Delaware Entity Status Certificate and the Delaware.gov website to argue that GunUp's status was void as of March 1, 2015. Id. at 11 (citing Dkt. Nos. [16-4, 16-5]). Defendant's exhibit of the Delaware.gov webpage shows that GunUp's status was

"Void, AR's or Tax Delinquent" as of March 1, 2015.[5] Dkt. No. [16-5] at 2. In response, Plaintiff argues that GunUp's status has been revived such that it currently has capacity to sue.

Under Rule 17(b)(2), whether a corporation has capacity to sue or be sued is determined "by the law under which it was organized." Fed. R. Civ. P. 17(b)(2); see also Gas Pump, Inc. v. Gen. Cinema Beverages of N. Fla., Inc., 982 F.2d 478 (11th Cir. 1993). Here, Plaintiff GunUp was organized under Delaware law. See Dkt. No. [5] ¶ 1. Under Delaware law, "if any corporation . . . neglects or refuses for 1 year to pay the State any franchise tax or taxes, which has or have been, or shall be assessed against it, or which it is required to pay under this chapter . . . the charter of the corporation shall be void." 8 Del. C. § 510. However, "'in Delaware it has long been the law that a Delaware corporation is not dead for all purposes following forfeiture of its charter.' Indeed, 8 Del. C. § 312, provides for a method of reinstating corporate charters which have been forfeited." Boyd v. Wilmington Tr. Co., 630 F. Supp. 2d 379, 386 (D. Del. 2009) (alteration and

---

[5] "A district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment. Public records are among the permissible facts that a district court may consider." Universal Express, Inc. v. U.S. S.E.C., 177 F. App'x 52, 53 (11th Cir. 2006) (citations omitted). "District courts within this Circuit have taken judicial notice of online corporate records at the motion to dismiss stage." ACG S. Ins. Agency, LLC v. Safeco Ins. Co., No. 8:19-cv-528-T-36AAS, 2019 WL 8273657, at *4 (M.D. Fla. Dec. 16, 2019) (collecting cases); see also Tecnoglass, LLC v. RC Home Showcase Inc., 301 F. Supp. 3d 1267, 1270 n.1 (S.D. Fla. 2017) (explaining that corporate records publicly available on a state website are among the facts district courts may consider).

citation omitted) (quoting <u>Frederic G. Krapf & Son, Inc. v. Gorson</u>, 243 A.2d 713, 714–15 (Del. 1968)).

§ 312(e) provides the following regarding reinstatement of a corporation's charter:

> [R]evival shall validate all contracts, acts, matters and things made, done and performed within the scope of its certificate of incorporation by the corporation, its officers and agents during the time when its certificate of incorporation was forfeited or void pursuant to this title, or after its expiration by limitation, with the same force and effect and to all intents and purposes as if the certificate of incorporation had at all times remained in full force and effect.

8 Del. C. § 312(e). The Delaware Supreme Court has stated that "the performance of corporate acts following forfeiture is wrongful at the time, but the later reinstatement of the charter validates the corporate acts." <u>Frederic G. Krapf & Son</u>, 243 A.2d at 715. Other federal courts analyzing this issue have concluded that, upon reinstatement via § 312(e), a once-void corporation regains the ability to "prosecute actions on its behalf" and that "action taken while its charter was voided is ratified," including in instances in which a corporation filed suit while still void but later was reinstated and sought to maintain the suit.[6] <u>See</u> <u>V.E.C.</u>

---

[6] Defendant also maintains that because Plaintiff's corporate charter was void under § 512 as of March 1, 2015, Plaintiff only had capacity to sue or be sued for a maximum of three years from that date under Delaware law. Dkt. No. [16-1] at 12–13 (citing 8 Del. C. § 278). However, § 278 pertains to *dissolved* corporations. Other federal courts have observed that there is a distinction between void and dissolved corporations under Delaware law. <u>See, e.g.</u>, <u>Backyard Wrestling, Inc. v. Pro-Active Entertainment Group, Inc.</u>, 398 F. App'x 299, 300 (9th Cir. 2010) (addressing argument that limitations in § 278 applied to a void corporation and explaining that the entity was "not a dissolved corporation, but rather a once-void and now-renewed corporation. Under Delaware law, where a corporation was

Corp. of Del. v. Hilliard, No. 10 CV 2542(VB), 2011 WL 7101236, at *6 (S.D.N.Y. Dec. 13, 2011) (citations omitted); see also Backyard Wrestling, 398 F. App'x at 300; Admin. Servs. of N. Am., Inc. v. Hartford Fid. & Bonding Co., No. Civ.A. H-03-3949, 2005 WL 1994277, at *2 (S.D. Tex. Aug. 16, 2005).

Though Plaintiff does not appear to contest that its corporate charter was void, it instead argues that its charter has been revived. Dkt. No. [17] at 3. In support of Plaintiff's contention that its corporate charter has been revived, Plaintiff has filed a number of exhibits, including a printout of Delaware's website, Delaware.gov, showing GunUp with a status of "Good Standing" as of July 27, 2020. Dkt. No. [19-8] at 2. Plaintiff argues that, under Delaware law, revival of its corporate charter "cures any alleged lack of capacity under Rule 17." Dkt. No. [17] at 4.

As noted above, the Court may take judicial notice of public corporate records such as Plaintiff's exhibit of Delaware.gov showing GunUp's status of "Good Standing" as of July 27, 2020.[7] See Tecnoglass, 301 F. Supp. 3d at 1270

---

void but then renewed, it is as though the corporation was never void, and the corporation regains all of its previous rights, including capacity to sue" (citation omitted)).

[7] Defendant argues that Plaintiff has not made reference to any documents that "establish on their face that GunUp was revived pursuant to 8 Del. C. § 312." Dkt. No. [21] at 2. However, "8 Del. C. § 312[] provides for *a method* of reinstating corporate charters which have been forfeited." Boyd v. Wilmington Tr. Co., 630 F. Supp. 2d 379, 386 (D. Del. 2009) (emphasis added) (citing Frederic G. Krapf & Son, 243 A.2d at 714–15). Thus, the relevant issue is that Delaware's online corporate records indicate that Plaintiff's corporate charter is no longer void. Compare Dkt. No. [16-5] at 2 (showing GunUp's status as "Void, AR's or Tax

n.1. Accordingly, the Court is satisfied that Plaintiff has revived its corporate charter and has capacity to maintain this suit. See <u>V.E.C. Corp. of Del.</u>, 2011 WL 7101236, at *6; <u>Admin. Servs. of N. Am., Inc.</u>, 2005 WL 1994277, at *2.[8]

## B. Plaintiff's Causes of Action

In the First Amended Complaint, Plaintiff asserts two causes of action against Defendant: (1) violation of the WSSA and (2) common law fraud. Dkt. No. [5] ¶¶ 34–47. Defendant argues that (1) Plaintiff's claim under the WSSA is time-barred; (2) Plaintiff has failed to properly plead a common law fraud claim under Georgia law; and (3) both claims fail to meet Rule 9(b)'s specificity requirements. Dkt. No. [16-1] at 13–20, 21–25.

### 1. Whether Plaintiff's WSSA Claim is Time-Barred

Plaintiff's First Amended Complaint alleges a violation of the WSSA. Plaintiff alleges that Defendant is liable under the WSSA pursuant to Wash. Rev.

---

Delinquent" as of March 1, 2015) <u>with</u> Dkt. No. [19-8] at 2 (showing GunUp's status as "Good Standing" as of July 27, 2020).

[8] Defendant has also argued that Plaintiff's status at the time of the March 2015 Transaction bars its potential recovery under the WSSA: "[Plaintiff] was not properly a legal person with any powers to conduct business, so the WSSA's plain terms cannot afford it relief." Dkt. No. [16-1] at 13. Defendant does not cite any authority supporting this proposition, and, as Plaintiff argues, the language of § 312, as well as Delaware case law, suggests that Plaintiff may recover under the WSSA based on the alleged fraud from the Transaction because revival of a corporate charter under § 312 "validate[s] all contracts, acts, matters and things made, done and performed . . . during the time when its certificate of incorporation was forfeited or void . . . as if the certificate of incorporation had at all times remained in full force and effect." 8 Del C. § 312(e); <u>see also</u> <u>Frederic G. Krapf & Son</u>, 243 A.2d at 715.

Code §§ 21.20.010, 21.20.430(1), and 21.20.430(3). Dkt. No. [5] ¶¶ 35–39.

Plaintiff's WSSA claim is governed in this case by the Georgia Uniform Securities

Act's statute of limitations, O.C.G.A. § 10-5-58(j)(2).[9] O.C.G.A. § 10-5-58(j)(2)

provides that a claim for securities fraud must be "instituted within the earlier of

two years after discovery of the facts constituting the violation or five years after

the violation occurred." Defendant argues that Plaintiff's WSSA claim is time-

barred under either the two-year or five-year window provided in § O.C.G.A. 10-

5-58(j)(2). Dkt. No. [16-1] at 16–20.

"A statute of limitations bar is 'an affirmative defense, and . . . plaintiffs[s]

[are] not required to negate an affirmative defense in [their] complaint." La

Grasta v. First Union Secs., Inc., 358 F.3d 840, 845 (11th Cir. 2004) (alteration in

original) (citations omitted). "[D]ismissal on statute of limitations grounds is

appropriate only if it is apparent from the face of the complaint that the claim is

time-barred." Id. (quotation marks and citations omitted).

---

[9] "A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state." Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc., 485 F.3d 1233, 1240 (11th Cir. 2007) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). "The general rule in Georgia is that statutes of limitation are procedural in nature and are therefore governed by the law of the forum state." Butts v. Thomas, 686 S.E.2d 262, 263 (Ga. Ct. App. 2009) (citing Hunter v. Johnson, 376 S.E.2d 371 (Ga. 1989)). In this case, the Georgia Uniform Securities Act's statute of limitations, O.C.G.A. § 10-5-58(j)(2), governs Plaintiff's WSSA because the WSSA's limitation period under Wash. Rev. Code § 21.20.430(4)(b) is longer than Georgia's. See Garland v. Advanced Med. Fund, L.P. II, 86 F. Supp. 2d 1195, 1205–07 (N.D. Ga. 2000); see also Auld v. Forbes, 848 S.E.2d 876, 879–80 (Ga. 2020). Both parties agree that O.C.G.A. § 10-5-58(j)(2) applies to Plaintiff's WSSA claim.

Defendant's first argument is that Plaintiff's WSSA claim is time-barred under O.C.G.A. § 10-5-58(j)(2)'s two-year "discovery" provision "[b]ecause [Plaintiff] was on notice of its WSSA claim over two years before it filed this case on December 12, 2019[] . . . ." Dkt. No. [16-1] at 19. In essence, Defendant notes that Plaintiff filed its first amended complaint in the Washington suit on October 23, 2017, and argues that Plaintiff's claim is time-barred because Plaintiff "named the same defendant in the same cause of action based on the same underlying transaction as here." Id. at 17.

In response, Plaintiff argues that its WSSA claim is not barred by the two-year provision. Dkt. No. [17] at 12–15. Plaintiff relies heavily on the Supreme Court's decision in Merck & Co., Inc. v. Reynolds, 559 U.S. 633 (2010), arguing that its WSSA cause of action did not accrue until it acquired "actual knowledge of the 'facts constituting the violations,' including all the elements of the claim, or until such time as a reasonably diligent plaintiff would have gained that knowledge." Id. at 13–14. Plaintiff argues that though it could infer as of October 23, 2017—the date when the first amended complaint was filed in the Washington suit—that material misrepresentations had been made in the Transaction, Plaintiff had in fact "not discovered facts constituting the WSSA violation" at that time and thus the statute of limitations had not begun to run. See Dkt. Nos. [5] ¶¶ 28–30; [17] at 15.

Defendant argues that the relevant inquiry is "whether a plaintiff has notice that it can *allege* a viable claim" and that "[Plaintiff] had all the allegations

it needed for its WSSA claim against Media Lodge and its affiliated individuals in October 2017 and needed no inference of scienter to plead its claim." Dkt. No. [21] at 4, 7–8.

Construing Plaintiff's assertions in its favor, it appears that Plaintiff alleges and argues that, despite learning that the shares of Media Lodge it had received in the Transaction were "worthless," it did not learn until months later that Media Lodge had in fact engaged in a fraudulent or deceitful act—that is, material misrepresentations or omissions—related to the Transaction.[10] <u>See</u> Dkt. No. [17] at 14–15. The problem, of course, is that Plaintiff did, in fact, assert its WSSA claim against Urvan in the first amended complaint in the Washington suit.[11]

In <u>Merck</u>, the Supreme Court addressed the two-year discovery provision in 28 U.S.C. § 1658(b), the statute of limitation for federal securities claims brought under § 10(b) of the Securities Exchange Act of 1934. As the parties acknowledge, 28 U.S.C. § 1658(b) is materially identical to O.C.G.A. § 10-5-

---

[10] In making this argument, Plaintiff relies on reasoning from <u>Merck</u> regarding discovery of scienter or scienter-related facts relevant to a § 10(b) claim. <u>See</u> Dkt. No. [17] at 14–15 (citing <u>Merck</u>, 559 U.S. at 649–50).

[11] It is an undisputed fact that Plaintiff filed its first amended complaint in the Washington suit on October 23, 2017. In that first amended complaint, Plaintiff alleged, *inter alia*, that the named defendants, including Urvan, made various material misrepresentations and omissions in connection with the Transaction and were liable under the WSSA pursuant to Wash. Rev. Code §§ 21.20.010, 21.20.430(1), and 21.20.430(3). Dkt. No. [16-2] at 10, 12–13; ¶¶ 32–35, 45–49. As previously noted, the Court may take judicial notice of Plaintiff's first amended complaint in the Washington suit. <u>See</u> <u>Horne</u>, 392 F. App'x at 802.

58(j)(2): similar to O.C.G.A. § 10-5-58(j)(2), 28 U.S.C. § 1658(b) provides that a cause of action "may be brought not later than the earlier of[] (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."[12] In interpreting § 1658(b)(1)'s two-year discovery provision, the Supreme Court held that "a cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation—whichever comes first." Merck, 559 U.S. at 637. The Supreme Court provided further explanation for its holding:

> In determining the time at which 'discovery' of those 'facts' occurred, terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter— irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.

Id. at 654.

However, with regard to the scienter element and discovery of scienter-related facts, a plaintiff alleging a violation under § 10(b) need only show "that it is 'at least as likely as' not that the defendant acted with the relevant intent." See

---

[12] When a Georgia statute is modeled on or closely similar to a federal counterpart, courts may look to federal authority interpreting the federal provision for guidance. See, e.g., Cox v. Mayan Lagoon Ests., Ltd., 734 S.E.2d 883, 890 (Ga. Ct. App. 2012); see also Howell v. QS of Ga., LLC, No. 1:06-cv-479-TCB, 2007 WL 9702215, at *6 (N.D. Ga. Mar. 12, 2007) ("Because the Georgia RICO statue is modeled upon the federal RICO statute, the Court can look to federal authority for guidance." (citing Maddox v. Eng'g Co., 500 S.E.2d 591, 594 (Ga. Ct. App. 1998))).

id. at 649; See also 100079 Can., Inc. v. Stiefel Lab'ys, Inc., 596 F. App'x 744, 748 (11th Cir. 2014) (same). The Eleventh Circuit has provided the following clarification on this point:

> Therefore, even if Appellant did not in fact discover the information necessary to plead each element of a proper complaint, as long as a reasonably diligent plaintiff would have had sufficient information to adequately plead an effective complaint more than two years prior to when this action was commenced, Appellant's claim would still be time barred.

100079 Can., 596 F. App'x at 748 (discussing Merck).

Applying this reasoning to Plaintiff's arguments regarding its WSSA claim, Plaintiff would have only needed sufficient information to show that it was "at least as likely as not[,]" Merck, 559 U.S. at 649 (quotation marks omitted), that a fraudulent or deceitful act—such as a material misrepresentation or omission—occurred, such that Plaintiff could "adequately plead an effective complaint." 100079 Can., 596 F. App'x at 748. In this case, Plaintiff learned from Media Lodge's attorney that the stock Plaintiff received from the March 2015 Transaction was, in fact, worthless, and Plaintiff thereafter filed its first amended complaint in the Washington suit, alleging violations of the WSSA. Dkt. No. [5] ¶¶ 25, 28–29. In that first amended complaint, Plaintiff alleged that Media Lodge and the other named defendants—including Defendant Urvan—had made various "[m]aterial [m]isrepresentations and [o]missions" regarding the value of the stock and the overall value of certain entities involved in the Transaction. Dkt. No. [16-2] at 10, ¶¶ 32–35, 47–49. Plaintiff also alleged that Urvan was a member

of the board of directors of Media Lodge and that "his acts were a substantial factor in bringing about the Transaction, which he materially aided in negotiating and consummating." Id. at 3, ¶¶ 4, 47. Although Plaintiff has added some additional information to the First Amended Complaint in this case, the allegations and WSSA claim are fundamentally similar in nature. See Dkt. No. [5] ¶¶ 2, 24–26, 35–39.

Thus, though Plaintiff had sufficient information as of October 23, 2017, to file an amended complaint alleging that the named defendants in the Washington suit, including Defendant Urvan, made or participated in material misrepresentations or omissions in connection with the March 2015 Transaction and were liable under the WSSA, Plaintiff here simultaneously maintains that the facts it had were insufficient for the statute of limitations to begin running on the WSSA claim asserted at that time against Defendant Urvan. See Dkt. Nos. [5] ¶ 29; [17] at 14–15. The Court cannot accept this incongruity. Accordingly, the Court finds that Plaintiff's WSSA claim is time-barred under O.C.G.A. § 10-5-58(j)(2)'s two-year provision because Plaintiff filed the present action more than two years after filing the first amended complaint in the Washington suit with a similar claim.[13]

---

[13] Because the Court finds that Plaintiff's WSSA claim is time-barred under O.C.G.A. § 10-5-58(j)(2)'s two-year provision, the Court does not need to reach Defendant's argument that this claim is alternatively barred under the five-year provision. See Dkt. No. [16-1] at 19–21.

## 2. Plaintiff's Common Law Fraud Claim

Plaintiff's second cause of action is for common law fraud. Dkt. No. [5] ¶¶ 40–47. Defendant argues that this claim should be dismissed because Plaintiff has failed to plead certain elements of fraud under Georgia law. Dkt. No. [16-1] at 13–14.

As an initial matter, the parties dispute whether Georgia or Washington law applies to Plaintiff's common law fraud claim. See Dkt. Nos. [16-1] at 13–14; [17] at 6; [21] 10–11. While Defendant maintains that Georgia law applies to this common law cause of action, Plaintiff argues that Washington law should apply according to the doctrine of *lex loci delicti*. Dkt. No. [17] at 6.

"A federal court sitting in diversity must apply the conflict-of-laws rules of the forum state." Grupo Televisa, 485 F.3d at 1240. The Georgia Supreme Court has explained that "where a claim in a Georgia lawsuit is governed by the common law, and the common law is also in force in the other state, . . . the common law as determined by Georgia's courts will control." Coon v. Med. Ctr., Inc., 797 S.E.2d 828, 829 (Ga. 2017). Plaintiff has alleged a claim for common law fraud, so Georgia law applies to this claim. See id.; see also Nationwide Prop. & Cas. Ins. Co. v. Renaissance Bliss, LLC, 823 F. App'x 815, 823 (11th Cir. 2020) (noting that Georgia's conflict-of-laws rules "decline to apply the common law of other jurisdictions").

Under Georgia law, "[t]he tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or

refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff."
Crawford v. Williams, 375 S.E.2d 223, 224 (Ga. 1989) (citations omitted).
Defendant argues that Plaintiff (1) "fails to plead that [Defendant] acted with
scienter or intended to induce Media Lodge to act or refrain from acting" and (2)
"fails to plead loss causation."[14] Dkt. No. [16-1] at 14.

Plaintiff's arguments in response focus solely on the relevant elements of a
fraud claim under Washington law.[15] Dkt. No. [17] at 7. Nevertheless, Plaintiff
argues that the First Amended Complaint "alleges that Media Lodge and its
agents engaged in material misrepresentations and omissions that induced
GunUp to enter into the Transaction, and that Mr. Urvan knowingly participated
in and directed these misrepresentations and omissions." Id. Plaintiff contends
that the First Amended Complaint "describes in detail the representations and
omissions of Media Lodge and its representatives," knowledge of the falsity of
these representations, Plaintiff's reliance on these representations, and damages.
Id. at 8.

---

[14] To the extent Defendant argues that Plaintiff failed to plead that Urvan
"intended to induce Media Lodge to act or refrain from acting," it is unclear why
this is relevant given that the required element is "intention to induce the
plaintiff to act or refrain from acting." Dkt. No. [16-1] at 14; Crawford, 375 S.E.2d
at 224. GunUp, not Media Lodge, is the plaintiff, and so the Court does not
consider whether Urvan is alleged to have induced Media Lodge to act or refrain
from acting.

[15] The Court finds that the elements as articulated under Georgia and Washington
law overlap sufficiently such that the Court can consider whether Plaintiff's
allegations are sufficient under Georgia law.

To begin, the Court notes that, under Georgia law, "one who knowingly participates in a fraud may be liable for the fraud." <u>Siavage v. Gandy</u>, 829 S.E.2d 787, 790 (Ga. Ct. App. 2019) (alteration and quotation marks omitted). Turning to the scienter element, Plaintiff alleges that Media Lodge made various material misrepresentations and omissions to Plaintiff in connection with the Transaction and that Defendant Urvan "participated in [the alleged] misrepresentations[] [and] had knowledge of them[] . . . ." Dkt. No. [5] ¶¶ 26–27. The Court finds that these allegations satisfy the scienter element of Plaintiff's fraud claim. <u>See</u> <u>Dasher v. Davis</u>, 618 S.E2d 728, 730 (Ga. Ct. App. 2005) (quotation omitted) (describing scienter as "knowledge of the alleged falsehood").

Defendant also contends that Plaintiff has failed to plead loss causation. Dkt. No. [16-1] at 14. It is unclear that loss causation is a discrete element of a common law fraud claim so much as it is a requirement that a plaintiff prove that his or her damages or losses were proximately caused by the fraud. <u>See</u> <u>Holmes v. Grubman</u>, 691 S.E.2d 196, 200 (Ga. 2010) (discussing loss causation and proximate cause and stating that "in order to recover in tort for fraud, the plaintiff must prove that he sustained loss or damage as the proximate result of the alleged misrepresentations"). Regardless, Plaintiff has pled that it "has been damaged as a direct and proximate result of Media Lodge's material misrepresentations and omissions" and also that Defendant Urvan (1) participated, directed, or "was a substantial factor" in "the making of such material misrepresentations to [Plaintiff]" and (2) "is therefore liable to

22

[Plaintiff] for the damages that [Plaintiff] has suffered as a result of the misrepresentations or omissions."[16] Dkt. No. [5] ¶¶ 46–47. The Court finds that Plaintiff has adequately alleged that its losses were proximately caused by Media Lodge and Defendant Urvan and that "the content of the alleged misstatements . . . caused the financial harm actually suffered by [Plaintiff]." <u>Greenwald v. Odom</u>, 723 S.E.2d 305, 318 (Ga. Ct. App. 2012). Accordingly, and for the reasons discussed, the Court finds that Plaintiff has pled scienter and loss causation.

### 3. Whether Plaintiff's Fraud Claim Fails Under Rule 9(b)

Finally, Defendant argues that Plaintiff has failed to plead fraud sufficiently under Rule 9(b),[17] which requires that a complaint "state with particularity the circumstances constituting fraud or mistake," though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Whether the "allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b)" is evaluated "on a case-by-case basis." <u>U.S. ex rel. Atkins v. McInteer</u>, 470 F.3d 1350, 1358 (11th Cir. 2006). Rule 9(b) is satisfied if the complaint sets forth

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of

---

[16] Plaintiff also alleges that Defendant did not make certain payments or stock distributions under the parties' agreement in 2016 or 2017 and that Plaintiff's Media Lodge shares "were worthless." Dkt. No. [5] ¶¶ 21–23.

[17] Because the Court has determined that Plaintiff's WSSA claim is time-barred, the Court's analysis in this section pertains to Plaintiff's remaining claim for common law fraud.

omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

FindWhat, 658 F.3d at 1296. "[U]nder Rule 9(b), it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008).

Defendant argues that Plaintiff's allegations against him are overly generalized and do not properly alert him of his exact alleged misconduct. Dkt. No. [16-1] at 22–23. Defendant also maintains that Plaintiff's fraud claim fails because it does not articulate "what Urvan obtained as a consequence of the fraud." Id. at 24. Finally, Defendant argues that, to the extent Plaintiff alleges that Urvan "directed all misrepresentations or omissions made by Media Lodge," Plaintiff has failed to plead Media Lodge's fraud because the First Amended Complaint "fail[s] to specify the time and place" or the person responsible for the alleged misrepresentations or omissions. Id.

In response, Plaintiff argues that the allegations in the First Amended Complaint are "more than enough to put Mr. Urvan on notice of the nature of the fraud claim asserted against him." Dkt. No. [17] at 8. The Court agrees. First, it is clear that Plaintiff's allegations all relate to the March 2015 Transaction and negotiations and communications related to it. In multiple paragraphs, Plaintiff details various alleged misrepresentations or omissions by Media Lodge involving the Transaction. Dkt. No. [5] ¶¶ 24–26. These allegations include seven

sub-paragraphs that describe in further detail some of these alleged misrepresentations or omissions, including the documents in which some of these misrepresentations or omissions were made. Id. ¶¶ 26(a)–(g). It is also clear that Plaintiff alleges that Defendant was an active participant in these allegedly fraudulent acts involving the Transaction because Plaintiff has pled that "Mr. Urvan directed and was the final decision maker with regard to the Transaction," was "actively involved in Media Lodge's acquisition of GunUp Publishing," "materially aided in directing, negotiating and consummating" the Transaction, and "participated in the foregoing misrepresentations." Id. ¶¶ 2, 26–27, 47. It is also reasonably inferable from the First Amended Complaint that Media Lodge and Urvan, to the extent he is alleged to be closely involved with Media Lodge, were able to proceed with an agreement that otherwise might not have been completed but for the alleged misrepresentations and omissions. Id. ¶¶ 44–45.

Though some of Plaintiff's allegations do not provide precise times and places of certain alleged misrepresentations, "[r]ule 9(b) exists to prevent spurious charges and provide notice to defendants of their alleged misconduct, not to require plaintiffs to meet a summary judgment standard before proceeding to discovery." U.S. ex rel. Longest v. Dyncorp, No. 603CV16ORL31JGG, 2006 WL 47791, at *5 (M.D. Ga. Jan. 9, 2006). The Court finds that Defendant has notice of the activities he is alleged to have participated in regarding the March 2015 Transaction. For these reasons, the Court concludes that Plaintiff's First

Amended Complaint should not be dismissed for lack of specificity at this stage in the litigation.

## IV. CONCLUSION

In accordance with the foregoing, Defendant Steve Urvan's Motion to Dismiss First Amended Complaint [16] is **GRANTED IN PART and DENIED IN PART**. Plaintiff's WSSA claim in the First Amended Complaint is **DISMISSED**. However, Defendant's Motion is **DENIED** as to Plaintiff's claim for common law fraud.

**IT IS SO ORDERED** this 24th day of February, 2021.

**Leigh Martin May**
**United States District Judge**